# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | |
|---|---|
| EASTWOOD ENTERPRISES, LLC Individually and on Behalf of All Others Similarly Situated, | Case No.: 8:07-cv-1940-T-33EAJ |
| Plaintiff, vs. | CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |
| TODD S. FARHA, PAUL L. BEHRENS, THADDEUS BEREDAY, and WELLCARE HEALTH PLANS, INC. | **JURY TRIAL DEMANDED** |
| Defendants. | |

## CONSOLIDATED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

I.   NATURE AND SUMMARY OF THE ACTION ............................................................ 2

II.  JURISDICTION AND VENUE .................................................................................... 9

III. PARTIES ................................................................................................................... 10

IV.  LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS ........................................... 13

V.   BACKGROUND FACTS AND THE NATURE OF THE FRAUD ............................... 15

     A.   WellCare's Meteoric Rise ................................................................................ 16

     B.   Defendants' Fraudulent Scheme ....................................................................... 18

          1.   Defendants Falsified the Proportion of Government Premiums that
              WellCare Spent on Direct Medical Services ........................................... 18

          2.   Illegal Marketing Practices and Denials of Care .................................... 27

          3.   As Analysts and Commentators Questioned WellCare's Financial
              Statements and Marketing Practices, the Company Vehemently
              Denied Any Improprieties........................................................................ 32

          4.   The State and Federal Governments Execute an Unprecedented
              Raid of WellCare .................................................................................... 39

          5.   Subsequent Events Confirm that: (a) the Company Intentionally
              Defrauded the Government; (b) the Company's Financial
              Statements Were Materially Misstated throughout the Class
              Period; and (c) Defendants Farha, Behrens, and Bereday Were
              Responsible for the Fraud ....................................................................... 43

VI.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................... 49

     A.   False And Misleading Statements Concerning Fiscal Year 2004........................ 50

     B.   False And Misleading Statements Concerning Fiscal Year 2005........................ 54

     C.   False And Misleading Statements Concerning Fiscal Year 2006........................ 60

     D.   False And Misleading Statements Concerning Fiscal Year 2007........................ 66

VII. WELLCARE'S FINANCIAL STATEMENTS WERE MATERIALLY
     MISSTATED IN VIOLATION OF GAAP.................................................................... 77

     A.   WellCare Improperly Recognized Revenue That It Had Not Earned.................. 79

  B. WellCare Failed To Take A Charge To Income For The Premiums It Was Required To Refund To The States ....................................................... 80

  C. The Company's GAAP Violations Were Material ............................... 81

VIII. ADDITIONAL SCIENTER ALLEGATIONS ................................................. 82

  A. Defendants' Insider Stock Sales ........................................................ 84

  B. Defendants' Bonuses ........................................................................ 94

IX. LOSS CAUSATION ............................................................................... 96

X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ................................................................................ 97

XI. NO SAFE HARBOR ............................................................................... 98

XII. FIRST CLAIM ....................................................................................... 99

XIII. SECOND CLAIM .................................................................................. 103

XIV. THIRD CLAIM ..................................................................................... 105

XV. PRAYER FOR RELIEF .......................................................................... 106

XVI. JURY TRIAL DEMANDED .................................................................... 107

Court-appointed Lead Plaintiffs, the New Mexico State Investment Council, the Public Employees Retirement Association of New Mexico, the Teachers' Retirement System of Louisiana, the Policemen's Annuity and Benefit Fund of Chicago, and the Public School Teachers' Pension & Retirement Fund of Chicago (collectively, the "Public Pension Funds Group" or "Lead Plaintiffs"), by their undersigned attorneys, bring this action on behalf of themselves and all other similarly situated purchasers of the common stock of WellCare Health Plans, Inc. ("WellCare" or the "Company") between February 14, 2005, and October 25, 2007, inclusive (the "Class Period").

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, based on the investigation of counsel.  The investigation of counsel is predicated upon, among other things, review and analysis of  (i) documents filed publicly by WellCare with the Securities and Exchange Commission (the "SEC"); (ii) press releases, news articles, and other public statements issued by or concerning WellCare and other Defendants named herein; (iii) research reports issued by financial analysts concerning WellCare's securities and business; (iv) other publicly-available information and data concerning WellCare and its securities, including information concerning investigations of WellCare by, among others, the Federal Bureau of Investigation ("the FBI"), the U.S. Department of Justice, the U.S. Department of Health and Human Services, the SEC, and the States of Florida and Connecticut; and (v) interviews of numerous former WellCare employees.

As described below, WellCare has already confirmed many of this Complaint's allegations of fraud in a July 21, 2008 press release and Form 8-K, in which it announced that it would restate its financial results from 2004 through the first half of 2007 because it had, at the

direction of its senior management, improperly retained at least $46.5 million of Medicaid funds it owed to the States of Florida and Illinois.  However, the Company has also announced that its Special Committee is continuing to investigate the alleged fraud, and that the Company will not file its 2007 Form 10-K (or finalize the restatement) until that investigation is complete.  Further, the U.S. Attorney's Office for the Middle District of Florida and the SEC are continuing their own investigations into the alleged fraud.

Accordingly, Lead Plaintiffs believe that key information relevant to Lead Plaintiffs' allegations will be disclosed in WellCare's 2007 Form 10-K and the Special Committee's pending report.  Thus, on August 8, 2008, Lead Plaintiffs requested leave to file this Complaint after the Company filed its 2007 Form 10-K.  In an Order dated August 11, 2008, the Court set a deadline of October 31, 2008 for the filing of this Complaint.  Lead Plaintiffs are filing this Complaint pursuant to that Order, but respectfully reserve their right to seek leave to amend once the Company files its 2007 Form 10-K, the Special Committee issues its final report, or when the results of the various government investigations into WellCare become public.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      This is a case about a managed health care company that misappropriated Medicaid funds in order to artificially inflate its publicly reported income and its stock price.

2.      WellCare provides managed care services to Medicaid and Medicare recipients. The Company became a darling of Wall Street by reporting blockbuster financial results in an industry with notoriously low profit margins and government-imposed profit caps.  Throughout the Class Period, WellCare exceeded analysts' earnings expectations every quarter and year. Fueled by these record earnings, WellCare's stock price increased 222% during the Class Period. Significantly, WellCare claimed that it achieved these results while complying with all laws that

governed its highly-regulated industry—compliance that it acknowledged was a "prerequisite to achieving [its] business goals."

3.    In reality, however, WellCare's assurances of legal compliance were false, and the Company's strong financial results were the product of fraud. Throughout the Class Period, WellCare was legally required either to spend a certain percentage of its government Medicaid revenue on direct medical services, or, if it failed to do so, to refund the unspent money to the states with which it contracted. However, rather than comply with those requirements, WellCare devised a scheme to retain the unspent Medicaid premiums that it was legally required to return to the states, and to book those unspent premiums as "profits." The Company principally accomplished this scheme in two steps. First, WellCare shifted the unspent funds to a wholly-owned subsidiary domiciled in the Cayman Islands, ostensibly to purchase reinsurance. In reality, these reinsurance "purchases" were shams designed to allow the Company to hide its profits from state regulators. Second, in WellCare's filings with state regulators, the Company disguised these purported "reinsurance payments" as direct medical costs spent on patient care. The end result was that, in the Company's state regulatory filings, the Company appeared to have spent the required percentage of its premiums on medical care, so that it did not have to refund any premiums to the states.

4.    While WellCare was deceiving state regulators as to the Company's costs, it was simultaneously reporting large profits to investors in its SEC filings. WellCare did so by consolidating the results of its Cayman Islands reinsurer in its own financial statements (which WellCare did not do in its state regulatory filings). This allowed WellCare to book as profits the unspent premiums it had shifted to its offshore subsidiary, when WellCare was legally obligated to return those premiums to various state governments.

5.      WellCare gained two major benefits from this fraud.  First, WellCare retained at least $46.5 million that it was supposed to refund to the States of Florida and Illinois, which enabled WellCare to report results that typically exceeded analysts' expectations and artificially inflated the Company's stock price.  Second, the scheme allowed WellCare to receive a series of generous annual premium rate increases from the states, which substantially boosted its revenues and earnings.  This was because the states with which WellCare contracted set premium rates each year based on the amount of money that the Company spent on medical care—and the more money WellCare reported it had spent on direct medical services, the greater the increase tended to be.

6.      WellCare engaged in two additional fraudulent courses of conduct that furthered the scheme described above.  First, the Company employed illegal marketing practices to enlist new members.  Because the Company was paid a flat rate per enrolled member, this conduct inflated its revenues and income.  Second, WellCare illegally denied its members basic medical services, which allowed it to retain an artificially high percentage of its revenue as profit.  The net effect of this conduct was to leave the Company flush with excess cash—which it then shifted to its Cayman Islands reinsurance subsidiary to hide from the states.

7.      This scheme enabled WellCare to report financial results which made it appear as if the Company was performing better than its competitors.  As analysts noted throughout the Class Period, the Company's stock price rose sharply on the strength of WellCare's purported ability "to generate margins so much higher than its peers" and its "historical pattern of beating consensus estimates and raising its guidance."  Defendants Todd Farha (the Company's Chief Executive Officer), Paul Behrens (the Company's Chief Financial Officer) and Thaddeus Bereday (the Company's General Counsel and Chief Compliance Officer) capitalized on the

Company's artificially inflated stock for enormous personal gain.  During the Class Period, they sold approximately 1.47 million of their personally-held WellCare shares for proceeds of approximately $90.25 million.

8.      Beginning in March 2007, analysts began to question WellCare's strong financial results and ability to consistently outperform its competitors.  For example, CIBC World Markets reported that there appeared to be a discrepancy in WellCare's direct medical spending as set forth in its state regulatory filings and its SEC filings, and stated that "this discrepancy . . . is driven by WellCare's use of reinsurance and affiliate companies."  Then, in April 2007, Goldman Sachs intimated that WellCare was shifting profits to its Cayman Islands reinsurance subsidiary to hide from Florida regulators its failure to spend enough of its government premiums on direct medical services.  In response, Defendants WellCare, Farha, and Behrens vehemently denied the allegations, accusing the analysts of "sensationaliz[ing] routine information to generate trading volume and profit," and unequivocally asserting that the reinsurance transactions were "legal."

9.      At the same time, reports began emerging about WellCare's illegal marketing practices.  In May 2007, *The New York Times* reported that the Centers for Medicare and Medicaid Services ("CMS") had determined that WellCare employed widespread illegal marketing practices to gain enrollment in the Company's plans, including forging enrollment signatures and signing up dead people.  In response, Defendant Farha denied that systematic marketing abuses were occurring and touted the Company's purported "zero tolerance" policy and "strict" adherence to its "best-in-class" compliance program.

10.     Defendants' scheme unraveled on October 24, 2007, when approximately 200 armed federal and state agents swarmed WellCare's Tampa headquarters in a raid that

specifically targeted Defendants Farha, Behrens, and Bereday.  The raid was unprecedented in the managed healthcare industry in terms of its size, scope, and show of force.  The Government deliberately timed the raid to coincide with a meeting of WellCare's Board of Directors, and, when the raid began, several agents headed directly to the Company's third-floor boardroom and took seven directors, including Defendant Farha, off-site for several hours of questioning.  The agents seized Defendants Farha' and Behrens' computers as well as hundreds of documents from their offices that were directly related to the fraud described herein.

11.     The Company's stock price cratered on news of the raid, falling from approximately $122 per share on October 23, 2007 to approximately $42 per share on October 25, 2007—an astonishing drop of $80 per share, or 66%.  In total, the precipitous decline in WellCare's common stock wiped out approximately $3 billion in market capitalization.

12.     Subsequent events have confirmed that (a) WellCare intentionally defrauded the States of Florida and Illinois out of at least $46.5 million in Medicaid premiums, and (b) Defendants Farha, Behrens, and Bereday either knew of, or recklessly disregarded, this fraudulent scheme.  On December 21, 2007, Gregory West, a former WellCare Finance Manager who was responsible for reporting the Company's medical expense data to the State of Florida, pled guilty to conspiracy to falsify that data.  In his plea agreement, West admitted that, beginning in "early 2004," he and others at WellCare engaged in a conspiracy to "reduce [WellCare's] contractual payback obligations to [Florida] . . . and thereby correspondingly benefit [WellCare] through an increase in profits."  West explained that he did so by "falsely and fraudulently inflat[ing]" the Company's Medicaid expense data in reports to the State of Florida through a variety of means, including by "creating a wholly-owned entity," (referring to the Company's reinsurance subsidiary), "and then using said entity to conceal and falsely and

fraudulently inflate" the Company's medical expenses.  Significantly, West's plea agreement specifically provided that West acted "at the direction of one or more [WellCare] officers," and that WellCare's "officers and employees engaged in meetings and other conduct in a concerted and organized effort to conceal and cover-up the false and fraudulent nature of [WellCare's] various [medical] expenditure information."  As alleged herein, former WellCare employees have confirmed that West's immediate supervisors were Peter Clay, Vice President of Medical Economics, and Defendant Behrens.  The Federal Government's criminal investigation is ongoing, and West continues to cooperate fully in that investigation.

13.     Further, as set forth below, former WellCare employees have confirmed that they attended meetings with Defendants Farha and Behrens at which those Defendants instructed them, and other employees, to falsify the Company's medical expense data in reports to the State of Florida, for the specific purpose of evading WellCare's refund obligations and artificially inflating its publicly reported financial results.

14.     Moreover, the Company itself has confirmed that Defendants Farha, Behrens, and Bereday orchestrated the fraudulent scheme.  After the raid, the Company formed a Special Committee to investigate the matters alleged herein.  In January 2008, the Company announced that it had received the Special Committee's preliminary report and remedial recommendations, and that as a result of those findings, Defendants Farha, Behrens, and Bereday had immediately "resigned" without explanation.  Pursuant to their employment agreements, their "resignations" were treated for the purposes of severance compensation in the same manner as "terminations with cause," thus divesting Defendant Farha of more than $10 million in equity awards and $800,000 in cash compensation, and divesting Defendants Behrens and Bereday of substantial

compensation. As analysts noted, the Company's replacement and punishment of these Defendants constituted "an unofficial admission of wrongdoing."

15. Soon thereafter the Company officially admitted its wrongdoing. On July 21, 2008, the Company issued a press release and Form 8-K in which it admitted that it had mischaracterized certain "expenses" as direct medical costs, which in turn "understated the amount of the refunds" that WellCare owed to the States of Florida and Illinois by approximately $46.5 million. The Company also confirmed that its "former senior management" had caused it to withhold the refunds illegally by "set[ting] an inappropriate tone in connection with the Company's efforts to comply with the regulatory requirements" governing its business. WellCare further stated that its hiring of "new company leadership" to replace Defendants Farha, Behrens, and Bereday was a "remedial measure[]" designed to correct the "material weaknesses in internal control over financial reporting" that these Defendants had caused.

16. The Company admitted that its financial results from 2004 through the first two quarters of 2007 were materially false and misleading and would be restated. The Company announced that correcting its financial statements would reduce its two most crucial measures of profitability—net income and diluted earnings per share—by as much as 14% during the Class Period. As the restatement revealed, rather than being a Company that always exceeded analysts' expectations and consistently outperformed its competitors, in reality WellCare's financial results repeatedly fell short of those expectations, and the Company performed no better than its peers. Indeed, had WellCare accurately reported its financial results throughout the Class Period, it would have missed analysts' earnings expectations in no fewer than five out of 13 reporting periods—thus eviscerating the "historical pattern of beating consensus estimates" that caused the Company's share price to skyrocket.

17.     In addition to materially inflating WellCare's financial statements, the fraud has jeopardized the Company's ability to do business with the government—which is its only source of revenue—and exposed it to other material criminal and civil sanctions.  As the Company has stated, these sanctions include the possibility that "the Company could be <u>disqualified from participating in certain health care funding programs which are material to its business</u>." (Emphasis added.)

18.     Investigations by the U.S. Attorney's Office for the Middle District of Florida and the SEC are ongoing.  On September 3, 2008, Florida, which accounted for as much as 76% of the Company's revenue during the Class Period, reduced the premium rates it pays to WellCare's Medicaid subsidiaries by 3% and reduced the number of Floridians that WellCare is permitted to enroll in its Medicaid plans.  WellCare's stock price has never recovered from the fraud alleged herein, and now trades at approximately $22 per share, down approximately 82% from its Class Period high closing price of $122.27—achieved on the day before the raid.  The Company has not filed any financial statements with the SEC since the raid, has not finalized its restatement, and remains liable for the criminal and civil sanctions noted above.

## II.    <u>JURISDICTION AND VENUE</u>

19.     The claims asserted herein arise pursuant to Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  WellCare maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

22.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### III.     PARTIES

23.     Lead Plaintiff New Mexico State Investment Council ("SIC") is a non-cabinet level agency reporting to the Governor of New Mexico, organized under the laws of the State of New Mexico.  As reflected in the certification already on file with the Court and attached hereto as Exhibit A, SIC purchased shares of WellCare common stock during the Class Period at artificially inflated prices and suffered damages as a result of the violations of the Exchange Act alleged herein.

24.     Lead Plaintiff Public Employees Retirement Association of New Mexico ("PERA") is a public pension fund organized under the laws of the State of New Mexico that manages and invests over $13.7 billion for the benefit of approximately 80,000 active and retired New Mexico public employees.  As reflected in the certification already on file with the Court and attached hereto as Exhibit A, PERA purchased shares of WellCare common stock during the Class Period at artificially inflated prices and suffered damages as a result of the violations of the Exchange Act alleged herein.

25.     Lead Plaintiff the Teachers' Retirement System of Louisiana ("Louisiana Teachers") is a public pension fund established for the benefit of current and retired employees of the public educational institutions in the State of Louisiana.   Louisiana Teachers is Louisiana's largest public retirement system, with over $14 billion in assets under management and 150,000 active or retired members.  As set forth in the certification already on file with the Court and attached hereto as Exhibit B, Louisiana Teachers purchased shares of WellCare

common stock during the Class Period at artificially inflated prices and suffered damages as a result of the violations of the Exchange Act alleged herein.

26.     Lead Plaintiff Policemen's Annuity and Benefit Fund of Chicago ("Chicago Police") is a pension fund established for the benefit of members of the Chicago Police Department.  Chicago Police serves over 26,000 active and retired members and has over $4.1 billion in assets under management.  As reflected in the certification already on file with the Court and attached hereto as Exhibit C, Chicago Police purchased shares of WellCare common stock during the Class Period at artificially inflated prices and suffered damages as a result of the violations of the Exchange Act alleged herein.

27.     Lead Plaintiff Public School Teachers' Pension & Retirement Fund of Chicago ("Chicago Teachers") is a public pension fund established for the benefit of teachers and other employees of the Chicago Public Schools.  Chicago Teachers serves over 22,000 retirees and 34,000 contributing members, and has over $8.5 billion in assets under management.  As reflected in the certification already on file with the Court and attached hereto as Exhibit D, Chicago Teachers purchased shares of WellCare common stock during the Class Period at artificially inflated prices and suffered damages as a result of the violations of the Exchange Act alleged herein.

28.     SIC, PERA, Louisiana Teachers, Chicago Police and Chicago Teachers are collectively referred to as "Lead Plaintiffs" or the "Public Pension Funds Group."  The Court appointed the Public Pension Funds Group to serve as Lead Plaintiffs by Order dated March 11, 2008.

29.     Defendant WellCare Health Plans, Inc. (together with its subsidiaries, "WellCare" or the "Company"), formerly known as WellCare Group, Inc., is a Delaware corporation founded

in 1985 with its principal place of business at 8725 Henderson Road, Renaissance One, Tampa, Florida.  WellCare provides managed care services exclusively for government-sponsored healthcare programs and offers members a range of Medicaid and Medicare medical services and prescription drug plans.

30.     Defendant Todd S. Farha ("Farha") was WellCare's Chief Executive Officer, President, and Chairman of the Board of Directors during the Class Period.  Farha signed the Company's materially false SEC filings, including but not limited to its Forms 10-K and 10-Q, and the Sarbanes-Oxley certifications that accompanied those filings, throughout the Class Period.  During the Class Period, Farha sold approximately 64% of his personally-held WellCare shares for proceeds of approximately $56.5 million.  Farha resigned from the Company in January 2008.

31.     Defendant Paul L. Behrens ("Behrens") was WellCare's Chief Financial Officer and Senior Vice President during the Class Period.  Behrens signed the Company's materially false SEC filings, including but not limited to its Forms 10-K and 10-Q, and the Sarbanes-Oxley certifications that accompanied those filings, throughout the Class Period.  Before he joined the Company, Behrens was an accounting partner in the healthcare practice of Ernst & Young LLP.  During the Class Period, Behrens sold approximately 58% of his personally-held WellCare shares for proceeds of approximately $15.8 million.  Behrens resigned from the Company in January 2008.

32.     Defendant Thaddeus Bereday ("Bereday") was WellCare's Senior Vice President, General Counsel, and Secretary during the Class Period.  Defendant Bereday also was the Company's Chief Compliance Officer charged with executing its Trust Program.  Before he joined the Company, Bereday was a partner at the law firm of Brobeck, Phleger & Harrison,

LLP, where he served as outside counsel during the buyout of the Company led by Defendant Farha.  During the Class Period, Bereday sold approximately 87% of his personal holdings of Company stock for proceeds of approximately $18 million.  Bereday resigned in January 2008.

33.     Defendants Farha, Behrens, and Bereday are referred to collectively as the "Officer Defendants."  The Officer Defendants, by virtue of their high-level positions with the Company, directly participated in the management of WellCare, were directly involved in WellCare's day-to-day operations, including its accounting and reporting functions, had the ability to control, and did control, the Company's conduct, and were privy to confidential, proprietary information concerning the Company and its business, operations, and financial statements, as alleged herein.  The Officer Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein; were aware, or recklessly disregarded, that the false and misleading statements were being issued; and approved or ratified these statements, in violation of the federal securities laws.

## IV.     LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

34.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of WellCare between February 14, 2005 and October 25, 2007, inclusive (the "Class"), and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

35.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, WellCare common shares were actively traded on the New York Stock Exchange ("NYSE").  As of August 1, 2007, the Company had almost 42

million shares of common stock issued and outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Individuals and entities that purchased WellCare common shares during the Class Period may be identified from records maintained by WellCare or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

36.     Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

37.     Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained counsel competent and experienced in class and securities litigation.

38.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, financial condition, operations and management of WellCare;

(c)     whether Defendants acted with scienter; and

(d)     to what extent the members of the Class have sustained damages, and the proper measure of damages.

39.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V.    BACKGROUND FACTS AND THE NATURE OF THE FRAUD

40.     WellCare provides managed care services to Medicaid and Medicare recipients.

41.     The Medicaid program provides medical care to indigent and disabled persons. Although Medicaid is funded by both the state and federal governments, it is state-operated and implemented.  Through its licensed subsidiaries, WellCare operates Medicaid plans in Florida, New York, Connecticut, Illinois, Louisiana, Georgia, and Ohio.

42.     Medicare is a federal program that provides a variety of hospital, medical, and prescription drug benefits to people over the age of 65 and some people with disabilities. Medicare is administered and funded by CMS.  WellCare administers stand-alone Medicare prescription drug plans ("PDP") plans in all 50 states and the District of Columbia.

43.     Under the Medicaid and Medicare programs, the state and federal governments, respectively, contract with approved health maintenance organizations ("HMOs") such as WellCare to provide primary or supplemental coverage to Medicaid and Medicare recipients. The federal and state governments pay WellCare a premium for every Medicaid and Medicare recipient that enrolls in one of WellCare's managed plans.  These per-member premiums are called "capitated" premiums.  Premiums are usually adjusted annually.

44.     In turn, WellCare contracts with individual health care providers, such as doctors, to service WellCare members.  Most of WellCare's contracts with health care providers pay the

providers on a fee-for-service basis.  As a result, WellCare retains more of its premium payments, and increases its profits, when its members receive less care.

A.      **WellCare's Meteoric Rise**

45.     The fraud that Defendants masterminded transformed WellCare from a little-known, privately-held company into a Wall Street superstar.  From the time of the Company's IPO in mid-2004 through 2006, WellCare's net income almost tripled, from approximately $49 million to approximately $139 million, and its enrollment figures more than tripled, from 747,000 to 2,258,000.  Its stock price appreciated a staggering 618%, from $17 per share to over $122 per share, between the time of its IPO and October 2007, when the federal and state governments raided its corporate headquarters.

46.     The extraordinary surge in WellCare's stock price was driven by the Company's pattern of exceeding analyst expectations.  Indeed, WellCare exceeded analysts' earnings expectations every quarter from the time of its IPO until the raid, as reflected in the chart below:

| Reporting Period | Reported Earnings per Share-Diluted | Consensus Expectations | Margin by which WellCare Beat Expectations |
|---|---|---|---|
| 4Q 2004 | $.46 | $.44 | $.02 |
| 1Q 2005 | $.27 | $.25 | $.02 |
| 2Q 2005 | $.36 | $.35 | $.01 |
| 3Q 2005 | $.41 | $.38 | $.03 |
| 4Q 2005 | $.27 | $.(07)[1] | $.34 |
| 2005 Year-End | $1.32 | $1.04 | $.28 |
| 1Q 2006 | $.42 | $.35 | $.07 |
| 2Q 2006 | $.55 | $.48 | $.07 |
| 3Q 2006 | $1.06 | $.96 | $.10 |
| 4Q 2006 | $1.38 | $1.31 | $.07 |
| 2006 Year-End | $3.43 | $3.30 | $.13 |
| 1Q 2007 | $.60 | $.54 | $.06 |
| 2Q 2007 | $1.30 | $1.20 | $.10 |

---

[1] Analysts expected WellCare to report negative earnings per share for the 2005 fourth quarter because of temporary charges associated with start-up costs for developing new business in various states.  Analysts expected lower 2005 full-year earnings for the same reason.

47.     In addition to exceeding analysts' expectations, each quarter WellCare issued guidance providing remarkable growth rates.   Indeed, from the time the Company went public until the raid, the Company continuously projected annual and long-term growth of at least 20%, and revised its guidance upward at almost every quarterly reporting period.  For example, throughout 2005, WellCare exceeded analysts' expectations each quarter and raised its year-end guidance three times.  By November 2005, when the Company reported third quarter results above consensus expectations and raised its fiscal year ("FY") 2005 guidance for the last time, WellCare projected extremely high growth rates of 32% to 40% over its FY 2004 results.

48.     Analysts highlighted these facts in lauding the Company as the top performer in its industry.  For example, a May 9, 2005 Credit Suisse report stated, "WellCare reported 1Q [2005] results that qualify as the best in the Medicaid space . . . and also became the only one of its peers to raise its guidance."  Similarly, an August 4, 2005 CIBC World Markets report stated that "WellCare's second quarter [2005] earnings handily beat expectations, and coupled with the company's improved earnings outlook, should help to dispel some of the investor concern surrounding WellCare, following disappointing results from several of its Medicaid peers."  A February 14, 2006 CIBC report likewise concluded that "WellCare's fourth quarter [2005] earnings and upwardly revised 2006 guidance should be more than enough to push the stock higher."

49.     The Company continued this pattern even more aggressively throughout 2006, reporting record results that substantially exceeded analysts' earnings expectations each quarter, while raising its year-end guidance on three separate occasions.  Indeed, by year-end 2006, the Company had almost tripled its yearly net income over its year-end 2005 net income, prompting Defendant Farha to call the Company's 2006 financial performance "transformative."  Again,

analysts highlighted these facts in touting the Company's performance.  For example, on August 2, 2006, CIBC World Markets exclaimed that, "WellCare's second quarter [2006] earnings and full year guidance were <u>well beyond our imagination</u> . . . .  Everything else equal, we'd expect the stock to react positively tomorrow."  (Emphasis added.)  Similarly, on November 1, 2006, CIBC stated that: "<u>Words can't do justice to WellCare's third quarter [2006] earnings and 2007 outlook</u>, so we'll try numbers instead.  Over the last two quarters, [WellCare's] 2006 EPS [earnings per share] projections have increased 32%, while the company's initial 2007 EPS guidance is $0.60 (18%) higher than consensus."  (Emphasis added.)

50.     The Company continued this same pattern of beating expectations and raising guidance right up until the government raid, causing its stock price to reach a Class Period high of $122.27 on October 23, 2007—the day before hundreds of armed agents descended on WellCare's headquarters as a result of the fraud described below.

**B.      Defendants' Fraudulent Scheme**

51.     As noted above in ¶¶3-6, throughout the Class Period, WellCare (a) fraudulently retained at least $46.5 million in Medicaid premiums that it was legally obligated to return to various states; (b) systematically engaged in illegal marketing practices; and (c) routinely denied its enrollees necessary medical care.  The paragraphs below describe each aspect of Defendants' fraudulent scheme.

**1.      Defendants Falsified the Proportion of Government Premiums that WellCare Spent on Direct Medical Services**

52.     WellCare reported the amount of money that it spent on direct medical care through a metric called a "medical loss ratio."  The Company's "medical loss ratios" reflected the percentage of premiums it spent on medical services, excluding administrative costs, overhead, and profit.  Thus, if the Company received $10 in Medicaid premiums, spent $8 on

direct medical care for its enrollees, and retained $2 for administrative costs and profit, it would report a medical loss ratio of 80%.  In other words, a higher medical loss ratio meant that the Company was retaining less money and reporting less profit.

53.     Because WellCare (like other government-sponsored health plans) operated with a small profit margin, even a slight change in the Company's medical loss ratios had a dramatic effect on its profitability.  For example, in 2004, WellCare reported only $49 million of net income on approximately $1.4 billion in revenue, a profit margin of approximately 3.5%.  In 2005, 2006, and the first quarter of 2007, WellCare similarly reported narrow profit margins of 2.7%, 3.6%, and 2%, respectively.

54.     Given these thin margins, the Company explained in its 2006 Form 10-K that "[r]elatively small changes" in its medical loss ratio "can create significant changes in our financial results."  For example, "a hypothetical 1% increase in [WellCare's] medical benefits ratio would have reduced [WellCare's] earnings before income taxes for the years ended December 31, 2005 and 2006 by" 22% and 16%, respectively.  Accordingly, the Company informed investors that accurately estimating its medical benefits expense was its "most significant critical accounting estimate."

55.     Accurately calculating medical loss ratios was particularly important with regard to the Company's business in the State of Florida because Florida generated as much as 76% of the Company's premium revenue during the Class Period.  Thus, misrepresenting the Company's Florida medical loss ratios would significantly distort WellCare's net income.

56.     Governing law and the Company's state contracts required it to meet certain minimum medical loss ratios.  State and federal agencies set specific medical loss ratios to

ensure that WellCare provided its members with needed care, and to restrict inordinate profiting from taxpayer dollars.

57.     For example, Section 409.912(4)(b) of the Florida Statutes, incorporated into the Company's contract with Florida's Agency for Health Care Administration to provide behavioral health services to Medicaid recipients (the "Florida Medicaid Contract"), required the Company's Florida mental health subsidiaries to either (a) spend 80% of their premiums on direct medical services or (b) refund to Florida any shortfall below that 80% benchmark. Similarly, the contract between WellCare and the Florida Healthy Kids Corporation to provide health benefits for eligible children (the "Healthy Kids Contract") required WellCare to (a) spend 85% of its premium revenues on direct health care services, or (b) refund to Florida half of any shortfall.

58.     Like the Company's contracts in Florida, the Company's contract with the Illinois Department of Health and Family Services to provide health care to Medicaid recipients (the "Illinois Medicaid Contract") specified that the Company had to spend 82% of its premium revenue on direct care, or the State would deduct any shortfall from future premium payments.

59.     During the Class Period, the Company spent significantly less on direct medical services than its state contracts and governing law required, *i.e.*, it was not meeting its required medical loss ratios.  However, rather than return this unspent money to the states, which would have reduced the Company's profits and harmed its chances of obtaining future rate increases, WellCare, at the explicit instruction of its CEO, Defendant Farha, devised a fraudulent scheme to retain the funds it was supposed to return.  The principal manner in which this scheme operated was as follows.

60.     First, the Company transferred its unspent Medicaid premiums to a wholly-owned

Cayman Islands subsidiary called Comprehensive Reinsurance Ltd. ("Comprehensive Re"),

ostensibly to purchase reinsurance.  In truth, these reinsurance "payments" were nothing but

sham transactions designed to hide profits from the Company's state regulators.

61.     Next, the Company mischaracterized these transferred funds as direct medical

expenses in WellCare's filings with state regulators.  By mischaracterizing these transferred

funds as direct medical costs, the Company achieved the minimum medical loss ratios specified

in its contracts and thus evaded its refund obligations.  The Company also appeared to its state

regulators to be less profitable than it actually was, which allowed it to secure a series of

premium rate increases.

62.     Finally, Defendants used the money that they had fraudulently transferred to

Comprehensive Re to inflate artificially the Company's publicly reported net income.

Defendants did so by incorporating Comprehensive Re's profits into WellCare's consolidated

balance sheets, thus reporting as profits the money that Defendants should have returned to the

states.

63.     As set forth below, at least one former WellCare employee has pled guilty in this

Court to conspiracy to commit Medicaid fraud, thereby acknowledging that he and other senior

"officers" of the Company intentionally defrauded the State of Florida pursuant to this scheme.

Moreover, in the course of Lead Plaintiffs' investigation, Lead Plaintiffs identified additional

former employees who confirmed that Defendants Farha and Behrens were the senior WellCare

officers directly responsible for the fraud.

64.     Confidential Witness 1 ("CW 1") worked for WellCare from 1999 until May

2007.  CW 1 worked as the Company's Director of Strategic Planning and Human Resources

Information Systems from September 2006 until May 2007, and prior to that held the following

positions: Florida State Director of Sales and Operations from April 2005 until September 2006;

Director of Business Analytics from April 2004 until April 2005; Director of Sales Support and

Inside Sales from March 2003 until April 2004; Regional Director of Sales from January 2001

until March 2003; and Regional Manager of Sales from 1999 until January 2001.  Before joining

WellCare, CW 1 was a Law Enforcement Specialist with the U.S. Air Force.

65.     From April 2003 until September 2006, CW 1 reported directly to Imtiaz Sattaur,

who was at the time President of WellCare's Florida operations, which accounted for the vast

majority of WellCare's business.  CW 1 stated that beginning in approximately August 2004, he

learned that WellCare was "improperly appropriating funds" by manipulating the medical loss

ratio governing its Healthy Kids program.

66.     Specifically, in approximately August 2004, CW 1 attended a meeting with

Defendant Farha, Sattaur, Mike Turrell (WellCare's Vice President of Corporate Compliance

and Regulatory Affairs) and a WellCare actuary.  At this meeting, Defendant Farha and Sattaur

discussed the fact that the Company owed Florida approximately $3 million because the

Company had failed to spend 85% of its Healthy Kids premiums on direct medical care.  CW 1

reported that, at this meeting, Defendant Farha stated that "I don't want to give the money back.

I want to give the money to the Street," meaning Wall Street.  CW 1 said that Defendant Farha

then ordered Sattaur to inflate WellCare's medical loss ratio for the purpose of withholding

WellCare's refund to Florida.  CW 1 further reported that Sattaur initially resisted Defendant

Farha's instruction because Sattaur was concerned that an audit could uncover the manipulation.

According to CW 1, Defendant Farha responded that he was unconcerned about any audit

because any improperly-added costs would appear under a line item designated as "other" and, if

the auditors questioned that line item, Defendant Farha would decide how to explain it away. CW 1 reported that Sattaur followed Defendant Farha's order and the Company not only kept the approximately $3 million refund it owed the State for 2004, but also withheld another approximately $18 million in refund payments owed to Florida from 2004 through 2007.

67.     CW 1 also stated that, shortly after the August 2004 meeting described above, he had a conversation with Sattaur during which Sattaur told CW 1 that Defendant Farha had instructed Sattaur to hide profits from the Florida Government.  Sattaur told CW 1 that Farha wanted to make WellCare appear to have spent more on medical services than it actually had, so that WellCare could argue to the Florida State Legislature that the Company deserved a rate increase for its Medicaid program—especially its Temporary Assistance to Needy Families program, for which WellCare received relatively low premiums.  Sattaur told CW 1 that, to achieve the illusion of higher expenses, Farha had instructed him to "push funds offshore" for high-risk patients and to shift income to an offshore company called Comprehensive Reinsurance.

68.     Similarly, CW 2 reported that, in 2003, Defendants Farha and Behrens instructed him to fraudulently inflate the Company's behavioral health costs in order to withhold payments to the State of Florida and help the Company achieve rate increases.  CW 2 was the Company's Vice President of Actuarial Services from May 2000 until November 2003, when he resigned rather than falsify the Company's expense records.  CW 2 reported that in 2003, Defendant Farha asked him to determine which of the Company's business segments was most profitable. After studying the issue, CW 2 told Defendant Farha that the Company's behavioral health operations were most profitable but that the Company's margins were constrained by the 80/20 Rule (*i.e.*, the rule which required the Company to spend at least 80% of its premiums on direct

medical services, or refund to Florida any shortfall below that benchmark). In response, Defendant Farha instructed CW 2 to "sharpen the pencil" and "throw everything and the kitchen sink" into the Company's behavioral health costs. CW 2 reported that the Company achieved this inflation by falsely categorizing primary care expenses, such as primary care visits, as behavioral health visits, and by padding mental health costs with a variety of other improper expenses.

69.　　CW 2 further reported that shortly after Defendant Farha instructed him to inflate the Company's behavioral health costs, Defendant Behrens called him into his office for a conference call with Bill White, the Company's Corporate Controller. During this meeting, Defendant Behrens instructed CW 2 on a second way to inflate the Company's behavioral health costs: by padding the Company's Incurred But Not Recognized expenses ("IBNR") with an inflated margin. The Company's IBNR represented the costs that the Company had incurred or would incur during a reporting period but had not yet actually paid. IBNR therefore functioned as a reserve against WellCare's Medicaid and Medicare business; the higher the Company's IBNR, the lower its profit margin.

70.　　CW 2 normally calculated IBNR by accurately tallying the Company's reported but unpaid claims, and then adding a reasonable estimate of additional expenses that the Company would incur during any given period. CW 2 stated that, "I felt my job was to hit the nail on the head [as to reported claims] and then put my best estimate on top of that [for unreported claims], which in my experience was 6% to 8%." But Defendant Behrens instructed CW 2 to inflate the estimated margin well beyond 8%: "[Defendant Behrens' instruction] was much higher, much higher than my confidence level," CW 2 stated. CW 2 reported that, as a

result of this scheme, the Company's IBNR was "way overstated" and that Defendant Behrens'

instructions amounted to "sandbagging" the Company's reported expenses.

71.     CW 2 further stated that Defendant Behrens also described his plan to create a

mental health subsidiary through which the Company could additionally inflate its reported

expenses.  By forming a subsidiary and categorizing it as a provider, the Company could report

all of the subsidiary's expenses—even administrative costs—as direct medical expenses.  "That

was the strategy," said CW 2.  Confronted with Defendants Farha's and Behrens' scheme, CW 2

resigned rather than execute it any longer.  CW 2 said that his meeting with Defendant Behrens

was "the last straw:" "It made it pretty clear that they didn't need an actuary.  They needed

someone to pad the IBNR."

72.     WellCare has admitted that the scheme to inflate its medical loss ratios, as

reported to the states, enabled the Company to keep at least $46.5 million it should have returned

to Florida and Illinois, and thus artificially inflated its reported income during the Class Period

by as much as 14%.  In addition, this scheme was material in a number of other important ways.

73.     First, this scheme enabled WellCare to always exceed analysts' earnings

expectations during the Class Period, when, in truth, the Company consistently missed

expectations.  Indeed, if WellCare had accurately reported its financial results throughout the

Class Period, it would have failed to exceed analysts' expectations for seven out of 13 reporting

periods during the Class Period—and would have missed expectations no fewer than five times.

Thus, the restatement shattered WellCare's "historical pattern of beating consensus estimates"

and revealed it to be just another company struggling to compete in an industry with low profit

margins.  Set forth below is a chart reflecting WellCare's true earnings per share (calculated

based on its announced restatement), its false reported results, and analysts' consensus

expectations.  The periods for which WellCare would have fallen below consensus expectations

if it had accurately reported its income, are highlighted:

| Reporting Period | Consensus Expectations | WellCare's Reported Earnings Per Share – Diluted | WellCare's Restated Earnings Per Share – Diluted |
|---|---|---|---|
| 4Q 2004 | $.44 | $.46 | $.40 |
| 1Q 2005 | $.25 | $.27 | $.25 |
| 2Q 2005 | $.35 | $.36 | $.33 |
| 3Q 2005 | $.38 | $.41 | $.37 |
| 4Q 2005 | $.(07) | $.27 | $.25 |
| 2005 Year-End | $1.04 | $1.32 | $1.20 |
| 1Q 2006 | $.35 | $.42 | $.38 |
| 2Q 2006 | $.48 | $.55 | $.50 |
| 3Q 2006 | $.96 | $1.06 | $.96 |
| 4Q 2006 | $1.31 | $1.38 | $1.26 |
| 2006 Year-End | $3.30 | $3.43 | $3.13 |
| 1Q 2007 | $.54 | $.60 | $.57 |
| 2Q 2007 | $1.20 | $1.30 | $1.24 |

74.    Further, the scheme to inflate WellCare's direct medical costs deceived state

regulators into granting large premium rate increases, thus driving the Company's revenue and

income higher by substantial amounts.  For example, in 2005, Florida granted the Company a

5.3% increase in premium rates, which significantly exceeded analysts' expectations of between

3% and 4%.  In 2006, Florida granted WellCare another large increase of 5.4%, which also

exceeded analysts' expectations.  And in 2007, Florida granted a similarly large increase of 5%.

75.    While this scheme inflated the Company's financial results and its stock price, it

also materially jeopardized WellCare's ability to operate as a going concern.  WellCare's

contracts with the state and federal governments were its only source of revenue.  The

Company's ability to continue as a viable business therefore depended on whether the state and

federal governments trusted the Company enough to hire it to provide medical services to

vulnerable populations.  Consequently, WellCare's respect for and compliance with government

laws and regulations was of the utmost importance to its business model.  Recognizing this basic

truth, the Company told investors in its 2006 Form 10-K that "<u>any</u> violation of the laws and regulations applicable to" WellCare could have a material adverse impact on the Company by causing the "loss or limitation of [the Company's] right to participate in . . . Medicaid and Medicare" and the "suspension or loss of one or more of [the Company's] licenses to act as an insurer, health maintenance organization, or third party administrator."  (Emphasis added.)

76.     The scheme described above violated state and federal law.  Specifically, Defendants' scheme to manipulate the Company's medical loss ratios violated, among other things, 18 U.S.C. § 1347, which criminalizes any "scheme or artifice to defraud any health care benefit program;" Florida's 80/20 Rule; and Florida Statutes § 409.920, which makes it unlawful to misrepresent "items of income and expense" in state Medicaid reports.

77.     Each of those violations was a material threat to WellCare's ability to continue its business with the government.  As explained more fully below, however, the Company engaged in a host of additional violations that similarly jeopardized its business model.

### 2.     <u>Illegal Marketing Practices and Denials of Care</u>

78.     Throughout the Class Period, federal regulations required WellCare to market its plans accurately, and to provide its members with medically necessary care.  For example, 42 C.F.R. § 438.104 required WellCare to provide "accurate oral and written" information to potential enrollees so that they could "make an informed decision on whether to enroll."  The same section further required that WellCare "not mislead [or] confuse" potential enrollees.  In addition, as the Company set forth in its 2006 Form 10-K, applicable law precluded the Company from "offering kickbacks or other inducements [to doctors] for referral of members."

79.     Other regulations prohibited WellCare from denying required medical treatment.

For example, 42 C.F.R. § 438.700 exposed WellCare to sanctions for failing "to provide medically necessary services," and 42 C.F.R. § 417.479(d) prohibited WellCare from paying any "physician group as an inducement to reduce or limit covered medically necessary services."

80.     Rather than adhere to these regulations, which would have shrunk the Company's revenue and increased its expenses, the Company systematically violated them throughout the Class Period.  As set forth more fully below, WellCare sales agents routinely engaged in illegal marketing practices by targeting mentally incompetent enrollees who could not understand plan terms, falsely promising potential members that their doctors were enrolled in the Company's plans, and falsely promising potential members that they would continue to receive certain medical services.  When these techniques failed to capture enough enrollees, the Company's sales agents outright forged signatures on enrollment documents and even enrolled dead people.  Further, the Company denied its members necessary care by entering into agreements with doctors by which it paid them bonuses for denying needed diagnostic and specialist services.

81.     Numerous former employees reported that, based on their first-hand experience, WellCare routinely violated the regulations cited above and that Defendants were responsible for those violations.  For example, CW 1 reported that Defendant Farha allowed WellCare sales agents to engage in widespread illegal marketing practices in Florida's Dade County in order to boost revenue.  In one instance that occurred in 2003, CW 1 learned that two agents, Debbie and Gary Golin, fraudulently enrolled over 1,000 members in the Company's Medicaid plan.  CW 1's supervisor, Sattaur, investigated the incident and told the area director, Vince Carver, to fire the Golins.  However, CW 1 stated that Defendant Farha intervened and told Carver not to fire the Golins because they were big producers.  According to CW 1, over the next year Sattaur continued to press Defendant Farha to fire the Golins.  Defendant Farha refused to do so until

Florida's Office of the Inspector General and the Agency for Health Care Administration began investigations into the Golins' enrollment practices.  By that time, said CW 1, WellCare had received approximately $2.5 million in fraudulent premiums in 2004 from the 1,000 illegal enrollments.

82.     Further, CW 3 explained that Defendants offered doctors so-called grants as quid pro quos for enrolling large blocks of patients, which violated the prohibitions against offering "kickbacks or other inducements" for the referral of members, as noted above.  CW 3 worked as WellCare's Director of Provider Relations for the Tampa/Gulf region from 2004 until May of 2007.  Her duties included serving as a liaison between the Company and its medical providers, reviewing and processing medical claims, and fielding patient complaints about their doctors.  For much of her tenure, CW 3 reported to Sattaur.  CW 3 stated that the Company often awarded purported grants worth "hundreds of thousands of dollars" to groups of physicians (referred to as Independent Physician Associations or "IPAs") and "in exchange" the IPAs would enroll their patients into WellCare's plans.  CW 3 stated that Defendants Farha, Behrens, and Bereday signed off on all such grants.

83.     CW 4 reported that WellCare sales agents systematically forged enrollment documents and duped mentally incompetent people into enrolling.  CW 4 was an Enrollment Specialist in the Company's Tampa headquarters from April 2005 until February 2008.  CW 4's job was to investigate enrollment complaints that the Company received from its members or from CMS.  CW 4 reported that "enrollees" often complained that they had never joined a WellCare plan and had never even met the sales agent who purportedly signed them up.  CW 4 also stated that when she would contact new enrollees for verification, she often discovered that

29

they were mentally incompetent people, such as stroke victims, who did not understand plan terms.

84.     CW 5 similarly reported that the Company's sales agents intentionally misled Medicaid recipients to boost revenue.  CW 5 was an Enrollment Specialist in the Company's Tampa headquarters from January 2006 to June 2007, and was responsible for ensuring that members had been enrolled properly.  CW 5 explained that disabled Medicaid recipients were entitled to free prescription drug coverage under Medicaid, but also were dually eligible (on account of their disability) for Medicare's prescription drug plan, which required them to pay a premium.  In order to capture these premiums from disabled Medicaid recipients, CW 5 reported, WellCare's sales agents routinely enrolled them into Medicare's drug plan.  CW 5 also reported that sales agents forged enrollees' signatures on enrollment documents.

85.     Other former employees confirmed that these illegal marketing practices were widespread and occurred throughout the country.  For example, CW 6, a former WellCare Benefits Consultant in Illinois from June 2007 until October 2007, stated that management "had us misleading the enrollees into thinking their doctors would eventually be approved" to participate in WellCare's plans when they would not be.  Similarly, CW 7, a Benefits Coordinator in Illinois from December 2006 until April 2008, explained that management "asked me to increase my sales when I knew they weren't supplying the benefits that I was supposedly giving these people."  And CW 8, a Medicare Benefits Consultant for the Company in Georgia from January 2006 through January 2007, stated that WellCare management instructed its sales agents to trick enrollees with false promises of an adequate provider network because it took at least a month for an unsatisfied member to disenroll from WellCare's plan, and in the meantime, WellCare could collect capitated premiums.

30

86.     Former employees also reported that Defendants systematically denied medical services to the Company's indigent and disabled members to boost profits.  For example, CW 3 explained that WellCare had a policy of paying doctors to deny medical care.  CW 3 stated that WellCare rewarded IPAs for "underutilizing," or keeping their medical loss ratios below a certain threshold, so that WellCare could make a larger profit.  She said that IPAs who underutilized would receive "surplus checks" of up to $200,000, while those who did not underutilize were sometimes put on probation or disallowed from participating in WellCare's plans.  CW 3 reported that, based on her review of providers' utilization reports, in many cases, IPAs "underutilized" by refusing to allow patients to see specialists or receive certain diagnostic services, solely in order to minimize total costs.  CW 3 reported that these practices were widespread throughout WellCare's Florida business, and when she raised her concerns with each of her supervisors throughout her three years at WellCare, she was always ignored.  CW 9, a Claims Supervisor for WellCare in Ohio from February 2005 until February 2008, confirmed that WellCare paid IPAs large bonuses if they "underutilized" at the expense of their patients' health.

87.     In December of 2007, the *St. Petersburg Times* described WellCare's systematic denial of necessary behavioral health care in an article titled "HMO's Care Questioned – Parents, others give WellCare low marks on mental health services," as follows:

> Kristy Curry's 9-year old son has cut his wrists twice, set her bathroom on fire and been institutionalized six times in the last four years for his own protection.  "He's got a lot of problems," said the Largo woman.

> But she said those problems have been exacerbated by the fact that her son's Medicaid HMO, WellCare Health Plans, repeatedly delays or denies medications, therapy and specialist care recommended by his doctor.  Another Largo mom, Melinda Norton, complained of almost identical problems getting treatment for her bipolar 10-year-old.

A WellCare spokeswoman, citing privacy laws, was unable to comment on the boys' cases.

But Curry, who just spent her kids' Christmas toy fund on a $310 prescription for her son, blamed the insurer for his unnecessary suffering. "He went two months recently without therapy or meds and ended up being Baker Acted (hospitalized) again," she said.

### 3.   As Analysts and Commentators Questioned WellCare's Financial Statements and Marketing Practices, the Company Vehemently Denied Any Improprieties

88.     Beginning in the spring of 2007, analysts began to notice disparities in the Company's medical loss ratios (*i.e.*, the percentage of premiums the Company spent on medical care) as reported in its state regulatory filings versus its SEC filings. Specifically, the Company's SEC filings reflected lower medical loss ratios (*i.e.*, lower medical expenses) than what was set forth in WellCare's state regulatory filings. Analysts also began to question whether these disparities indicated that WellCare was using its reinsurer to hide profits from the states but report them to investors. In response to these reports, Defendants WellCare, Farha, and Behrens vehemently and angrily denied any suggestion of impropriety, and impugned the integrity of the Company's critics.

89.     For example, on March 9, 2007, Credit Suisse noted a "pattern" in WellCare's medical loss ratios that it clamed was unique in the government-sponsored managed care industry. The analyst report noted that the Company's medical loss ratios as reported in its SEC filings were "well below that of its peer group" and were continuing to fall or hold steady, while the medical loss ratios of WellCare's peer companies "have been steadily increasing since 2003-04." That report also stated that the Company's reported medical loss ratios appeared to contradict each other: while WellCare's medical loss ratios appeared "surprisingly low" in its SEC filings, they were much higher in its regulatory filings.

90.     Just three days later, another analyst report suggested that the Company may have been using its reinsurance subsidiary to manipulate its medical loss ratios.  On March 12, 2007, CIBC World Markets issued an analyst report noting that WellCare's Florida Medicaid subsidiaries reported a combined medical loss ratio of 83.7% in regulatory filings, while the Company's SEC filings implied a Florida Medicaid medical loss ratio of only 77.8%.  The report stated that, "We think the discrepancy . . . is driven by WellCare's use of reinsurance and affiliate companies in the state," and hypothesized that WellCare could have designed a plan to shift premiums to its wholly-owned Cayman reinsurance subsidiary so "that the reinsurer will never have to make a payment" and could retain the funds as profit.  Under such an approach, the report stated, the Company could be reporting its reinsurance premiums as direct medical costs to the states.  However, "[i]f the reinsurer is wholly owned," the Company could use "consolidation" in its SEC filings to absorb the profit it had transferred to its reinsurer, and publicly report that profit as WellCare's own.

91.     A few weeks after that, a third analyst questioned whether the Company was using its reinsurance subsidiary to shift profits.  On April 4, 2007, Goldman Sachs analyst Matthew Borsch issued a report intimating that WellCare appeared to be shifting profits to its Cayman Islands reinsurance subsidiary in order to give Florida regulators the impression that the Company's profits were slim.  According to Borsch, WellCare's Florida plans had sent $62.8 million to the Cayman company, but the reinsurer had paid out only $31.7 million in claims, thus keeping as profit approximately 50% of the funds that WellCare had shifted to it.  This 50% margin vastly exceeded the Company's competitors' reinsurance margins, which typically hovered between 0% and 4%.  According to Goldman Sachs, if WellCare's Florida plans would have adhered to the typical reinsurance margins that prevailed in the managed care industry,

those plans would have reported to the states profits that were 66% higher than the figures they actually reported, which would have triggered their refund obligations.

92.     On April 11, 2007, WellCare staunchly denied these allegations, and attacked the credibility of the Goldman Sachs analyst who made them.  On that day, *The Tampa Tribune* reported that:

> CIBC World Markets and Goldman, Sachs & Co. both say WellCare has been able to give state regulators the impression that its profits are slim by shifting money to a WellCare subsidiary in the Cayman Islands in the form of reinsurance payments.
>
> * * *
>
> <u>WellCare questioned both Borsch's motives and math.</u>
>
> "<u>Analysts often sensationalize routine information to generate trading volume and profit</u>," wrote <u>WellCare spokeswoman Carol Cassara</u> in the first of several e-mails to The Tampa Tribune in response to claims made by Borsch and others.
>
> Not only is it legal for WellCare to conduct business with an affiliated company, she wrote, the arrangement was approved by Florida regulators in advance.
>
> * * *
>
> Cassara, the WellCare spokeswoman, said the Goldman, Sachs report errs by applying Wall Street-style analysis to a Medicaid arena.  "<u>The report uses aggregate data to make assumptions that are not reflective of our multiple lines of business</u>," she wrote in an e-mail to the Tribune.
>
> The company says its 2006 net income margin was only 3.7 percent, "lower than many of our competitors in the industry," Cassara wrote.  [Emphasis added.]

93.     Despite these denials, on April 12, 2007, the Company suddenly—and belatedly—announced that the President of its Florida operations, Mr. Sattaur, had "resigned" effective April 6—just two days after Goldman Sachs had issued its report questioning whether the Company was using its reinsurance subsidiary to hide profits from state regulators.  Although Sattaur was chief of the Company's largest and most profitable sector, the Company did not state

why he had resigned, only vaguely alluding to his desire to "pursue other opportunities."  In

response, a Stifel Nicolaus analyst reported that there was "a perceived notion that the company

is showing the state [of Florida] an artificially inflated MLR in order to avoid sanctions and/or

potentially lower rate increases," and that Sattaur "left abruptly to pursue other interests," which

"create[d] some concern, in our opinion."

94.     Just two weeks later, reports of WellCare's profit-shifting resurfaced, and the

Company again vehemently denied any wrongdoing.  On April 27, 2007, *The Tampa Tribune*

reported that the Florida Department of Financial Services was investigating the relationship

between WellCare and its Cayman subsidiary for possible overpayments:

> Florida's chief financial officer, Alex Sink, is reviewing ties between
> WellCare Health Plan's Medicaid HMOs in Florida and a WellCare subsidiary in
> the Cayman Islands, her office confirmed on Thursday.
>
> * * *
>
> Marc Ryan, vice president of policy at Tampa-based WellCare, said that
> when Sink completes her review she will find that there were no overpayments to
> the affiliate.
>
> * * *
>
> Ryan noted that the [Goldman Sachs and CIBC] analysts erred by lumping
> the Medicaid and Medicare premiums together.  Only $19 million of the shift was
> for Medicaid because the risk for Medicare beneficiaries was much greater.  After
> end-of-year claims came in, the claim recoveries for Medicaid patients equaled
> $19 million, he said.
>
> The Medicare premiums and recoveries also matched up, he said.  The
> confusion may have arisen because the reinsurer was created in late 2005.  "It's a
> new entity," he said.  [Emphasis added.]

95.     As investor concerns grew, the Company's stock price fell from $93.44 on April

24 to $86.50 on April 27.  To reverse this decline, Defendants acted aggressively to dispel

investor worries and turn the market's focus back to the Company's inflated financial results.

On April 30, 2007, Defendants surprised the market by taking the extraordinary step of pre-

announcing, <u>without any advance notice</u>, the Company's first quarter earnings. These earnings were ahead of consensus estimates, and the Company further announced that it would revise its full-year 2007 guidance in one week. On May 7, 2007, Defendants increased guidance for the full-year 2007 by the second-largest amount in Company history, which also was far ahead of consensus estimates. Specifically, Defendants increased the guidance for year-end 2007 from earnings per share-diluted of $4.10-$4.20, to $4.65-$4.75—a 13% increase over the Company's February guidance, and a 37% increase over the Company's record 2006 results.

96.     Defendants' efforts to deflect attention from WellCare's Cayman Islands reinsurer worked. In response to these positive announcements, analysts crowed that the Company had "defied its critics" and was continuing to report "positive future adjustments." Credit Suisse reported on May 8, 2007 that, "In a quarter that saw four sell-side analyst downgrades (including our own) [and] numerous press reports alleging misconduct across its Medicare and Medicaid operations, . . . <u>WellCare once again defied its critics</u>." The report explicitly noted that, "This is the second largest quarterly boost in the Company's history and <u>maintains its historical pattern of beating consensus estimates and raising its guidance</u>." Even though this guidance boost was especially large, Credit Suisse concluded that the Company's "history suggests that <u>management has left something in the tank to fuel future positive adjustments</u>. We note that WellCare has raised its outlook for the year in all but the first quarter after the IPO." (Emphases added.) Highlighting WellCare's strategy of attacking its critics in the analyst community, CIBC issued a report entitled, "If You Mess With The Bull, You're Going To Get The Horns – 1Q07 Pre-Announced," which specifically stated that "the increase in the company's earnings guidance was far in excess of any consensus expectations."

97.     After it pre-announced its first quarter 2007 results, the Company continued to aggressively deny that its reinsurance arrangement was improper.  On a May 8, 2007 conference call, Defendant Behrens called criticisms of the Company's reinsurance arrangement "inappropriate," stated that the reinsurance arrangement had "been approved by the appropriate regulatory authorities," that the Company's use of reinsurance had "no material impact" on its operations, and that WellCare had "provide[d] full disclosure" of the pertinent facts.  When Borsch, the Goldman Sachs analyst, tried to "delve a little bit further" into the Company's use of its Cayman reinsurer, Defendant Behrens again staunchly defended the Company's use of reinsurance as "proper[]" and asserted that the Company had "been very disclosive [sic] about how it operates."

98.     These tactics had their intended effect, as the price of WellCare stock increased from $82.08 on May 7, 2007 to $90.16 on May 8, 2007, on extremely high trading volume.

99.     Shortly thereafter, Defendant Behrens personally reached out to Borsch, the Goldman Sachs analyst, and again denied that the Company was hiding profits from state regulators.  Goldman Sachs reported that during a special call between Borsch and Behrens on May 29, 2007 Defendant Behrens "stated to us that the public information to which we have access was insufficient for us to conduct a proper analysis [of the reinsurance subsidiary]."

100.    At the same time analysts were questioning WellCare's financial results, the Company's illegal marketing practices also were coming under increased scrutiny.  Just as Defendants denied any profit-shifting, they also staunchly denied any illegal marketing practices and extolled their supposed "zero tolerance" policy.

101.    For example, on April 19, 2007, CMS cited WellCare for multiple marketing violations, including activities that "mislead" and "misrepresent" plan terms.  Despite these

findings, just three weeks later the company claimed that it had "zero tolerance" for any marketing abuses.  On May 6, 2007, *The New York Times* reported that WellCare sales agents in Georgia had "forged" potential enrollees' signatures, sales agents in California had "signed up elderly Chinese-Americans with limited ability to speak English" who later discovered "that their doctors did not accept the plan," and sale agents nationwide had generally failed to provide other enrollees with information sufficient to understand the plans in which they were enrolling.  In response to these abuses, the article reported, CMS made multiple visits to WellCare's headquarters to discuss with the Company's "senior officials" the many "strong concerns" it had about WellCare's marketing practices.  Leslie V. Norwalk, then-acting administrator of CMS, stated that during these visits "WellCare was informed that its efforts thus far to address marketing issues were inadequate and unacceptable."  Nevertheless, WellCare spokesman John N. Anberg stated that, "We have zero tolerance for any behavior that violates marketing guidelines."

102.    Two days later—during the same conference call in which Defendant Behrens denied any profit-shifting through the Company's reinsurance subsidiary—Defendant Farha dismissed *The New York Times* article and denied that WellCare was committing marketing violations.  Specifically, he stated that the Company has "zero tolerance" for violations, that there would be no "regulatory impact" from the manner in which the Company marketed its plans, and that the Company "will be setting new best-in-class parameters that we'll all abide by."

103.    However, WellCare's marketing violations were so widespread that, on May 16, 2007, the Senate's Special Committee on Aging held a hearing on the subject, during which the Committee required WellCare to explain its efforts to cease its illegal practices.  Senator Ron

Wyden of Oregon specifically stated that there had been "a pattern" of "ripp[ing] off" potential enrollees.  But Gary Bailey, WellCare's Vice President of Medicare Operational Performance, assured the committee that WellCare had "a strong compliance program."

104.    Yet WellCare continued its "deceptive" marketing practices.  On June 15, 2007, CMS announced that it would oversee and enforce a suspension of WellCare's marketing of its Medicare programs in order to halt and correct "deceptive marketing practices."  Congress once again summoned WellCare to account for its marketing violations, and WellCare again claimed that it was in compliance with all regulations.  Specifically, on June 26, 2007, Bailey told the House Subcommittee on Oversight & Investigations that the Company "has no tolerance for any unethical behavior."

105.    Notwithstanding these repeated promises of "no tolerance," on August 9, 2007 CMS again cited WellCare for violating eight provisions of its Medicare contract—including some of the same violations for which WellCare had been cited in April and had purportedly fixed.

### 4.    The State and Federal Governments Execute an Unprecedented Raid of WellCare

106.    On the morning of October 24, 2007, WellCare's unlawful conduct finally caught up to it.  On that day, more than 200 armed federal and state agents from the Federal Bureau of Investigation, the U.S. Department of Health and Human Services, and the Florida Attorney General's Medicaid Fraud Control Unit stormed WellCare's headquarters in Tampa, Florida to execute a federal search warrant.  To ensure that they would be able to seize and question Defendants Farha, Behrens, and Bereday, the agents deliberately timed the raid to coincide with a Board of Directors meeting at which Defendants would be present.  Indeed, at 9:30 a.m., several agents headed directly to the Company's third-floor boardroom, removed Defendant

Farha and several other directors, and took them off-site for several hours of questioning.  The

raid and related search were so extensive that the Company effectively shut down for the day; the

overwhelming majority of the Company's Tampa employees were sent home and the Company's

website was disabled.

107.    The state and federal governments' search directly targeted Defendants Farha's

and Behrens's involvement in the fraud described herein.  The agents seized Defendants Farha's

and Behrens' laptop computers, and seven disks belonging to Behrens.  The agents also seized at

least 100 separate documents from Defendant Farha concerning the fraud described above, such

as a "Florida Legislative Agenda Binder, including '80/20' section," "audit committee docs,"

and several documents relating to "executive compensation," such as a stock "Vesting Analysis."

In addition, the agents seized at least 214 documents from Defendant Behrens concerning the

fraud described above, including a folder titled "Captive Reinsurer," scores of documents

addressing WellCare's "profitability" and financial statements, numerous "internal audit" reports

and summaries from 2004 through 2007, a binder labeled "Audit Committee," a "stack of

Deloitte Touche audit letters," "handwritten notes re: Deloitte," "Deloitte 'Open Items,'" and a

"Stock Options Notebook."

108.    The search warrant and inventory of seized documents also establish that the

fraud at WellCare permeated the Company's operations nationwide, such that it could not have

been the work of low-level employees.  Pursuant to the search warrant—which authorized the

seizure of 22 different kinds of documents from a five-year period—state and federal agents

seized enough documents and BlackBerrys to fill a moving truck that had been backed up to a

loading dock.  The inventory reflected that the confiscated items concerned WellCare's

operations in at least nine States spanning the country: Florida, New York, Ohio, Louisiana, Georgia, Illinois, Missouri, Indiana, and Maine.

109.    This raid was unprecedented in character and scope in the history of the healthcare industry.  According to John Gorman, a health care consultant and a high-ranking Medicare official during the Clinton administration, this was the first time that a Medicare health plan had been forcibly raided.  Gorman stated that "when the government suspects overbilling or other improprieties . . . it usually sends subpoenas, not agents with guns."  Similarly, an October 25, 2007 analyst note by Wachovia Capital Markets, LLC observed that while the "managed care and PBM sectors that we cover are no stranger to government investigations . . . we can't recall any of these past issues involving an FBI-related search."

110.    WellCare's stock plummeted <u>an astonishing $80 per share as a result of the raid</u>. Once news of the raid became public, the NYSE immediately halted trading of WellCare shares at 10:59 a.m. on October 24, before allowing trading to resume the next day.  Even with this temporary halt in place, WellCare stock fell from a closing price of $122.27 on October 23 to $42.67 on October 25—<u>losing two-thirds of its value</u>—on about 30 times its average daily trading volume.  This drop wiped out approximately $3 billion in market capitalization, as the market realized that Defendants' repeated denials of wrongdoing were untrue.  The artificial inflation in WellCare's stock price, and the drop caused by the revelation of the fraud, are reflected in the graph on the following page:



111.    Press and analyst reports issued shortly after the raid confirmed that it was triggered by the fraud alleged herein.  For example, in a report issued on October 25, 2007, Wachovia stated that the raid related to "the company's reinsurance subsidiary, which is headquartered offshore in the Cayman Islands," "improper marketing," and "allegations of denial of care."  An October 25 *St. Petersburg Times* article reported that the raid was related to the Company's "marketing practices" and "WellCare's use of a subsidiary in the Cayman Islands for reinsurance."  Likewise, an October 25 article in *The Tampa Tribune* reported that the raid was related in part to the Company's "marketing abuses."  And a later article in *The Wall Street Journal* reported that the raid was triggered by a "whistleblower lawsuit by a former financial-department employee" and concerned WellCare's payments to "its Cayman Island Unit [of]

premiums as much as five times market price for reinsurance, thereby inflating expenses for care that it reported to the state and allowing it to refund less money."

112.    Consistent with these reports, Connecticut Attorney General Richard Blumenthal announced on October 26, 2007 that his office had been conducting a months-long investigation into WellCare for "hiding" Medicaid profits in an effort to secure large rate increases, and that the investigation was triggered by an internal "whistleblower complaint."

113.    Shortly after the raid, the federal government served five subpoenas on the Company and its affiliates which further established that the raid was focused on all three aspects of the fraud described herein—*i.e.*, profit-shifting via reinsurance payments, illegal marketing practices, and improper denials of care.  In particular, the subpoenas collectively sought from WellCare and its affiliates "any and all records" concerning "companies offering any reinsurance," "marketing," and "the denial of claims and encounters," as well as records reflecting the "reduction of medical loss ratio," any "80/20 report(s)" and any "corporate ethics or compliance program(s)."  (Emphasis added.)

### 5.    Subsequent Events Confirm that: (a) the Company Intentionally Defrauded the Government; (b) the Company's Financial Statements Were Materially Misstated throughout the Class Period; and (c) Defendants Farha, Behrens, and Bereday Were Responsible for the Fraud

114.    There is no longer any question that WellCare defrauded the state and federal governments.  On December 21, 2007, Gregory West, a former WellCare employee, pled guilty in the U.S. District Court for the Middle District of Florida to conspiracy to commit Medicaid fraud in violation of 18 U.S.C. § 1349.[2]  West was a Finance Manager in the Company's Medical Economics Department, and was responsible for reporting the Company's medical expenditures to the State of Florida.  According to CW 10, a senior account for WellCare from October 2006

---

[2] Mr. West's plea agreement did not become public until October 6, 2008.

to April 2008, West reported to Peter Clay, WellCare's Vice President of Medical Economics, who directly reported to Defendant Behrens.  In his plea agreement, West admitted that, beginning in "early 2004," he engaged in a conspiracy to "reduce [WellCare's] contractual payback obligations to [Florida] under the [Company's] 80/20 contracts, and thereby correspondingly benefit [WellCare] through an increase in profits."  West explained that he did so by "falsely and fraudulently inflat[ing]" the Company's Medicaid expense data in reports to the State of Florida through a variety of means, including (a) "creating a wholly-owned entity," (referring to Comprehensive Re), "and then using said entity to conceal and falsely and fraudulently inflate" the Company's medical expenses; (b) adding expenses in the Company's regulatory reports that were not bona fide medical expenses; and (c) falsifying the Company's "encounter data" to show that Medicaid recipients met with their doctors more often than they actually did.

115.    West's plea agreement confirmed that he was not a rogue employee, but acted at the specific direction of the Company's senior officers.  Indeed, West's plea agreement specifically provided that he acted "at the direction of one or more [WellCare] officers."  The plea agreement also stated that WellCare engaged in the criminal conspiracy by "acting through its officers," and that those "officers and employees engaged in meetings and other conduct in a concerted and organized effort to conceal and cover-up the false and fraudulent nature of [WellCare's] various expenditure information."

116.    While the plea agreement did not specifically identify the WellCare officers who directed West, it is notable that Defendant Behrens supervised his department, and that Defendant Farha has admitted that he "personally participated" in the Company's medical economics reporting.  On a November 2, 2005 conference call, Defendant Farha stated: "Our

medical economics, actuarial and medical operations teams review each of our market's medical

cost performance on a monthly basis.  I personally participated in the most recent round of these

meetings covering every market in the company and can reiterate my confidence in our medical

costs performance."

117.     At the hearing at which West pled guilty, the Federal Government made clear that

its investigation into WellCare was significant and ongoing.  During that hearing, the

Government stated that West was cooperating in its "very large, very significant ongoing health

care fraud investigation" of WellCare, which the Government described as "a very complex,

very sophisticated matter."  This statement again confirms that the fraud was not the work of a

rogue employee, but was a complicated scheme orchestrated by the Company's top executive

officers.

118.     The Company's own investigation has confirmed that, as a result of that fraud, its

financial statements throughout the Class Period were materially false.  The day after the raid,

the SEC informed the Company that it was opening up its own investigation.  In response, the

Company formed a Special Committee "to monitor developments in the investigation and

oversee responses to them."  On July 21, 2008, WellCare filed a Form 8-K with the SEC (the

"Restatement 8-K") in which it reported that, as a result of issues identified by the Special

Committee, it had determined that its financial statements from 2004 through the first two

quarters of 2007 must be restated.  By concluding that its financial statements throughout the

Class Period need to be restated, the Company has admitted that those financial statements were

materially false when issued, and thus must be corrected and re-issued.

119.     In the Restatement 8-K, the Company admitted that it had committed "accounting

error" by including "certain ineligible medical expenses in our premium refund calculations

which understated the amount of the refund" that the Company owed to Florida under the Florida

Medicaid Contract and the Healthy Kids Contract.  The Company admitted similar conduct with

respect to the refunds it owed to Illinois under the Illinois Medicaid Contract.  Due to its

"errors," the Company stated that it owed the States of Florida and Illinois an additional $46.5

million in refund payments.

120.    WellCare explained that its improper retention of the refunds it owed to Florida

and Illinois had artificially inflated its two most important financial metrics—net income and

earnings per share-diluted—by substantial amounts throughout the Class Period.  Specifically,

WellCare admitted that its net income and earnings per share-diluted were overstated by at least

14% for FY 2004, 9% for FY 2005, 9% for FY 2006, and 5% for the first six months of 2007.

The Company also stated that the Special Committee's investigation was ongoing, and thus the

Company would not present its final restatement until it files its 2007 Form 10-K, which it has

not yet been able to do as a result of the fraud alleged herein.

121.    In addition, the Company has confirmed that Defendants Farha, Behrens, and

Bereday were responsible for the fraud that caused the Company to report materially false

financial results.  In December 2007, the Company first indicated their culpability by excluding

them from Company-wide retention and severance programs that would have granted them a

bonus equal to 50% of their salary.

122.    Then, on January 25, 2008, WellCare announced that it had received the Special

Committee's "preliminary report with recommendations" and that, as a result of that report,

Defendants Farah, Behrens, and Bereday had "resigned."  No other "resignations" were

announced, and each Defendant left his post effective immediately.  The Company further stated

that their resignations were "in the best long-term interest of the company."

123. The Company classified Defendants' resignations as being "without good reason," which, according to Defendants' employment agreements and the Company's Form 14-A proxy statement, is treated the same as a "termination with cause" for purposes of severance compensation. This classification meant that each Defendant would no longer receive substantial financial benefits to which he would have been entitled if he had been "terminated without cause." For example, the Company divested Defendant Farha of more than $10 million in equity awards that, if he had been terminated without cause, would have vested and become immediately exercisable, as well as a $400,000 cash bonus and a full year's salary of $400,000. The Company also cancelled all of Farha's equity awards that had not vested by March 31, 2008, which, in Lead Plaintiffs' estimation, amounted to approximately 320,000 stock options and 169,000 restricted shares. The Company further divested Defendant Behrens of $310,000 in salary he would have received if he had been terminated without cause, and cancelled all equity awards that had not vested by March 31, 2008, which, in Lead Plaintiffs' estimation, amounted to approximately 30,000 options and 12,200 shares. Similarly, the Company deprived Defendant Bereday of $276,000 in salary he would have received if he had been terminated without cause, and cancelled all equity awards that had not vested by March 31, 2008, which, in Lead Plaintiffs' estimation, amounted to approximately 17,500 options and 5,300 shares.

124. The only reason that these Defendants were allowed to "resign without good reason" rather than being terminated for cause, is because, from the Company's perspective, there was no substantive difference—either way, these Defendants forfeited millions of dollars to which they would have been entitled. Indeed, the Company had the option of terminating these Defendants without cause, which, as noted above, would have allowed them to retain many of

the benefits of which they were divested.  The fact that the Company did not do so is compelling evidence of these Defendants' scienter.

125.    Further, in Defendant Farha's separation agreement, the Company explicitly acknowledged that both Farha and the Company might be found liable for criminal or civil securities law violations.  To protect the Company from this possibility, Defendant Farha's separation agreement conditioned his right to receive 130,000 WellCare "Performance Shares" (for which he already was eligible) on the requirement that neither he nor the Company be found to have violated any civil or criminal law, rule, or regulation in any government-initiated proceeding arising from the ongoing investigations.

126.    In its Restatement 8-K, WellCare further acknowledged that Defendants Farha, Behrens, and Bereday directed the fraud, stating that:

> [W]e have determined that <u>former senior management set an inappropriate tone in connection with the Company's efforts to comply with the regulatory requirements</u> related to the AHCA contract and Healthy Kids, and therefore a material weakness existed in a portion of the control environment.  We also have determined that <u>former senior management's failure to ensure effective communications</u> regarding the AHCA contract and Healthy Kids with certain regulators resulted in a material weakness in a portion of the information and communication system.  [Emphasis added.]

127.    WellCare further explained that its hiring of "new company leadership" was a "<u>remedial</u> measure[]" designed to correct the internal control deficiencies that these Defendants had caused.  (Emphasis added.)

128.    Defendants' conduct has not only caused the Company to issue materially false financial statements, but also has exposed the Company to potentially severe civil and criminal liability that has yet to be resolved.  As the Company explained in the Restatement 8-K, any civil, criminal, or regulatory enforcement action could have catastrophic consequences for the

Company, including "disqualif[ication] from participating in certain health care funding programs which are material to its business."

129.    In a July 21, 2008 analyst report, Goldman Sachs wrote that the announced restatement offered an incomplete picture of how the fraud has impacted, and will continue to impact, the Company.  Goldman Sachs reported that the announced restatement failed to provide "clarity" because it did not disclose the "full scope of the ongoing investigation" and did not indicate the kind and amount of sanctions that the Company is facing.  Moreover, Goldman Sachs noted that "criminal sanctions against the company that could materially impact its public sector contracts more broadly cannot be ruled out."

130.    The fraud continues to significantly impact the Company.  Most recently, on September 3, 2008, the State of Florida, by far the Company's largest market, reduced the premium rates it pays to WellCare's Medicaid subsidiaries by 3% and the number of Floridians that WellCare is permitted to enroll in its Medicaid plans—clipping the wings of the Company's once high-flying business model.

## VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

131.    Throughout the Class Period, Defendants WellCare, Farha, and Behrens made materially false and misleading statements on three principal subjects.  First, as the Company admitted in its Restatement 8-K, WellCare issued materially false and misleading financial statements from 2004 through the second quarter of 2007.  While reporting these false income figures, Defendants also certified that the Company's financial statements were accurate and complete, and that there were no material weaknesses in the Company's internal controls over financial reporting.  These statements were important to investors because they assured investors that they could safely rely on the Company's reported results.  However, as the Company admitted in its Restatement 8-K, Defendants Farha, Behrens, and Bereday created a material

weakness in the Company's internal control over financial reporting that rendered WellCare's financial statements materially false.

132.    Second, Defendants WellCare, Farha, and Behrens falsely claimed that WellCare complied with all federal and state laws and regulations governing its business.  These statements of legal compliance were important to investors because WellCare's government contracts were its only source of revenue, and any legal violation directly jeopardized that source of revenue—a fact that the Company acknowledged.   These statements were false because, as set forth above at ¶¶76-80, WellCare engaged in a scheme that violated numerous federal and state laws and regulations governing the manner in which WellCare was required to spend or refund its Medicaid premiums, report its medical expenses, market its health plans, and provide necessary medical care for its enrollees.  Further, as the Company admitted in its Restatement 8-K, Defendants Farha, Behrens, and Bereday were responsible for the Company's legal and regulatory violations.

133.    Third, when confronted with allegations of the fraud described herein, Defendants WellCare, Farha, and Behrens issued a series of materially false denials.  These statements were important to investors because they dispelled analysts' and investors' concerns that the Company might be engaging in behavior that jeopardized its sole source of revenue, *i.e.*, its relationship with its government contractors.  However, as subsequent events have established, the Company indeed committed the fraud alleged herein, and Defendants Farha, Behrens, and Bereday directed the scheme.

134.    Each of these false statements is set forth below.

A.      **False And Misleading Statements Concerning Fiscal Year 2004**

135.    As noted above, throughout the Class Period, WellCare reported artificially high levels of net income and earnings per share-diluted that allowed the Company to consistently

exceed analysts' expectations and drove its stock price higher.  This pattern began on February 14, 2005, the first day of the Class Period, when the Company issued a press release announcing its financial results for the fourth quarter and year-ended December 31, 2004.  The press release reported that the Company's net income for the 2004 fourth quarter was "$17.7 million, or $0.46 per diluted share," and that its net income for the year-ended 2004 was "$49.3 million, or $1.56 per diluted share."

136.    WellCare reported the same net income and earnings per share-diluted in its 2004 Form 10-K filed with the SEC on February 15, 2005.  The 2004 Form 10-K was signed and certified by Defendants Farha and Behrens.  Defendants Farha and Behrens also stated that the 2004 Form 10-K presented a complete and accurate statement of the Company's financial condition, by certifying that:

> [P]ursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:
>
> (1)     The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> (2)     The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.  [Emphasis added.]

137.    The above statements were materially false and misleading because, as the Company admitted in its Restatement 8-K, the Company's 2004 fourth quarter and year-end net income and earnings per share-diluted were overstated by 14%.  As set forth more fully above, this overstatement was achieved through a scheme, directed by Defendants Farha, Behrens, and Bereday, pursuant to which WellCare (a) engaged in fraudulent transactions with its reinsurance subsidiary, (b) reported those transactions as direct medical costs in its state regulatory filings in order to meet its specified medical loss ratios, (c) thereby retained at least $46.5 million it was legally required to refund to the states during the Class Period, and (d) then reported those

illegally-retained funds as profit in its consolidated financial statements, thus artificially inflating its net income and earnings per share-diluted.

138.    The Company's 2004 Form 10-K also stated (as amended by the Company's Form 10-K/A filed with the SEC on June 22, 2005) that that Company possessed effective internal controls over financial reporting, so that its financial statements reflected all material information:

> Our management carried out an evaluation required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision and with the participation of our President and Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15 and 15d-15 under the Exchange Act ("Disclosure Controls").  <u>Based on the evaluation, our CEO and CFO concluded that, subject to the limitations noted herein, as of December 31, 2004, our Disclosure Controls are effective in timely alerting them to material information required to be included in our reports filed with the SEC.</u>  [Emphasis added.]

139.    This statement was materially false and misleading because, throughout the Class Period, material weaknesses existed in the Company's internal controls over financial reporting, which allowed the Company to materially overstate its net income and earnings per share-diluted through the scheme described above.  Further, these weaknesses were caused by Defendants Farha, Behrens, and Bereday.  Indeed, as the Company admitted in its Restatement 8-K, the Company's "former senior management's failure to ensure effective communications . . . with certain regulators resulted in a material weakness in a portion of the information and communication system."

140.    The Company's 2004 Form 10-K also assured investors that WellCare and Defendants Farha and Behrens were conducting the Company's business in accordance with all applicable laws and regulations.  Specifically, the Company stated that it "implement[ed] a

comprehensive corporate ethics and compliance program, called the Trust Program." The

Company described the program as follows:

> The Trust Program <u>covers all aspects of our company</u> and is
> designed to assist us with <u>conducting our business in accordance</u>
> <u>with applicable federal and state laws and high standards of</u>
> <u>business ethics</u>.  The Trust Program applies to members of our
> board of directors, our associates <u>including our Chief Executive</u>
> <u>Officer [and] Chief Financial Officer</u>. . . .  [Emphasis added.]

141.    The Trust Program, as posted on the Company's website, stated unequivocally

that "WellCare will comply with all applicable laws;" that "federal and state laws and

WellCare's high standards of business ethics will be enforced;" that WellCare "shall ensure" that

its disclosures to the SEC are "full, fair, [and] accurate;" and that "senior management are

responsible for ensuring" the enforcement of those laws and requirements.

142.    The statements concerning the Trust Program were materially false and

misleading because WellCare, at the direction of Defendants Farha, Behrens, and Bereday, was

systematically violating several federal and state laws and regulations governing the manner in

which WellCare was required to spend or refund its Medicaid premiums, report its medical

expenses to state regulators, market its health plans, and provide necessary medical care for its

enrollees, as set forth above at ¶¶76-80.

143.    Investors and analysts relied on these false statements to conclude that WellCare

was legitimately achieving large profits beyond consensus expectations.  For example, a

February 15, 2005 Credit Suisse analyst report stated that, "WellCare reported a very strong 4Q

on Monday, with EPS of $0.46, beating our est. of $0.43 and consensus of $0.44"  Likewise, a

February 14, 2005 analyst report by Wachovia Capital Markets, LLC highlighted that the

Company's earnings per share exceeded "our estimate and consensus."  Notably, had WellCare

honestly reported its 2004 fourth quarter financial results, it would have missed analysts'
earnings expectations by four cents per share.

       **B.**     **False And Misleading Statements Concerning Fiscal Year 2005**

     144.    The Company continued to issue artificially inflated financial results throughout
2005. On May 9, 2005, the Company issued a press release reporting that, for the 2005 first
quarter, the Company earned net income of "$10.6 million, or $0.27 per diluted share."

     145.    WellCare repeated those figures for net income and earnings per share-diluted in
the Company's quarterly report on Form 10-Q ("1Q 2005 10-Q"), filed with the SEC on May 10,
2005 and signed and certified by Defendants Farha and Behrens. The 1Q 2005 10-Q also
contained Sarbanes-Oxley certifications by Defendants Farha and Behrens in the form set forth
above in ¶136.

     146.    The above statements were materially false and misleading because, as the
Company admitted in its Restatement 8-K, the Company's 2005 first quarter net income and
earnings per share-diluted were overstated by at least 9%. As set forth more fully above, this
overstatement was achieved through a scheme, directed by Defendants Farha, Behrens, and
Bereday, pursuant to which WellCare (a) engaged in fraudulent transactions with its reinsurance
subsidiary, (b) reported those transactions as direct medical costs in its state regulatory filings in
order to meet its specified medical loss ratios, (c) thereby retained at least $46.5 million it was
legally required to refund to the states during the Class Period, and (d) then reported those
illegally-retained funds as profit in its consolidated financial statements, thus artificially inflating
its net income and earnings per share-diluted.

     147.    The Company's 1Q 2005 10-Q contained a certification of the Company's
internal controls by Defendants Farha and Behrens, in the form set forth above ¶138, which was
materially false and misleading for the reasons provided in that paragraph.

 b

148.    Investors and analysts relied on the Company's inflated financial statements to conclude that WellCare was the best-performing company in its sector.  For example, a May 9, 2005 Credit Suisse analyst report stated that, "WellCare reported 1Q results that <u>qualify as the best in the Medicaid space this earnings season</u> . . . .  The company generated real earnings upside, with EPS of $0.27 . . . ."  (Emphasis added.)  Likewise, a May 9, 2005 Wachovia Capital Markets, LLC report stated that WellCare was "firing on all cylinders—Q1 2005 beats our estimate."  As a result of the false statements set forth above, the price of WellCare stock rose from $31.60 on May 9, 2005 to close at $33.40 on May 10, 2005, on high trading volume.

149.    On August 3, 2005, the Company continued to issue false financial results in excess of analysts' estimates.  On that date, WellCare issued a press release announcing its financial results for the 2005 second quarter, which reported that the Company achieved net income of "$14.2 million, or $0.36 per diluted share," or an increase of more than 58% over the year-ago period.  In the press release, Defendant Farha highlighted the Company's "excellent financial results."

150.    These figures for net income and earnings per share-diluted were repeated in the Company's quarterly report on Form 10-Q ("2Q 2005 10-Q"), filed with the SEC on August 4, 2005 and signed and certified by Defendants Farha and Behrens.  The 2Q 2005 10-Q also contained Sarbanes-Oxley certifications by Defendants Farha and Behrens in the form set forth above in ¶136.

151.    The above statements were materially false and misleading because, as the Company admitted in its Restatement 8-K, the Company's 2005 second quarter net income and earnings per share-diluted were overstated by at least 9%.  As set forth more fully above, this overstatement was achieved through a scheme, directed by Defendants Farha, Behrens, and

Bereday, pursuant to which WellCare (a) engaged in fraudulent transactions with its reinsurance subsidiary, (b) reported those transactions as direct medical costs in its state regulatory filings in order to meet its specified medical loss ratios, (c) thereby retained at least $46.5 million it was legally required to refund to the states during the Class Period, and (d) then reported those illegally-retained funds as profit in its consolidated financial statements, thus artificially inflating its net income and earnings per share-diluted.

152.    Further, WellCare's 2Q 2005 10-Q contained a certification of the Company's internal controls by Defendants Farha and Behrens, in the form set forth above in ¶138, and was materially false for the reasons set forth in that paragraph.

153.    Investors and analysts again relied on the Company's materially inflated financial results to conclude that WellCare was outperforming its industry peers.  An August 4, 2005 analyst report by CIBC World Markets stated that, "WellCare's second quarter earnings handily beat expectations, and coupled with the company's improved earnings outlook, should help to dispel some of the investor concern surrounding WellCare, following disappointing results from several of its Medicaid peers."  (Emphasis added.)  Similarly, an August 4, 2005 report by Credit Suisse stated that the Company "reported strong 2Q EPS of $0.36, in line with our estimate and $0.01 ahead of consensus."  Significantly, had WellCare accurately reported its 2005 second quarter net income and earnings per share-diluted, it would have fallen short of consensus expectations by two cents per share.

154.    The following quarter, the Company again artificially inflated its financial results to exceed consensus expectations.  On November 1, 2005, the Company issued a press release announcing its financial results for the 2005 third quarter, which reported that it had achieved net income of "$16.3 million . . . or $0.41 per diluted share."  In the press release, Defendant Farha

stated that the Company had delivered "superior results" in its "key growth, earnings, and cash flow measures."

155.    WellCare repeated those figures in its quarterly report on Form 10-Q ("3Q 2005 10-Q"), filed with the SEC on November 2, 2005 and signed and certified by Defendants Farha and Behrens.  The 3Q 2005 10-Q also contained Sarbanes-Oxley certifications by Defendants Farha and Behrens in the form set forth above in ¶136.

156.    The above statements were materially false and misleading because, as the Company admitted in its Restatement 8-K, the Company's 2005 third quarter net income and earnings per share-diluted were overstated by at least 9%.  As set forth more fully above, this overstatement was achieved through a scheme, directed by Defendants Farha, Behrens, and Bereday, pursuant to which WellCare (a) engaged in fraudulent transactions with its reinsurance subsidiary, (b) reported those transactions as direct medical costs in its state regulatory filings in order to meet its specified medical loss ratios, (c) thereby retained at least $46.5 million it was legally required to refund to the states during the Class Period, and (d) then reported those illegally-retained funds as profit in its consolidated financial statements, thus artificially inflating its net income and earnings per share-diluted.

157.    In addition, WellCare's 3Q 2005 10-Q contained a certification of the Company's internal controls by Defendants Farha and Behrens, in the form set forth above in ¶138, which was materially false for the reasons set forth in that paragraph.

158.    Investors and analysts yet again relied on these statements to conclude that WellCare was continuing to legitimately exceed consensus expectations and outperform its peers.  For example, a November 1, 2005 analyst report by Credit Suisse "applaud[ed] the company's success to date," highlighted that the Company's earnings per share "beat[]

cons[ensus] and our est[imates]," and noted that WellCare "does not appear to be having any of the medical cost or reserve issues faced by its peers." Similarly, a November 1, 2005 CIBC World Markets report stated that "<u>fears of an earnings miss proved unfounded, as third quarter earnings beat expectations</u> on what appears to be a high quality quarter." (Emphasis added.) And Legg Mason issued a report on November 2, 2005 conceding that although it had been "skeptical" of the Company's ability to compete, "<u>Given the results of the last two quarters</u>, and confident plans for 2006, <u>this 'show-me' story is delivering, in our opinion</u>." (Emphasis added.) As a result of the false statements set forth above, the price of WellCare stock rose from an opening price of $31.35 on November 1, 2005 to close at $35.33 on November 2, 2005, on high trading volume. Importantly, if WellCare had accurately reported its 2005 third quarter results, it would have missed consensus expectations by one cent per share.

159. On February 13, 2006, the Company issued a press release announcing its financial results for the fourth quarter and year-ended December 31, 2005. The press release stated that, for the 2005 fourth quarter, WellCare earned net income of "$10.8 million," or "$0.27 per diluted share," and for the year-ended 2005, the Company earned net income of "$51.9 million, or $1.32 per diluted share."

160. The figures for net income and earnings per share-diluted, set forth above, were repeated in the Company's annual report on Form 10-K ("2005 Form 10-K") filed with the SEC on February 14, 2006. The 2005 Form 10-K was signed and certified by Defendants Farha and Behrens. In addition, the 2005 Form 10-K contained Sarbanes-Oxley certifications by Defendants Farha and Behrens in the form set forth above in ¶136.

161. The above statements were materially false and misleading because, as the Company admitted in its Restatement 8-K, the Company's 2005 fourth quarter and year-end net

income and earnings per share-diluted were overstated by at least 9%.  As set forth more fully above, this overstatement was achieved through a scheme, directed by Defendants Farha, Behrens, and Bereday, pursuant to which WellCare (a) engaged in fraudulent transactions with its reinsurance subsidiary, (b) reported those transactions as direct medical costs in its state regulatory filings in order to meet its specified medical loss ratios, (c) thereby retained at least $46.5 million it was legally required to refund to the states during the Class Period, and (d) then reported those illegally-retained funds as profit in its consolidated financial statements, thus artificially inflating its net income and earnings per share-diluted.

162.    Further, WellCare's 2005 Form 10-K contained a certification of the Company's internal controls by Defendants Farha and Behrens, in the form set forth above in ¶138, which was materially false and misleading for the reasons set forth in that paragraph.

163.    In addition, the Company repeated the statements concerning its Trust Program originally set forth in its 2004 Form 10-K, as set forth above in ¶¶140-41.  The statements concerning the Trust Program were materially false and misleading because WellCare, at the direction of Defendants Farha, Behrens, and Bereday, was systematically violating several federal and state laws and regulations governing the manner in which WellCare was required to spend or refund its Medicaid premiums, report its medical expenses to state regulators, market its health plans, and provide necessary medical care for its enrollees, as set forth above at ¶¶76-80.

164.    Investors and analysts against relied on the above false statements to conclude that WellCare was continuing to outperform the market's expectations.  A February 14, 2006 analyst report by CIBC World Markets noted that the Company's strong results "should be more than enough to push the stock higher tomorrow."  As a result of the false statements set forth above, the price of WellCare stock rose from an open of $39.01 on February 13, 2006 to close at

$41.50 on February 14, 2006, on high trading volume.  Indeed, a February 13, 2006 CIBC World

Markets report observed that WellCare's earnings reports consistently caused its stock to rise,

stating, "Since reporting its first quarter as a public company in 2Q04, WellCare has gained an

average of 3.0% on the day it reports earnings."

C.      <u>False And Misleading Statements Concerning Fiscal Year 2006</u>

165.     During fiscal year 2006, WellCare continued to report record results.  Indeed, by

the end of the year, the Company had almost tripled its net income when compared to 2005.  The

Company's 2006 financial results were so ostensibly spectacular that Defendant Farha called

them "transformative" and touted the Company's "industry-leading growth."  Because of these

results, the Company's stock price appreciated almost 70% during 2006.  As set forth below,

however, the Company's record financial results were false.

166.     On May 8, 2006, the Company issued a press release announcing its financial

results for the 2006 first quarter, which stated that the Company earned net income of "$16.8

million, or $0.42 per diluted share," representing 58% growth over the year-ago period.  In that

press release, Defendant Farha stated that, "We continue to achieve industry-leading growth."

167.     WellCare repeated those figures for net income and earnings per share-diluted in

its quarterly report on Form 10-Q ("1Q 2006 10-Q"), filed with the SEC on May 9, 2006 and

signed and certified by Defendants Farha and Behrens.  In addition, the 1Q 2006 10-Q contained

Sarbanes-Oxley certifications by Defendants Farha and Behrens in the form set forth above in

¶136.

168.     The above statements were materially false and misleading because, as the

Company admitted in its Restatement 8-K, the Company's 2006 first quarter net income and

earnings per share-diluted were overstated by at least 9%.  As set forth more fully above, this

overstatement was achieved through a scheme, directed by Defendants Farha, Behrens, and

60

Bereday, pursuant to which WellCare (a) engaged in fraudulent transactions with its reinsurance subsidiary, (b) reported those transactions as direct medical costs in its state regulatory filings in order to meet its specified medical loss ratios, (c) thereby retained at least $46.5 million it was legally required to refund to the states during the Class Period, and (d) then reported those illegally-retained funds as profit in its consolidated financial statements, thus artificially inflating its net income and earnings per share-diluted.

169.    Further, WellCare's 1Q 2006 10-Q contained a certification of the Company's internal controls by Defendants Farha and Behrens, in the form set forth above in ¶138, which was materially false and misleading for the reasons set forth in that paragraph.

170.    Investors and analysts again relied on the Company's materially false financial results to conclude that WellCare was performing far ahead of expectations.  A May 8, 2006 analyst report by CIBC World Markets highlighted that, "WellCare beat first quarter expectations by $0.07 per share, and raised full year guidance by $0.15 per share, on the strength of better than expected medical cost trends . . . ."  As a result of the false statements set forth above, the price of WellCare stock rose from an open of $41.05 on May 8, 2006 to close at $45.38 on May 10, 2006, on high trading volume.

171.    The next quarter, the Company again overstated its income.  On August 2, 2006, the Company issued a press release announcing its financial results for the 2006 second quarter, which stated "that net income for the second quarter of 2006 increased 56.7% [over the year-ago period] to $22.2 million, or $0.55 per diluted share"

172.    WellCare repeated those figures for net income and earnings per share-diluted in its quarterly report on Form 10-Q ("2Q 2006 10-Q"), filed with the SEC on August 4, 2006, and signed and certified by Defendants Farha and Behrens.  In addition, the 2Q 2006 10-Q contained

Sarbanes-Oxley certifications by Defendants Farha and Behrens in the form set forth above in ¶136.

173.    The above statements were materially false and misleading because, as the Company admitted in its Restatement 8-K, the Company's 2006 second quarter net income and earnings per share-diluted were overstated by at least 9%.  As set forth more fully above, this overstatement was achieved through a scheme, directed by Defendants Farha, Behrens, and Bereday, pursuant to which WellCare (a) engaged in fraudulent transactions with its reinsurance subsidiary, (b) reported those transactions as direct medical costs in its state regulatory filings in order to meet its specified medical loss ratios, (c) thereby retained at least $46.5 million it was legally required to refund to the states during the Class Period, and (d) then reported those illegally-retained funds as profit in its consolidated financial statements, thus artificially inflating its net income and earnings per share-diluted.

174.    Further, WellCare's 2Q 2006 10-Q contained a certification of the Company's internal controls by Defendants Farha and Behrens, in the form set forth above in ¶138, which was materially false and misleading for the reasons set forth in that paragraph.

175.    Again, analysts and investors relied on those false statements to conclude that the Company was performing well.  For example, an August 2, 2006 analyst report by CIBC World Markets stated that, "WellCare's second quarter earnings and full year guidance were well beyond our imagination . . . .  Everything else equal, we'd expect the stock to react positively tomorrow."  As a result of the false statements set forth above, the price of WellCare stock rose from a close of $50.36 on August 1, 2006 to close at $51.45 on August 3, 2006, on high trading volume.

176.    In the third quarter of 2006, the Company reported its best financial results to date, nearly doubling its net income from the prior quarter.  Specifically, on November 1, 2006, the Company issued a press release announcing that for the 2006 third quarter, the Company earned net income of "$43.3 million, or $1.06 per diluted share."

177.    WellCare repeated those figures for net income and earnings per share-diluted in its quarterly report on Form 10-Q ("3Q 2006 10-Q"), filed with the SEC on November 3, 2006, and signed and certified by Defendants Farha and Behrens.  In addition, the 3Q 2006 10-Q contained Sarbanes-Oxley certifications by Defendants Farha and Behrens in the form set forth above in ¶136.

178.    The above statements were materially false and misleading because, as the Company admitted in its Restatement 8-K, the Company's 2006 third quarter net income and earnings per share-diluted were overstated by at least 9%.  As set forth more fully above, this overstatement was achieved through a scheme, directed by Defendants Farha, Behrens, and Bereday, pursuant to which WellCare (a) engaged in fraudulent transactions with its reinsurance subsidiary, (b) reported those transactions as direct medical costs in its state regulatory filings in order to meet its specified medical loss ratios, (c) thereby retained at least $46.5 million it was legally required to refund to the states during the Class Period, and (d) then reported those illegally-retained funds as profit in its consolidated financial statements, thus artificially inflating its net income and earnings per share-diluted.

179.    Further, WellCare's 3Q 2006 10-Q contained a certification of the Company's internal controls by Defendants Farha and Behrens, in the form set forth above in ¶138, which was materially false and misleading for the reasons set forth in that paragraph.

180.    On November 2, 2006 the Company held a conference call to discuss its third

quarter results.  During that call, an analyst asked whether the Company expected to be sued over

regulatory violations that occurred in an Illinois subsidiary that the Company had recently

acquired.  In response, Defendant Farha assured investors that the Company's senior

management had "focused" on ensuring that "everyone" in the Company adhered to "all

applicable" laws:

> We have a what I would consider to be an industry leading corporate compliance
> program that is a significant and has been, by the way, a significant focus of the
> senior leadership in our Company that is design[ed] to make sure that everyone
> from our front line employees through the top comply with all the applicable
> regulations and rules.  We feel very good about our operations and done [sic]
> believe that anything like this is a risk for our Company.  [Emphasis added.]

181.    That statement was materially false and misleading because, in fact, WellCare, at

the direction of Defendants Farha, Behrens, and Bereday, was systematically violating several

federal and state laws and regulations governing the manner in which WellCare was required to

spend or refund its Medicaid premiums, report its medical expenses to state regulators, market its

health plans, and provide necessary medical care for its enrollees, as set forth above at ¶¶76-80.

182.    Analysts and investors again relied on WellCare's false statements of income and

legal compliance to conclude that the Company was legitimately exceeding market expectations.

For example, a November 1, 2006 analyst report by CIBC World Markets stated that, "Words

can't do justice to WellCare's third quarter earnings and 2007 outlook . . . ."  As a result of the

false statements set forth above, the price of WellCare stock rose from a closing price of $58.75

on October 31, 2006 to close at $61.39 on November 2, 2006, on heavy trading volume.

183.    On February 13, 2007, WellCare announced the best results in its history.  On that

day, the Company issued a press release announcing its financial results for the fourth quarter

and year-ended December 31, 2006.  The press release stated that the Company's fourth quarter

net income was "$57.0 million, or $1.38 per diluted share," and its year-end net income was "$139.2 million, or $3.43 per diluted share."  These year-end results reflected that WellCare had almost tripled its income from 2005—results that Defendant Farha called "transformative."

184.    WellCare reported those figures for net income and earnings per share-diluted in its annual report on Form 10-K ("2006 Form 10-K") filed with the SEC on February 14, 2007. The 2006 Form 10-K was signed and certified by Defendants Farha and Behrens.  In addition, the 2006 Form 10-K contained Sarbanes-Oxley certifications by Defendants Farha and Behrens in the form set forth above in ¶136.

185.    The above statements were materially false and misleading because, as the Company admitted in its Restatement 8-K, the Company's 2006 fourth quarter and year-end net income and earnings per share-diluted were overstated by at least 9%.  As set forth more fully above, this overstatement was achieved through a scheme, directed by Defendants Farha, Behrens, and Bereday, pursuant to which WellCare (a) engaged in fraudulent transactions with its reinsurance subsidiary, (b) reported those transactions as direct medical costs in its state regulatory filings in order to meet its specified medical loss ratios, (c) thereby retained at least $46.5 million it was legally required to refund to the states during the Class Period, and (d) then reported those illegally-retained funds as profit in its consolidated financial statements, thus artificially inflating its net income and earnings per share-diluted.

186.    Further, WellCare's 2006 Form 10-K contained a certification of the Company's internal controls by Defendants Farha and Behrens, in the form set forth above in ¶138, which was materially false and misleading for the reasons set forth in that paragraph.

187.    In addition, the Company repeated the statements concerning its Trust Program originally set forth in its 2004 Form 10-K, as noted above in ¶140-41.  These statements were

materially false and misleading because WellCare, at the direction of Defendants Farha, Behrens, and Bereday, was systematically violating several federal and state laws and regulations governing the manner in which WellCare was required to spend or refund its Medicaid premiums, report its medical expenses to state regulators, market its health plans, and provide necessary medical care for its enrollees, as set forth above at ¶¶76-80.

188.     Analysts and investors again relied on the above false statements to conclude that WellCare was legitimately exceeding market expectations.  For example, a February 14, 2007 CIBC World Markets report stated that WellCare "beat consensus" estimates.   As a result of the false statements set forth above, the price of WellCare stock rose from a closing price of $76.50 on February 12, 2007 to close at $79.70 on February 15, 2007, on high trading volume.  Notably, had the Company accurately reported its fourth quarter earnings per share-diluted of $1.26, it would have missed expectations by five cents per share.  Moreover, if the Company had accurately reported its full year earnings per share-diluted of $3.13, it would have fallen short of analysts' expectations by 17 cents per share.

### D.     False And Misleading Statements Concerning Fiscal Year 2007

189.     As noted above in ¶¶88-91, in March and April of 2007, CIBC and Goldman Sachs analysts began to raise questions about discrepancies between the Company's medical loss ratios as reported in its state regulatory filings versus its SEC filings, and hypothesized that these discrepancies indicated that WellCare might be using its Cayman Islands reinsurance subsidiary to hide profits from state regulators.  In response, Defendants WellCare, Farha, and Behrens staunchly denied those allegations and even personally criticized the analysts who issued the reports.

190.     For example, on April 11, 2007, *The Tampa Tribune* reported that "CIBC World Markets and Goldman, Sachs & Co. both say WellCare has been able to give state regulators the

impression that its profits are slim by shifting money to a WellCare subsidiary in the Cayman

Islands in the form of reinsurance premiums."  In that article, WellCare flatly denied those

reports, as follows:

> WellCare questioned both [the Goldman Sachs analyst's] motives and math.
>
> "Analysts often sensationalize routine information to generate trading volume and profit," wrote WellCare spokeswoman Carol Cassara in the first of several e-mails to The Tampa Tribune in response to claims made by Borsch and others.
>
> Not only is it legal for WellCare to conduct business with an affiliated company, she wrote, the arrangement was approved by Florida regulators in advance.
>
>                             * * *
>
> Cassara, the WellCare spokeswoman, said the Goldman, Sachs report errs by applying Wall Street-style analysis to a Medicaid arena.  "The report uses aggregate data to make assumptions that are not reflective of our multiple lines of business," she wrote in an e-mail to the Tribune.  [Emphasis added.]

191.    On April 27, 2007, reports of WellCare's profit-shifting resurfaced, and the

Company again vehemently denied any wrongdoing.  On that day, *The Tampa Tribune* published

an article reporting that the Florida Department of Financial Services was investigating WellCare

for possibly making overpayments to its Cayman subsidiary in order to hide profits from state

regulators.  The Company denied those allegations as follows:

> Marc Ryan, vice president of policy at Tampa-based WellCare, said that when [Florida's CFO] completes her review she will find that there were no overpayments to the affiliate.
>
>                             * * *
>
> Ryan noted that the [Goldman Sachs and CIBC] analysts erred by lumping the Medicaid and Medicare premiums together.  [Emphasis added.]

192.    WellCare's statements in the April 11 and April 27 articles in *The Tampa Tribune*

were materially false and misleading because, in fact, Defendants were executing a scheme

pursuant to which WellCare (a) engaged in fraudulent transactions with its reinsurance subsidiary, (b) reported those transactions as direct medical costs in its state regulatory filings in order to meet its specified medical loss ratios, (c) thereby retained at least $46.5 million it was legally required to refund to the states during the Class Period, and (d) then reported those illegally-retained funds as profit in its consolidated financial statements, thus artificially inflating its net income and earnings per share-diluted.  Further, the Company's state regulators had not "approved" those reinsurance transactions, as evidenced by the October 24, 2007 raid of WellCare's headquarters, Gregory West's guilty plea to conspiracy to commit Medicaid fraud, and the Company's admission in its Restatement 8-K that Defendants Farha, Behrens, and Bereday had "set an inappropriate tone in connection with the Company's efforts to comply with the regulatory requirements" that governed its business.

193.    As investor concern over these allegations grew, the Company's stock price fell from $93.44 on April 24 to $86.50 on April 27.  The Company quickly acted to reverse this decline, dispel allegations of improper profit-shifting, and re-focus investors' attention on the Company's false financial results.  Thus, on April 30, 2007, the Company issued a press release pre-announcing—a week ahead of schedule—its financial results for the 2007 first quarter.  That press release stated that for the 2007 first quarter, the Company had earned net income of "$25.0 million, or $0.60 per diluted share," which was four cents above analysts' consensus estimates.  Noting that the Company "continues to deliver excellent results," Defendant Farha stated that he was "very optimistic about WellCare's future" and that the Company would upwardly revise its full-year guidance on May 7, 2007.

194.    On May 7, 2007, the Company issued another press release, in which it repeated the net income and earnings per share-diluted figures set forth above.  It also announced that it

was increasing its guidance for the year 2007 by 13%, to reflect earnings per share of $4.65-$4.75, which would substantially exceed the Company's record 2006 earnings of $3.43 per share.  In that press release, Defendant Farha stated that, "Our strong start to the year sets the stage for a very successful 2007."

195.    WellCare reported the above figures for net income and earnings per share-diluted in its quarterly report on Form 10-Q ("1Q 2007 10-Q"), filed with the SEC on May 9, 2007 and signed and certified by Defendants Farha and Behrens.  In addition, the 1Q 2007 10-Q contained Sarbanes-Oxley certifications by Defendants Farha and Behrens in the form set forth above in ¶136.

196.    The above statements were materially false and misleading because, as the Company admitted in its Restatement 8-K, the Company's 2007 net income and earnings per share-diluted were materially overstated by 5% for the first six months of 2007.  As set forth more fully above, this overstatement was achieved through a scheme, directed by Defendants Farha, Behrens, and Bereday, pursuant to which WellCare (a) engaged in fraudulent transactions with its reinsurance subsidiary, (b) reported those transactions as direct medical costs in its state regulatory filings in order to meet its specified medical loss ratios, (c) thereby retained at least $46.5 million it was legally required to refund to the states during the Class Period, and (d) then reported those illegally-retained funds as profit in its consolidated financial statements, thus artificially inflating its net income and earnings per share-diluted.

197.    Further, WellCare's 1Q 2007 10-Q contained a certification of the Company's internal controls by Defendants Farha and Behrens, in the form set forth above in ¶138, which was materially false and misleading for the reasons set forth in that paragraph.

198.   On May 8, 2007, the Company held an earnings conference call to discuss its first quarter results, during which Defendants Farha and Behrens repeatedly denied that the Company was using its reinsurance subsidiary to hide profits from state regulators.

199.   For example, Defendant Behrens stated that the analysts questioning the Company's use of its reinsurance subsidiary had erred in their analysis and drawn "inappropriate conclusions," that the Company's reinsurance relationship had "been approved" by state regulators, and "clearly had no material impact" on the Company's 2006 results, as follows:

> Some attention has been focused on WellCare's use of reinsurance as part of our overall risk and capital management strategies.  . . . The reinsurance rates are developed by Mercer actuaries, and the agreements between our regulated entities and captive reinsurer have been approved by the appropriate regulatory authorities.  We provide full disclosure in our statutory filings as required by the NEIC.
>
> When extracting information from statutory filings, a full understanding of the filings is necessary to avoid drawing inappropriate conclusions, some of which have recently been published.  . . .  This [reinsurance] arrangement clearly had no material impact on Florida Medicaid medical result in 2006.  [Emphasis added.]

200.   Later during the call, Goldman Sachs analyst Matthew Borsch tried to "delve a little bit further" into the Company's relationship with its reinsurer, and asked whether the Company had effectively been hiding profits in its Cayman subsidiary.  In response, Defendant Behrens again denied any impropriety:

> [W]hen looking at the reported results I don't see anything unusual in the pattern as I detailed, for instance using the example of Florida.  So I do believe that that [reinsurance] has all been reported properly.   Our program is designed consistently across markets, and I think we've been very disclosive [sic] about how it operates.  [Emphasis added.]

201.   Defendant Behrens's statements during the May 8, 2007 call were materially false and misleading because Defendants were executing an undisclosed scheme by which WellCare (a) engaged in fraudulent transactions with its reinsurance subsidiary, (b) reported those transactions as direct medical costs in its state regulatory filings in order to meet its specified

70

medical loss ratios, (c) thereby retained at least $46.5 million it was legally required to refund to

the states during the Class Period, and (d) then reported those illegally-retained funds as profit in

its consolidated financial statements, thus artificially inflating its net income and earnings per

share-diluted.  Further, the Company's state regulators had not "approved" the Company's

transactions with its captive reinsurer, as evidenced by the October 24, 2007 raid of WellCare's

headquarters, Gregory West's guilty plea to conspiracy to commit Medicaid fraud, and the

Company's admission in its Restatement 8-K that Defendants Farha, Behrens, and Bereday had

"set an inappropriate tone in connection with the Company's efforts to comply with the

regulatory requirements" that governed its business.  Finally, the Company's improper use of its

reinsurance subsidiary indeed had a material impact on its 2006 results, as the Company

admitted in its Restatement 8-K, by inflating its 2006 net income and earnings per share-diluted

by at least 9%.

202.    Meanwhile, reports began surfacing about the Company's systematic marketing

violations.  As noted above in ¶101, on May 6, 2007, *The New York Times* reported that

WellCare sales agents nationwide had "forged" potential enrollees' signatures, deceived non-

English speakers about whether their doctors participated in WellCare's plans, and generally

failed to provide other enrollees with information sufficient to understand the plans in which they

were enrolling.  The article reported that WellCare's marketing violations were so pronounced

that Leslie V. Norwalk, then-acting administrator of CMS, had told the Company that "its efforts

thus far to address marketing issues were inadequate and unacceptable."

203.    Accordingly, during the May 8, 2007 conference call, analysts also questioned

Defendant Farha on these allegations.  In response, Defendant Farha flatly denied any

impropriety and extolled the Company's supposed "zero tolerance" compliance program:

<u>We focus very diligently on our compliance efforts,</u> which included training and retraining, which include an aggressive secret shopper program. . . . [We have] <u>zero tolerance for any infraction</u> and for example, in the instances that for some reason were written about in May, we were the ones that found it, acted immediately to terminate those agents and, of course, self-report to the relevant agencies. <u>So we don't see any regulatory impact from that.</u> [W]hat we are doing is being proactive, playing a leading role in the industry workgroup to set <u>best-in-class standards</u> for how agents conduct themselves . . . . [Emphasis added.]

204.    Defendant Farha's above statement was materially false and misleading because, in reality, the Company was systemically engaging in a variety of marketing practices that violated applicable regulations in order to grow its enrollment and, in turn, its revenue, as set forth above at ¶¶76-80.  Indeed, despite Defendant Farha's assurances, the Company's illegal marketing practices continued unabated.  Consequently, on June 15, 2007, CMS announced that it would oversee and enforce an ostensibly voluntary suspension of WellCare's marketing of its Medicare Advantage plan in order to halt and correct ongoing "deceptive marketing practices."

205.    Analysts and investors once again relied on Defendants' false statements to conclude that the Company was performing well and was in compliance with all applicable laws and regulations.  For example, a May 1, 2007 CIBC World Markets analyst report stated that, "There's been a lot of attention on [WellCare's] reinsurance arrangements, but nothing appears to be inherently wrong with these transactions."  Notably, that report was authored by the same analyst who had first hypothesized, on March 12, 2007, that the Company was using its reinsurance subsidiary to potentially hide profits from States.  Similarly, a May 8, 2007 analyst report by Stifel Nicolaus stated that "[m]anagement appears very confident in their position and relationship with the state" concerning the Company's use of Comprehensive Re.  And a May 7, 2007 CIBC World Markets report highlighted that WellCare "beat consensus" earnings estimates and also issued guidance that was "far in excess of any consensus expectations."  As a result of

the false statements set forth above, the price of WellCare stock rose from an open of $82.08 on

May 7, 2007 to close at $90.16 on May 8, 2006, on extremely high trading volume.

206.    Throughout the spring and summer of 2007, scrutiny of WellCare's marketing

intensified to such a degree that Congress held two hearings on the subject.  On both occasions,

WellCare assured Congress that it was rigorously enforcing its supposedly "zero tolerance"

policy for marketing violations.  Specifically, on May 16, 2007, Gary Bailey, WellCare's Vice

President of Medicare Operational Performance, submitted testimony to the Senate's Committee

on Aging that WellCare had "no tolerance for any unethical or inappropriate actions," and

"vigorously enforce[d] a zero-tolerance policy for the violations of all laws, rules and policies,"

as required by its "Trust Program."

207.    Those statements were materially false and misleading because, in fact, the

Company was systematically engaging in a variety of marketing practices that violated

applicable regulations in order to grow its enrollment and, in turn, its revenue, as set forth above

at ¶¶76-80.  Indeed, despite Bailey's assurances, the Company's illegal marketing practices

continued unabated.  Consequently, on June 15, 2007, CMS announced that it would oversee and

enforce an ostensibly voluntary suspension of WellCare's marketing of its Medicare Advantage

plan in order to halt and correct ongoing "deceptive marketing practices."

208.    On May 20, 2007, additional reports surfaced that another state was investigating

the Company's reinsurance dealings, and the Company again flatly denied any impropriety.

Specifically, on May 20, 2007, the *Hartford Courant* published an article reporting that

"watchdogs in Connecticut have expressed concern that WellCare may be artificially reducing its

profit margins by shifting income to the Cayman Islands subsidiary," and that Connecticut

Attorney General Richard Blumenthal and Social Services Commissioner Michael P. Starkowski

were investigating whether WellCare "is reporting all of its profits, which the state relies on for setting the firm's payment rates."  The article further reported that Marc Ryan, "a vice president for WellCare in Florida, said last week that the company isn't trying to hide anything," that WellCare's reinsurance rates were "reasonable and fair . . . and the company's transactions with its Cayman Island reinsurance affiliate have been fully disclosed to and approved by the state insurance department."

209.    WellCare's denials set forth above were materially false and misleading because Defendants were executing an undisclosed scheme, by which WellCare (a) engaged in fraudulent transactions with its reinsurance subsidiary, (b) reported those transactions as direct medical costs in its state regulatory filings in order to meet its specified medical loss ratios, (c) thereby retained at least $46.5 million it was legally required to refund to the states during the Class Period, and (d) then reported those illegally-retained funds as profit in its consolidated financial statements, thus artificially inflating its net income and earnings per share-diluted.  Further, the Company's state regulators had not "approved" the Company's transactions with its captive reinsurer, as evidenced by the October 24, 2007 raid of WellCare's headquarters, Gregory West's guilty plea to conspiracy to commit Medicaid fraud, and the Company's admission in its Restatement 8-K that Defendants Farha, Behrens, and Bereday had "set an inappropriate tone in connection with the Company's efforts to comply with the regulatory requirements" that governed its business.

210.    Meanwhile, the Company's marketing violations continued to such an extent that WellCare had to cease marketing certain of its Medicaid plans and Congress held a second hearing on the Company's marketing practices.  On June 15, 2007, CMS announced that it would oversee and enforce an ostensibly voluntary suspension of WellCare's marketing of its Medicare

Advantage plans in order to halt and correct "deceptive marketing practices."  Shortly thereafter, on June 26, 2007, Bailey appeared before the House of Representatives' Subcommittee on Oversight & Investigations, where he repeated the testimony he gave on May 16, 2007, as set forth above at ¶206.

211.    Again, that testimony was materially false and misleading because, as set forth above at ¶¶76-80, throughout the Class Period, WellCare systematically engaged in a variety of marketing practices that violated applicable regulations, in order to grow its enrollment and its revenue.  Indeed, WellCare's marketing violations continued even after Bailey's June 26, 2007 testimony.  Consequently, on August 9, 2007, CMS cited WellCare for eight kinds of marketing violations, including engaging in activities that "mislead" enrollees and "misrepresent" its plans.

212.    WellCare continued to misrepresent its financial results throughout the summer of 2007.  Specifically, on August 2, 2007, the Company issued a press release announcing its financial results for the 2007 second quarter, which stated that WellCare had earned net income of "$54.6 million, up 146% over the second quarter 2006," and diluted earnings per share of "$1.30 versus $0.55 in the same period last year, a 136% increase."  Further, in the press release, the Company raised its full-year guidance for 2007 another 6%, this time to reflect record earnings per share-diluted of $5.00-$5.05.

213.    WellCare repeated its 2007 second quarter net income and earnings per share-diluted figures in its quarterly report on Form 10-Q ("2Q 2007 10-Q"), filed with the SEC on August 3, 2007 and signed and certified by Defendants Farha and Behrens.  In addition, the 2Q 2007 10-Q contained Sarbanes-Oxley certifications by Defendants Farha and Behrens in the form set forth above in ¶136.

214.    The above statements were materially false and misleading because, as the Company admitted in its Restatement 8-K, the Company's net income and earnings per share-diluted were overstated by 5% for the first six months of 2007.  As set forth more fully above, this overstatement was achieved through a scheme, directed by Defendants Farha, Behrens, and Bereday, pursuant to which WellCare (a) engaged in fraudulent transactions with its reinsurance subsidiary, (b) reported those transactions as direct medical costs in its state regulatory filings in order to meet its specified medical loss ratios, (c) thereby retained at least $46.5 million it was legally required to refund to the states during the Class Period, and (d) then reported those illegally-retained funds as profit in its consolidated financial statements, thus artificially inflating its net income and earnings per share-diluted.

215.    Further, WellCare's 2Q 2007 10-Q contained a certification of the Company's internal controls by Defendants Farha and Behrens, in the form set forth above in ¶138, and was materially false and misleading for the reasons set forth in that paragraph.

216.    Analysts and investors relied on these statements to conclude that WellCare was continuing to achieve financial results beyond the market's expectations.  For example, an August 2, 2007 analyst report by Credit Suisse noted that, "[T]oday's announcement maintains WellCare's historical pattern of beating consensus estimates and raising guidance."  As a result of the false statements set forth above, the price of WellCare stock rose from a close of $100.84 on August 1, 2007 to close at $106.80 on August 2, 2007, on heavy trading volume.

217.    WellCare's repeated denials of impropriety, continuous issuance of artificially inflated financial results, and other false statements set forth above had their intended effect.  Throughout the rest of the summer and into the fall of 2007, the Company's share price rose to a high of $122.27, achieved on October 23, 2007.  The very next day, on October 24, 2007,

WellCare's scheme unraveled, as 200 armed federal and state agents raided the Company's corporate headquarters. This massive enforcement action was triggered by the fraud alleged herein and specifically targeted Defendants Farha, Behrens, and Bereday, as set forth above at ¶¶106-09.

218. In response to the raid, the Company's stock plunged from a closing price of $122.27 on October 23, 2007, to a closing price of $42.67 on October 25—even though the NYSE halted trading on the day of the raid—on its highest volume of the year.

219. Since that raid, subsequent events have established that WellCare intentionally defrauded the government as alleged herein; that, consequently, its statements of net income and earnings per share-diluted were materially misstated throughout the Class Period; and that Defendants Farha, Behrens, and Bereday directed the fraud, as set forth more fully above at ¶¶114-27.

220. To date, investigations by the U.S. Attorney's Office for the Middle District of Florida and the SEC are ongoing. The Company's stock price has never recovered from the fraud alleged herein, and now trades at approximately $22 per share, down approximately 82% from its Class Period high.

## VII. WELLCARE'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP

221. Each of the Company's Forms 10-K and 10-Q issued during the Class Period stated that it was prepared in accordance with generally accepted accounting principles ("GAAP"). Each of those statements was false. Indeed, by admitting in its Restatement 8-K that the Company's financial statements from 2004 through the first half of 2007 were the product of "accounting errors" at the time the financial statements were issued, WellCare has admitted that it violated GAAP throughout the Class Period. Specifically, and as described more fully below,

WellCare violated GAAP throughout the Class Period by recognizing revenues that it had not earned and failing to account for contingent liabilities.  Each of these violations was material under GAAP standards.

222.    Further, in the Restatement 8-K, WellCare mischaracterized the nature of the accounting improprieties, calling them "accounting errors" instead of accounting "irregularities."  In accounting literature, the term accounting "error" refers to unintentional misstatements, such as mistakes made in gathering or processing accounting data from which financial statements are prepared, incorrect accounting estimates, or mistakes made in applying accounting principles.  While accounting errors can still signify reckless conduct, they are used to describe errors that are not intentional fraud.  In contrast, accounting "irregularities" refers to intentional misstatements, including fraudulent financial reporting undertaken to render financial statements misleading.  Significantly, WellCare filed its Restatement 8-K before Gregory West's plea agreement became public.  As set forth above, Mr. West's plea confirms that the actions which led to the misstatements in WellCare's financial statements were, in fact, intentional and, as such, the misstatements should have been characterized as "irregularities."

223.    GAAP are standards recognized by the accounting profession as the conventions, rules and procedures that define accepted accounting practices at a particular time.   The SEC has the statutory authority to promulgate GAAP for publicly-traded companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").  GAAP includes Statements of Financial Accounting Standards and Statements of Financial Accounting Concepts issued by the FASB, as well as Staff Accounting Bulletins issued by the SEC.  SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC that are

not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.  Defendants' specific GAAP violations are described below.

### A.    WellCare Improperly Recognized Revenue That It Had Not Earned

224.    In its Restatement 8-K, WellCare admitted that it overstated its financial results throughout the Class Period by recording as revenue at least $46.5 million it was legally required to either spend on medical services or refund to the States of Florida and Illinois.  This conduct violated FASB's Statement of Accounting Concepts No. 5, "Recognition and Measurement in Financial Statements of Business Enterprises" ("CON 5"), and SEC Staff Accounting Bulletin No. 104 ("SAB 104").

225.    CON 5 provides that revenue cannot be recognized until it is "realized or realizable" and "earned."  CON 5 explains that "[r]evenues and gains are realized when . . . services . . . are exchanged for cash or claims to cash," and revenues "are realizable when related assets received or held [*i.e.*, services] are readily convertible to known amounts of cash or claims to cash."  (Emphasis added.)

226.    SAB 104 reiterates that revenue cannot be recognized until it is "realized or realizable" and "earned," and provides that revenue satisfies those criteria when, in relevant part, "services have been rendered."  (Emphasis added.)

227.    In WellCare's case, CON 5 and SAB 104 required that, before the Company recorded its Medicaid premiums as revenue, it actually fulfilled the terms of its state contracts and governing law by providing the required level of medical services.  As WellCare admitted in its Restatement 8-K, it failed to "expend [] the minimum percentage of [] premiums on eligible medical expense," and therefore failed to provide the services required to earn at least $46.5 million of those premiums.  Nevertheless, in violation of CON 5 and SAB 104, the Company recorded those funds as revenue on its financial statements throughout the Class Period.

228.    To correct this admitted "accounting error," the Company announced in its Restatement 8-K that it will restate its revenues downward from 2004 through the first two quarters of 2007.  Specifically, the Company will restate its revenues downward by $11 million in fiscal year 2004, $8 million in fiscal year 2005, $20 million in fiscal year 2006, and $7 million in the first half of fiscal year 2007.

229.    The Company's downward restatement of revenue had a substantial negative effect on its net income and earnings per share-diluted, thus requiring restatement of those figures as well.  This is because the Company never provided any medical services associated with the revenue it improperly recorded, and thus cannot offset its revenue reduction with a corresponding reduction in medical costs.  Consequently, the Company must reduce its income on a virtually dollar-for-dollar basis with its revenue reductions, thus materially reducing its net income and earnings per share-diluted by at least 14% for 2004, 9% for 2005, 9% for 2006, and 5% for the first half of 2007.

## B.    WellCare Failed To Take A Charge To Income For The Premiums It Was Required To Refund To The States

230.    WellCare admitted in its Restatement 8-K that the Company "did not record an adequate liability for the refunds" it owed to Florida and Illinois, "which resulted in an accounting error."  Specifically, by failing to record a proper liability for the refunds it owed to Florida and Illinois, the Company violated FASB Statement of Financial Accounting Standards No. 5 ("FAS 5").

231.    Paragraph 8 of FAS 5 states that a contingent liability must be taken "as a charge to net income if" (a) "it is probable that . . . a liability had been incurred" and (b) the "amount of loss can be reasonably estimated."  (Emphasis added.)  Further, even if one or both conditions in Paragraph 8 is not met, Paragraph 10 of FAS 5 requires disclosure of the liability "when there is

at least a reasonable possibility that a loss . . . may have been incurred.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made."

232.    On or about the end of the fiscal year, the Company knew the amount of Medicaid premiums it had received and the amount of direct medical costs it had actually incurred for the year.  The Company easily could have calculated how much it owed back to the states in refundable premiums—and indeed calculated that amount in its Restatement 8-K.  The Company also knew that its refund obligations—as set forth in its contracts and governing law—were certain.  Accordingly, WellCare's liabilities (*i.e.*, its refund obligations) were, at the very least, both "probable" and "estimable," thus requiring the Company to disclose the liability and take it as a charge against net income.  In violation of FAS 5, the Company failed to do so, thus artificially inflating its net income and earnings per share-diluted by at least 14% for 2004, 9% for 2005, 9% for 2006, and 5% for the first half of 2007.

### C.    The Company's GAAP Violations Were Material

233.    Each of WellCare's accounting violations was material under GAAP standards.  Indeed, FASB Statement of Financial Accounting Standards No. 154 ("FAS 154") requires restatement only for material errors.  Thus, by announcing its restatement, the Company has admitted that its "accounting errors" and resulting financial misstatements were material.

234.    Moreover, the Company's GAAP violations meet other standards for materiality.  SEC Staff Accounting Bulletin No. 99 ("SAB 99") requires the consideration of "both quantitative and qualitative factors" in determining materiality.  SAB 99 provides that, as a general matter, a financial misstatement is quantitatively material if it affects a company's results by 5%.  As WellCare has admitted, throughout the Class Period, its financial results were

misstated by at least 5%—and as much as 14%, or almost triple the 5% benchmark—thus satisfying the standard for quantitative materiality.

235.    Further, SAB 99 provides that a financial misstatement is qualitatively material if, among other things, it "hides a failure to meet analysts' consensus expectations," "affects the registrant's compliance with regulatory requirements," "involves concealment of an unlawful transaction," or "concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability."  WellCare's GAAP violations meet all those qualitative criteria.

236.    Specifically, by artificially inflating the Company's net income and earnings per share-diluted, these GAAP violations "hid[] a failure to meet consensus expectations" on several occasions, as set forth above in the chart at ¶73.

237.    In addition, these GAAP violations affected WellCare's "compliance with regulatory requirements" and concealed "unlawful transaction[s]" by allowing the Company to avoid its legally-imposed refund obligations to the State of Florida principally through sham transactions with the Company's reinsurance subsidiary.

238.    Finally, since these GAAP violations concerned the Company's Florida operations, which accounted for up to 76% of the Company's premium revenue during the Class Period, they affected a segment of WellCare's business that "play[ed] a significant role in [its] operations or profitability."

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

239.    As alleged above and further set forth below, numerous facts give rise to the strong inference that, throughout the Class Period, Defendants knew or recklessly disregarded that the statements set forth above were materially false and misleading.

240.     As described more fully above in ¶¶114-17, former WellCare employee Gregory West has pleaded guilty to conspiracy to commit Medicaid fraud.  West's guilty plea has confirmed that the Company intentionally committed the fraud alleged herein, and did so for the specific purpose of avoiding its refund obligations to the State of Florida and thus artificially inflating its publicly reported financial results.

241.     Moreover, West's guilty plea has established that this fraud was undertaken "at the direction of one or more [WellCare] officers," and that those "officers and employees engaged in meetings and other conduct in a concerted and organized effort to conceal and cover-up" the fraud.  Although the plea agreement did not identify the officers by name, as set forth more fully above at ¶¶114-17, Defendant Behrens supervised West's Medical Economics department, and Defendant Farha personally participated in the Company's medical economics reporting.

242.     Further, two former WellCare employees have confirmed that Defendants Farha and Behrens conceived of and orchestrated the criminal conspiracy to which West pled guilty, as set forth more fully above at ¶¶63-71.  Indeed, those employees reported that, on numerous occasions, Defendants Farha and Behrens explicitly instructed them and others to execute the fraud alleged herein for the specific purpose of retaining funds that the Company was legally required to return to the State of Florida and thus artificially inflating its publicly reported financial results.

243.     In addition, as set forth more fully above at ¶¶118-27, the Company has admitted in its Restatement 8-K that its Class Period financial statements were materially false and misleading, and that Defendants Farha, Behrens, and Bereday were responsible for the accounting improprieties.

244.    Moreover, throughout the Class Period, Defendants Farha and Behrens made numerous material false statements on a variety of critical subjects, including the Company's net income, earnings per share-diluted, and regulatory and legal compliance.  Through these statements, Defendants Farha and Behrens demonstrated their personal knowledge of and familiarity with the Company's financial reporting and its Cayman Islands subsidiary.  Further, analysts and the press repeatedly and specifically asked Defendants Farha and Behrens whether the Company was using its Cayman reinsurer to hide profits from the states.  In response, Defendants Farha and Behrens repeatedly denied any wrongdoing, and even acted aggressively in April and May of 2007 to dispel any investor concerns, as set forth more fully above at ¶¶92-105.   As subsequent events have established, however, the facts that these Defendants repeatedly denied were true.  Defendants' Farha and Behrens repeated denials of true facts within their personal knowledge is strong evidence of their scienter.

245.    Further, Defendants Farha, Behrens and Bereday were highly motivated to perpetrate the fraudulent scheme.  These Defendants' insider stock sales and annual bonuses were respectively tied to the price of WellCare stock, and targeted levels of net income and earnings per share-diluted, as set forth more fully below.

A.    **Defendants' Insider Stock Sales**

246.    Throughout the Class Period, each Officer Defendant, while in possession of material non-public information concerning the fraud, engaged in substantial insider stock sales from which he gained large profits based upon the artificially inflated price of WellCare stock.  These sales were unusual in both timing and amount.  Indeed, each Officer Defendant sold substantial amounts of his personally-held shares just weeks before the raid, when WellCare stock was trading near an historic high, and well after each Officer Defendant was aware of the fraudulent scheme described herein.  In total, Defendants Farha, Behrens and Bereday sold more

84

than 1.47 million of their personally-held WellCare shares during the Class Period for proceeds of approximately $90.25 million.  The Officer Defendants' insider sales are set forth in detail below.

247.   During the Class Period, Defendant Farha sold 945,322 of his personally-held WellCare shares for proceeds of approximately $56.5 million.  In total, Defendant Farha sold 64% of the approximately 1.47 million WellCare shares he personally possessed at the start of the Class Period.  On October 10, 2007—just two weeks before the raid of WellCare's headquarters—Defendant Farha sold 16,808 WellCare shares at prices between approximately $112.31 and $113 per share, for proceeds of approximately $1.9 million.  Defendant Farha's insider sales are set forth in the chart on the following page:

| | | | | |
|---|---|---|---|---|
| **DEFENDANT FARHA'S INSIDER SALES** | | | | |
| **DATE** | **SHARES SOLD** | **% OF HOLDINGS** | **SHARE PRICE (≈)** | **PROCEEDS** |
| 3/15/05 | 1,058 | .07 | $29.73 | $31,454 |
| 7/6/05 | 219,000 | 12.6 | $33.81 | $7,405,200 |
| 12/20/05 | 6,762 | .55 | $41.25-$41.46 | $280,155 |
| 1/27/06 | 6,762 | .55 | $38.25 | $260,337 |
| 3/13/06 | 193,000 | 12.7 | $37.88 | $7,310,589 |
| 4/6/06 | 28,950 | 2.3 | $37.88 | $1,096,588 |
| 6/29/06 | 16,798 | 1.4 | $44.95-$47.00 | $789,506 |
| 7/12/06 | 16,798 | 1.4 | $52.00-$52.79 | $884,600 |
| 8/11/06 | 16,798 | 1.4 | $51.50-$51.78 | $870,304 |
| 9/13/06 | 16,798 | 1.4 | $59.00-$59.25 | $995,282 |
| 10/24/06 | 16,798 | 1.4 | $58.78-$59.34 | $996,236 |
| 11/16/06 | 16,798 | 1.4 | $63.25-$64.65 | $1,085,991 |
| 11/28/06 | 16,798 | 1.5 | $63.06-$64.22 | $1,071,048 |
| 12/6/06 | 16,798 | 1.5 | $66.91-$67.85 | $1,139,744 |
| 12/21/06 | 16,798 | 1.6 | $70.00-$71.48 | $1,200,721 |
| 1/9/07 | 16,798 | 1.6 | $70.25-$70.85 | $1,188,104 |
| 1/25/07 | 16,798 | 1.6 | $75.01-$76.00 | $1,270,662 |
| 2/7/07 | 16,798 | 1.6 | $77.50-$78.43 | $1,317,971 |
| 2/21/07 | 16,798 | 1.6 | $81.00-$81.34 | $1,366,349 |
| 3/6/07 | 16,798 | 1.6 | $83.72-$84.08 | $1,412,036 |
| 3/20/07 | 16,798 | 1.7 | $89.20-$89.77 | $1,508,124 |
| 4/5/07 | 16,798 | 1.7 | $90.00-$90.36 | $1,517,867 |
| 4/19/07 | 16,798 | 1.7 | $90.33-$91.03 | $1,528,918 |
| 5/10/07 | 16,798 | 1.8 | $89.50-$90.51 | $1,520,387 |
| 5/24/07 | 16,798 | 1.8 | $91.08-$92.00 | $1,545,416 |
| 6/6/07 | 19,436 | 2.2 | $91.15 | $1,771,591 |
| 6/12/07 | 16,798 | 1.9 | $90.12-$90.69 | $1,522,776 |
| 6/25/07 | 16,798 | 1.9 | $91.00-$91.75 | $1,541,217 |
| 7/12/07 | 16,798 | 2.0 | $93.20-$94.25 | $1,583,212 |
| 7/19/07 | 16,798 | 2.0 | $102.10-$104.17 | $1,750,352 |
| 8/15/07 | 16,798 | 2.1 | $93.30-$97.50 | $1,637,805 |
| 8/24/07 | 16,798 | 2.1 | $99.65-$100.07 | $1,681,144 |
| 9/11/07 | 16,798 | 2.1 | $100.87-$101.88 | $1,707,879 |
| 9/20/07 | 16,798 | 2.1 | $104.64-$105.44 | $1,768,124 |
| 10/10/07 | 16,808 | 2.2 | $112.31-$113.00 | $1,897,546 |
| **TOTALS** | **945,322** | **64%** | | **$56,455,235** |

248.    During the Class Period, Defendant Behrens sold 261,384 of his personally-held

WellCare shares for proceeds of approximately $15.8 million.  Defendant Behrens sold 58% of

the approximately 450,246 WellCare shares he personally possessed at the start of the Class

Period.  On October 10, 2007, just two weeks before the raid of the Company's headquarters,

Defendant Behrens sold 5,129 of his WellCare shares at prices between approximately $112.31

and $112.98 per share, for proceeds of $579,041.  Defendant Behrens' insider sales are reflected

in the chart on the following page:

| DEFENDANT BEHRENS' INSIDER SALES | | | | |
|---|---|---|---|---|
| DATE | SHARES SOLD | % OF HOLDINGS | SHARE PRICE (≈) | PROCEEDS |
| 3/15/05 | 159 | .04 | $29.73 | $4,727 |
| 7/6/05 | 64,000 | 14.0 | $33.81 | $2,164,077 |
| 12/20/05 | 2,500 | .65 | $41.25-$41.46 | $103,577 |
| 1/27/06 | 2,500 | .65 | $38.25 | $96,250 |
| 3/13/06 | 49,000 | 12.6 | $37.88 | $1,856,056 |
| 3/15/06 | 159 | .05 | $42.49 | $6,756 |
| 4/6/06 | 7,350 | 2.2 | $37.88 | $278,408 |
| 6/29/06 | 3,417 | 1.0 | $44.95-$47.00 | $160,699 |
| 7/12/06 | 3,416 | 1.0 | $52.00-$52.79 | $179,890 |
| 8/11/06 | 3,417 | 1.0 | $51.50-$51.81 | $177,035 |
| 9/13/06 | 3,416 | 1.0 | $59.00-$59.25 | $202,398 |
| 10/24/06 | 3,417 | 1.0 | $58.80-$59.33 | $202,652 |
| 11/16/06 | 3,416 | 1.0 | $63.25-$64.00 | $220,844 |
| 11/28/06 | 6,842 | 2.0 | $63.16-$64.22 | $436,294 |
| 12/6/06 | 5,129 | 1.5 | $66.91-$67.85 | $348,003 |
| 12/21/06 | 5,129 | 1.5 | $70.00-$71.48 | $366,621 |
| 1/9/07 | 5,129 | 1.5 | $70.25-$70.85 | $362,768 |
| 1/25/07 | 5,128 | 1.5 | $75.01-$76.00 | $387,976 |
| 2/7/07 | 5,129 | 1.5 | $77.50-$78.46 | $402,421 |
| 2/21/07 | 5,129 | 1.5 | $81.00-$81.34 | $417,193 |
| 3/6/07 | 5,129 | 1.5 | $83.71-$84.09 | $431,143 |
| 3/13/07 | 507 | .2 | $85.53 | $43,364 |
| 3/15/07 | 159 | .1 | $85.98 | $13,671 |
| 3/20/07 | 5,129 | 1.9 | $89.20-$89.77 | $460,482 |
| 4/5/07 | 5,129 | 1.9 | $90.00-$90.36 | $463,456 |
| 4/19/07 | 5,129 | 1.9 | $90.33-$91.01 | $466,830 |
| 5/10/07 | 5,129 | 2.0 | $89.50-$90.50 | $464,226 |
| 5/24/07 | 5,129 | 2.0 | $91.00-$92.00 | $471,868 |
| 6/12/07 | 5,129 | 2.0 | $90.19-$90.69 | $464,954 |
| 6/25/07 | 5,129 | 2.0 | $91.00-$91.73 | $470,586 |
| 7/12/07 | 5,129 | 2.0 | $93.21-$94.25 | $483,408 |
| 7/19/07 | 5,129 | 2.0 | $102.10-$104.17 | $534,442 |
| 8/15/07 | 5,129 | 2.0 | $93.33-$97.50 | $500,078 |
| 8/24/07 | 5,129 | 2.1 | $99.81-$100.07 | $513,310 |
| 9/11/07 | 5,129 | 2.1 | $100.84-$101.88 | $521,476 |
| 9/20/07 | 5,129 | 2.2 | $104.66-$105.44 | $539,868 |
| 10/10/07 | 5,129 | 2.3 | $112.31-$112.98 | $579,041 |
| TOTALS: | 261,384 | 58% | | $15,796,703 |

249.    Defendant Bereday sold 270,053 of his personally-held WellCare shares for proceeds of approximately $18 million during the Class Period.  Defendant Bereday sold 86.9% of the approximately 310,903 WellCare shares he personally possessed at the start of the Class Period.  Like Defendants Farha and Behrens, Defendant Bereday made large insider sales just two weeks before the raid of WellCare's headquarters, selling 5,637 shares on October 10, 2007, at prices between approximately $112.66 and $113 per share, for proceeds of $636,981.  Defendant Bereday's insider sales are set forth in the chart on the following page:

| DEFENDANT BEREDAY'S INSIDER SALES | | | | |
|---|---|---|---|---|
| **DATE** | **SHARES SOLD** | **% OF HOLDINGS** | **SHARE PRICE (≈)** | **PROCEEDS** |
| 3/15/05 | 159 | .05 | $29.73 | $4,727 |
| 7/6/05 | 48,000 | 14.9 | $33.81 | $1,623,058 |
| 12/20/05 | 2,500 | 1.0 | $41.25-$41.46 | $103,577 |
| 1/27/06 | 2,500 | 1.0 | $38.25 | $96,250 |
| 3/13/06 | 35,000 | 12.8 | $37.88 | $1,325,755 |
| 3/15/06 | 159 | .07 | $42.49 | $6,756 |
| 4/6/06 | 5,250 | 2.3 | $37.88 | $198,863 |
| 6/29/06 | 3,026 | 1.4 | $44.95-$47.00 | $142,222 |
| 7/12/06 | 3,026 | 1.4 | $52.02-$52.75 | $159,353 |
| 8/11/06 | 3,027 | 1.4 | $51.50-$51.81 | $156,829 |
| 9/13/06 | 3,026 | 1.4 | $59.00-$59.25 | $179,291 |
| 10/24/06 | 3,026 | 1.5 | $58.80-$59.29 | $179,462 |
| 11/16/06 | 3,027 | 1.5 | $63.25-$64.65 | $195,696 |
| 11/28/06 | 19,731 | 9.9 | $63.03-$64.22 | $1,258,059 |
| 12/6/06 | 11,379 | 6.5 | $66.90-$67.85 | $772,065 |
| 12/21/06 | 11,379 | 7.0 | $70.00-$71.48 | $813,371 |
| 1/9/07 | 5,129 | 3.2 | $70.25-$70.85 | $362,768 |
| 1/25/07 | 5,129 | 3.3 | $75.03-$76.00 | $387,976 |
| 2/7/07 | 5,129 | 3.5 | $77.50-$78.41 | $402,421 |
| 2/21/07 | 5,129 | 3.6 | $81.00-$81.34 | $417,193 |
| 3/6/07 | 5,129 | 3.7 | $83.71-$84.09 | $431,143 |
| 3/13/07 | 254 | .2 | $85.53 | $21,725 |
| 3/15/07 | 159 | .1 | $85.98 | $13,671 |
| 3/20/07 | 5,129 | 3.7 | $89.20-$89.78 | $460,482 |
| 4/5/07 | 5,129 | 4.0 | $90.00-$90.36 | $463,456 |
| 4/19/07 | 5,129 | 4.1 | $90.33-$90.71 | $466,830 |
| 5/10/07 | 5,129 | 4.4 | $89.50-$90.51 | $464,226 |
| 5/24/07 | 5,129 | 4.6 | $91.08-$92.00 | $471,868 |
| 6/12/07 | 5,129 | 4.7 | $90.19-$90.50 | $464,954 |
| 6/25/07 | 5,129 | 5.0 | $91.00-$91.75 | $470,586 |
| 7/12/07 | 8,040 | 7.7 | $93.20-$94.25 | $757,770 |
| 7/19/07 | 8,040 | 8.5 | $102.10-$104.17 | $837,768 |
| 8/15/07 | 8,040 | 9.2 | $93.30-$97.50 | $783,900 |
| 8/24/07 | 8,040 | 9.8 | $99.65-$100.08 | $804,643 |
| 9/11/07 | 8,040 | 10.4 | $100.84-$101.87 | $817,441 |
| 9/20/07 | 8,040 | 11.7 | $104.66-$105.44 | $846,690 |
| 10/10/07 | 5,637 | 9.9 | $112.66-$113.00 | $636,981 |
| **TOTALS** | **270,053** | **86.9%** | | **$17,999,826** |

250.     In addition, several of Defendants' sales were suspiciously timed to allow them to capitalize on the manner in which the false statements set forth above artificially inflated the price of WellCare stock.  For example, as set forth above at ¶¶171-75, between August 2 and August 4, 2006, the Company issued its artificially inflated 2006 second quarter financial results. As a result of those false statements, the price of WellCare stock rose from a close of $50.36 on August 1, 2006 to close at $51.49 on August 11, 2006.  On August 11, as reflected in the tables above, each Defendant sold thousands of their personally-held shares at artificially inflated prices.

251.     Likewise, as set forth above in ¶¶176-82, between November 1 and November 3, 2006, the Company issued its artificially inflated financial results for the third quarter of 2006, which, at the time, were the Company's best results to date. Those false financial results caused the price of WellCare shares to rise from a close of $58.75 on October 31, 2006, to close at $62.35 on November 15, 2006.  On November 15, 2006, each Defendant sold thousands of his WellCare shares at artificially inflated prices, as reflected in the tables above.

252.     Moreover, as set forth above in ¶¶183-88, between February 13 and February 14, 2007, the Company issued its artificially inflated results for the fourth quarter and year-end 2006, which Defendant Farha lauded as "transformative."  Consequently, the price of WellCare shares rose from a close of $76.50 on February 12, 2007, to close at $81.01 on February 21, 2007.  On February 21, 2007, as reflected in the tables above, each Defendant sold thousands of their personally-held shares at artificially inflated prices.  Notably, if the Company had accurately reported its financial results for the fourth quarter and year-end 2006, it would have missed analysts' earnings expectations by five and 17 cents, respectively.

253. In addition, between April 30 and May 9, 2007, Defendants WellCare, Farha, and Behrens issued a series of materially false and misleading statements, as set forth above in ¶¶193-205, in which they defended the use of Comprehensive Re as "proper[]," extolled the Company's "zero tolerance" compliance program, and touted the Company's artificially inflated earnings and upwardly revised guidance for 2007. Those statements caused the price of WellCare shares to rise from a close of $80.59 on April 30 to close at $89.95 on May 10, 2007. On May 10, 2007, as reflected in the tables above, each Defendant again sold thousands of their personally-held shares at artificially inflated prices.

254. Defendants' Class Period insider sales stand in contrast to their sales prior to the Class Period. For example, from the time of the Company's IPO in July 2004 to the beginning of the Class Period in February 2005, each Defendant sold shares on only a single occasion—a secondary offering that took place on December 22, 2004. On that date, Defendant Farha sold 165,000 shares for proceeds of approximately $5 million, Defendant Behrens sold 25,000 shares for proceeds of approximately $760,000, and Defendant Bereday sold 20,000 shares for proceeds of approximately $608,000.

255. As set forth in the tables above, Defendants sold far more shares, on far more occasions, and for far more in proceeds, during the Class Period than they did before the Class Period.

256. Pursuant to the 2007 Proxy, certain of Defendants' insider sales were made pursuant to SEC Rule 10b5-1(c)(1) trading plans initiated at some time in 2005. However, these plans—which were not made public—cannot negate Defendants' substantial motive and opportunity to profit from selling their personally-held WellCare stock during the Class Period. In the first place, Defendants themselves "approved" these plans. As the 2007 Proxy provides,

these trading plans were "approved in advance by our general counsel [Defendant Bereday] or, in the case of the general counsel, by the chief executive officer [Defendant Farha]."

257.     Further, according to an October 26, 2007 article in the *St. Petersburg Times*, Defendants' trading plans are tied to the Company's stock price—which gives Defendants a clear incentive to inflate the Company's stock price to trigger sales under their trading plans.  As that article set forth: "Recently, WellCare's stock has been soaring to all-time highs.  That triggered preset trading programs for several of the Company's key executives."

258.     Moreover, as noted by the SEC's Director of Enforcement in a speech on March 8, 2007, insiders often "abuse" Rule 10b5-1 trading plans in an attempt to disguise trades made with material, non-public information:

> [R]ecent academic studies suggest that the Rule is being abused.  The academic data shows that executives who trade within a 10b5-1 plan outperform their peers who trade outside of such a plan by nearly 6%; it ought to be the case that plan participants should be no more successful on average than those who trade outside a plan. <u>The difference seems to be that executives with plans sell more frequently and more strategically ahead of announcements of bad news. This raises the possibility that plans are being abused in various ways to facilitate trading based on inside information. We're looking at this—hard. We want to make sure that people are not doing here what they were doing with stock options. If executives are in fact trading on inside information and using a plan for cover, they should expect the "safe harbor" to provide no defense.</u>  [Emphasis added.]

259.     Finally, Defendants made substantial sales outside their trading plans.  Defendant Farha sold shares outside his trading plan on the following dates: March 15, 2005, July 6, 2005, December 20, 2005, March 13, 2006, April 6, 2006, and June 6, 2007.  These sales totaled 468,028 shares for proceeds of approximately $17.9 million.

260.     The largest of these sales, consisting of the 219,000 shares that Defendant Farha sold on July 6, 2005, was made pursuant to a secondary offering of common stock in which the Company sold no shares of its own.  Likewise, Defendant Farha's second largest sale, consisting

of the 193,000 shares he sold on March 13, 2006, was made pursuant to another secondary offering in which the Company sold only 575,000 shares, while Company insiders sold more than 5.57 million shares.  Further, the prospectuses for those offerings contained numerous false and misleading statements.  The Company's prospectus for the July 6, 2005 offering set forth the Company's artificially inflated financial results from its 2004 Form 10-K and 1Q 2005 10-Q, described above in ¶¶135-48.  And the Company's prospectus for the March 13, 2006 offering incorporated by reference Company's materially false and misleading 2005 Form 10-K, described above in ¶¶159-64.

261.    Defendant Behrens also sold shares outside his trading plan on the following dates: March 15, 2005, July 6, 2005, December 20, 2005, March 13, 2006, March 15, 2006, April 6, 2006, March 13, 2007, and March 15, 2007.  These sales totaled 123,834 shares for proceeds of approximately $4.5 million, and included Defendant Behrens' two largest sales, made in the July 6, 2005 offering, in which he sold 64,000 shares, and the March 13, 2006 offering, in which he sold 49,000 shares.

262.    And Defendant Bereday sold shares outside his trading plan on the following dates: March 15, 2005, July 6, 2005, December 20, 2005, March 13, 2006, March 15, 2006, April 6, 2006, March 13, 2007, and March 15, 2007.  These sales totaled 91,481 shares for proceeds of approximately $3.3 million, and included Defendant Bereday's two largest sales, made in the July 6, 2005 offering, in which he sold 48,000 shares, and the March 13, 2006 offering, in which he sold 35,000 shares.

### B.    Defendants' Bonuses

263.    Each Defendant stood to receive—and did receive—large cash and stock bonuses for ensuring that the Company met certain performance objectives.  According to the Company's 2007 Proxy, these performance goals included targets for net income and earnings per share—the

same metrics that Defendants manipulated in the scheme described herein.  Further, Defendants

Farha, Behrens and Bereday were responsible for setting the net income and earnings per share

targets that determined all executive cash and equity bonuses, including their own.

264.     Given that Defendants' bonus and equity awards were directly tied to certain

financial benchmarks, Defendants were highly motivated to manipulate the Company's financial

performance to achieve those benchmarks and reap substantial financial reward.  The chart

below details the annual salary and cash and equity bonuses that Defendants received based upon

the Company's materially misstated financial results during the Class Period:

| Defendants' FY 2004 Salary and Incentive Awards | | | | |
|---|---|---|---|---|
| Defendant | Salary | Cash Bonus | Restricted Stock Award | Stock Option Award |
| Farha | $311,538 | $600,000 | 20,000 shares | 81,315 options |
| Behrens | $285,577 | $165,000 | 3,000 shares | 8,131 options |

| Defendants' FY 2005 Salary and Incentive Awards | | | | |
|---|---|---|---|---|
| Defendant | Salary | Cash Bonus | Restricted Stock Award | Stock Option Award |
| Farha | $400,000 | $400,000 | 220,000 shares | 220,000 options |
| Behrens | $275,000 | $165,000 | N/A | 8,100 options |

| Defendants' FY 2006 Salary and Incentive Awards | | | | |
|---|---|---|---|---|
| Defendant | Salary | Cash Bonus | Restricted Stock Award | Stock Option Award |
| Farha | $400,000 | $400,000 | N/A | 200,000 options |
| Behrens | $282,269 | $200,000 | 7,308 shares | 29,356 options |
| Bereday | $256,462 | $150,000 | 2,339 shares | 9,394 options |

265.     In addition to the above annually-scheduled equity awards, Defendants received

other unscheduled equity awards during the Class Period that were based on the Company's

financial performance.  In June 2005, Defendant Farha received a "Performance Share Award"

entitling him to up to 240,279 shares so long as the Company recorded certain compounded

percentage increases in earnings per share between 2005 and 2009.

266.    In March 2006 Defendants received additional equity awards that were "determined based on the executive's performance and contribution to the company's success during 2005," according to the 2007 Proxy.  Specifically, on March 13, 2006, Defendant Farha received 100,000 options, Defendant Behrens received 9,584 shares of restricted stock, and Defendant Bereday received 4,792 shares of restricted stock.

267.    Defendants Behrens and Bereday received other awards in July 2006 that were "designed to reward the executives for the company's overall performance during the first half of 2006 and as a means of incenting and retaining the executives," according to the 2007 Proxy. Specifically, on July 27, 2006, Defendant Behrens received 20,141 stock options, and Defendant Bereday received 12,558 stock options.

## IX.    LOSS CAUSATION

268.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class.  During the Class Period, the market price of WellCare stock was artificially inflated as a result of the false and misleading statements made by Defendants, set forth above at ¶¶131-217, reaching a high of over $122.00 per share on October 23, 2007, immediately prior to the disclosure of WellCare's fraud on October 24, 2007. Consequently, both Lead Plaintiffs' and Class members' purchases of WellCare stock during the Class Period were made at artificially inflated prices.  As the Defendants' prior misrepresentations and fraudulent conduct were revealed to investors, shares of WellCare declined precipitously, causing substantial losses to investors.

269.    Specifically, WellCare's fraud was finally revealed to the market on October 24, 2007, when, as a direct result of the unprecedented raid on the Company, the public first learned that Defendants had engaged in the fraud alleged herein, and that Defendants' Class Period statements were false and misleading.  As this adverse information became known to investors,

the prior artificial inflation began to be eliminated from WellCare's share price, and Lead

Plaintiffs and the Class were damaged as a consequence of the resultant share price decline.

Indeed, as a direct result of investors learning of Defendants' scheme on October 24, 2007,

WellCare's stock price collapsed from over $122 per share at the close of trading on October 23,

2007, to close at approximately $42.67 per share on October 25, 2007.  This dramatic share price

decline thus eradicated the artificial inflation from WellCare's share price, causing real economic

loss to investors who purchased this stock during the Class Period.

270.    The decline in WellCare's stock price at the end of the Class Period was a direct

result of the nature and extent of Defendants' fraud being revealed to investors and to the market.

The timing and magnitude of WellCare's stock price decline negates any inference that the losses

suffered by Lead Plaintiffs and the other members of the Class were caused by changed market

conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to

Defendants' fraudulent conduct.  During the same period in which WellCare's share price fell

over 65% as a result of Defendants' fraud being revealed, the Standard & Poor's 500 securities

index was relatively unchanged.

## X.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

271.    At all relevant times, the market for WellCare's common stock was efficient for

the following reasons, among others:

(a)     WellCare's stock met the requirements for listing, and was listed and

actively traded on the NYSE national market exchange, a highly efficient and automated market;

(b)     As a regulated issuer, WellCare filed periodic public reports with the SEC

and the NYSE;

(c)     WellCare regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     WellCare was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

272.     As a result of the foregoing, the market for WellCare common stock promptly digested current information regarding WellCare from all publicly available sources and reflected such information in WellCare's stock price. Under these circumstances, all purchasers of WellCare common stock during the Class Period suffered similar injury through their purchase of WellCare common stock at artificially inflated prices, and a presumption of reliance applies.

## XI.    NO SAFE HARBOR

273.     The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.

274.     None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about the Company's financial results, its use of its Cayman Islands reinsurance subsidiary, and its regulatory and legal compliance, among others.

98

275.    Further, the statutory safe harbor does not apply to statements included in financial statements that purportedly were prepared in accordance with GAAP, such as WellCare's Forms 10-K and 10-Q issued throughout the Class Period.

276.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding the Company's financial results, its use of its Cayman Islands subsidiary, and its regulatory compliance, among others.  Given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by WellCare were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

277.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of WellCare who knew that the statement was false when made.

## XII.    <u>FIRST CLAIM</u>

**For Violations Of Section 10(b) Of The Exchange Act**
**And SEC Rule 10b-5 Promulgated Thereunder**
**<u>Against Defendants WellCare, Farha, And Behrens</u>**

278.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

279.     This Count is asserted on behalf of all members of the Class against Defendants

WellCare, Farha, and Behrens for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §

78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

280.     During the Class Period, Defendants WellCare, Farha, and Behrens disseminated

or approved the false statements specified below, among others, which they knew or deliberately

disregarded were misleading in that they contained misrepresentations and failed to disclose

material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading.

281.     These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in

that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of

material facts or omitted to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and/or (c) engaged in

acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs

and others similarly situated in connection with their purchases of WellCare common stock

during the Class Period.  As detailed herein, the misrepresentations contained in, or the material

facts omitted from, those statements included, but were not limited to, the Company's publicly

reported net income and earnings per share-diluted at each reporting period from 2004 through

the first two quarters of 2007, the statements of regulatory and legal compliance, and the

repeated denials that the Company was shifting profits to its reinsurance subsidiary in order to

hide them from state regulators.

282.     These Defendants, individually and in concert, directly and indirectly, by the use

of means or instrumentalities of interstate commerce and/or of the mails, engaged and

participated in a continuous course of conduct that operated as a fraud and deceit upon Lead

Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of WellCare common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, WellCare's artificially inflated statements of net income and earnings per share-diluted, and the Company's several violations of state and federal laws and regulations; (b) artificially inflate and maintain the market price of WellCare common stock; and (c) cause Lead Plaintiffs and other members of the Class to purchase WellCare common stock at artificially inflated prices and suffer losses when the true facts became known.

283.     Defendant WellCare is liable for all materially false and misleading statements made during the Class Period, as alleged above, including the false and misleading statements in:

a.     WellCare's 2004 Form 10-K;

b.     WellCare's 1Q 2005 10-Q;

c.     WellCare's 2Q 2005 10-Q;

d.     WellCare's 3Q 2005 10-Q;

e.     WellCare's 2005 Form 10-K;

f.     WellCare's 1Q 2006 10-Q;

g.     WellCare's 2Q 2006 10-Q;

h.     WellCare's 3Q 2006 10-Q;

i.     WellCare's 2006 Form 10-K;

j.     WellCare's 1Q 2007 10-Q; and

k.      WellCare's 2Q 2007 10-Q.

284.    WellCare is further liable for the false and misleading statements made in press releases, website postings, newspaper articles, congressional testimony, and during conference calls with investors and analysts, as alleged above, as the maker of such statements and under the principle of respondeat superior.

285.    Defendants Farha and Behrens are liable for the false and misleading statements they made, as set forth above, including:

a.      Defendant Farha's false statements during the May 8, 2007 conference call, and the other statements for which he was responsible, including those made in the Company's Forms 10-K and 10-Q, press releases, website postings, newspaper articles, and during and in connection with conference calls with analysts from February 14, 2005 through October 25, 2007; and

b.      Defendant Behrens' false statements during the May 8, 2007 conference call, and the other statements for which he was directly responsible, including those made in the Company's Forms 10-K and 10-Q, press releases, website postings, newspaper articles, and during and in connection with conference calls with analysts from February 14, 2005 through October 25, 2007.

286.    As described above, these Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. Specifically, these Defendants knew or recklessly disregarded that, in violation of numerous federal and state laws and regulations, during the Class Period, WellCare was engaging in a scheme to hide profits from its state regulators and artificially inflate its net income and earnings per share-diluted; to systematically employ illegal marketing practices; and to systematically deny its members necessary medical care, as described more fully above.

287.    The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at WellCare, which resulted in continuous and material overstatements

of the Company's most important financial metrics, and posed a material threat to the

Company's ability to do business with the federal and state governments, establish a strong

inference that Defendants WellCare, Farha, and Behrens acted with scienter in making the

materially false and misleading statements set forth above during the Class Period.

288.    Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on

the integrity of the market, they paid artificially inflated prices for WellCare common stock,

which inflation was removed from the stock when the true facts became known.  Lead Plaintiffs

and the Class would not have purchased WellCare common stock at the prices they paid, or at

all, if they had been aware that the market price had been artificially and falsely inflated by these

Defendants' misleading statements.

289.    As a direct and proximate result of these Defendants' wrongful conduct, Lead

Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged

herein in connection with their purchases of WellCare common stock during the Class Period.

## XIII.   SECOND CLAIM

### For Violations Of Section 20(a) Of The Exchange Act
### Against Defendants Farha, Behrens, and Bereday

290.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if

fully set forth herein.

291.    This Count is asserted on behalf of all members of the Class against each of the

Officer Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

292.    During their tenures as officers and/or directors of WellCare, each of these

Defendants was a controlling person of the Company within the meaning of Section 20(a) of the

Exchange Act.  By reason of their positions of control and authority as officers and/or directors

of WellCare, these Defendants had the power and authority to direct the management and

activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by WellCare during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

293.    In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Farha, Behrens, and Bereday had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions.  Defendants Farha and Behrens signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by WellCare during the Class Period.  Defendant Bereday, as Chief Compliance Officer, was directly responsible for controlling, and did control, the Company's violations of the several state and federal laws and regulations applicable to its business, and was directly involved in providing false information and certifying and/or approving the false statements disseminated by WellCare during the Class Period.  As a result of the foregoing, Defendants Farha, Behrens, and Bereday, as a group and individually, were controlling persons of WellCare within the meaning of Section 20(a) of the Exchange Act.

294.    As set forth above, WellCare violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of WellCare and as a result of their own aforementioned conduct, Defendants Farha, Behrens, and Bereday are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members

of the Class who purchased or otherwise acquired WellCare common stock.  Moreover, as

detailed above, during the respective times these Defendants served as officers and/or directors

of WellCare, each of these Defendants was culpable for the material misstatements and

omissions made by WellCare, including such misstatements as the Company's repeated and false

claims of regulatory compliance, and it statements of net income and earnings per share-diluted,

as set forth above.

296.    As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and

the other members of the Class suffered damages in connection with their purchase or acquisition

of WellCare common stock.

## XIV.  **THIRD CLAIM**

### **For Violations Of Section 20A Of The Exchange Act**
### **Against Defendants Farha, Behrens, And Bereday**

296.    Lead Plaintiffs repeat and reallege each and every allegation above as if fully set

forth herein.

297.    This Count is asserted against each of the Officer Defendants for violations of

Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, on behalf of Lead Plaintiffs and all other

Class members who purchased WellCare common stock contemporaneously with the Officer

Defendants' improper sales during the Class Period.

298.    The Officer Defendants, by virtue of their positions within WellCare, their control

over the Company, and their roles in the alleged fraud, possessed material non-public

information about WellCare and its business at the time they sold their personally-held WellCare

shares during the Class Period.  Specifically, as set forth above, during the Class Period, the

Officer Defendants knew of the fraud alleged herein when they sold approximately 1.47 million shares of WellCare stock for aggregate proceeds of approximately $90.25 million.

299.    As set forth in the attached certifications, Lead Plaintiffs purchased WellCare stock "contemporaneously" with the Officer Defendants' sales of WellCare stock.  For example:

a.    On July 6, 2005, Defendant Behrens sold 64,000 WellCare shares for proceeds of $2,164,077, and Defendant Bereday sold 48,000 WellCare shares for proceeds of $1,623,058.  The following day, Louisiana Teachers bought 17,400 WellCare shares for $656,072;

b.    On May 24, 2007, Defendant Farha sold 16,798 WellCare shares for proceeds of $1,545,416; Defendant Behrens sold 5,129 WellCare shares for proceeds of $471,868; and Defendant Bereday sold 5,129 WellCare shares for proceeds of $471,868.  On that same day, SIC bought 58,350 WellCare shares for $5,333,330;

c.    On August 15, 2007, Defendant Farha sold 16,798 WellCare shares for proceeds of $1,637,805; Defendant Behrens sold 5,129 WellCare shares for proceeds of $500,078; and Defendant Bereday sold 8,040 WellCare shares for proceeds of $783,900.  On that same day, PERA bought 1,600 WellCare shares for $149,776; and

d.    On August 24, 2007, Defendant Farha sold 16,798 WellCare shares for proceeds of $1,681,144; Defendant Behrens sold 5,129 WellCare shares for proceeds of $513,310; and Defendant Bereday sold 8,040 WellCare shares for proceeds of $804,643.  On that same day, Louisiana Teachers bought 7,250 WellCare shares for $715,258; Chicago Police bought 2,400 WellCare shares for $236,775; and Chicago Teachers bought 2,100 WellCare shares for $207,178.

300.    Numerous other Class members also purchased WellCare common stock contemporaneously with the Officer Defendants' Class Period sales.

301.    Consequently, under Section 20A of the Exchange Act, the Officer Defendants are liable to Lead Plaintiffs and the Class for all profits gained and losses avoided as a result of these transactions.

## XV.    **PRAYER FOR RELIEF**

302.    **WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

A.    Declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding compensatory damages in favor of Lead Plaintiffs and the other Class

members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses

incurred in this action, including attorneys' fees and expert fees;

D.     Awarding such equitable, injunctive, and other relief as the Court may deem just

and proper.

## XVI.   <u>JURY TRIAL DEMANDED</u>

303.   Lead Plaintiffs hereby demand a trial by jury.

Dated: October 31, 2008

**BERNSTEIN LITOWITZ BERGER**               **LABATON SUCHAROW LLP**
**& GROSSMANN LLP**


By:   /s/ Steven B. Singer                              By:   /s/ James W. Johnson
    Steven B. Singer                                            James W. Johnson
    Laura Gundersheim                                      Michael Stocker
    John Rizio-Hamilton                                     140 Broadway
    1285 Avenue of the Americas                      New York, New York 10005
    New York, New York 10019                          Tel: (212) 907-0700
    Tel: (212) 554-1400                                       Fax: (212) 818-0477
    Fax: (212) 554-1444

*Counsel for Teachers' Retirement System*
*of Louisiana, Public School Teachers'*
*Pension & Retirement Fund of Chicago,*          *Counsel for the New Mexico State*
*and Policemen's Annuity and Benefit*             *Investment Council and the Public*
*Fund of Chicago, and Court-appointed*           *Employees Retirement Association of*
*Lead Counsel for the Class*                              *New Mexico, and Court-appointed*
                                                                        *Lead Counsel for the Class*

**JOHNSON, POPE, BOKOR, RUPPEL**
**& BURNS, LLP**

    Scott C. Ilgenfritz, FBN 394084
    Post Office Box 1100
    Tampa, Florida 33601-1100

Tel: (813) 225-2500
Fax: (813) 223-7118

*Liaison Counsel for Lead Plaintiffs and
the Class*