UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

| | | |
|---|---|---|
| EASTWOOD ENTERPRISES, LLC, individually and on behalf of all others similarly situated, | ) ) ) ) | CASE NO.: 8:07-cv-1940-T-33EAJ |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| TODD S. FARHA, PAUL L. BEHRENS, THADDEUS BEREDAY, and WELLCARE HEALTH PLANS, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANT THADDEUS BEREDAY'S MEMORANDUM OF LEGAL AUTHORITY IN OPPOSITION TO MOTIONS TO QUASH FILED BY NON-PARTIES CITRUS HEALTH CARE, INC., PREFERRED MEDICAL PLAN, INC., VISTA HEALTHPLAN OF SOUTH FLORIDA, INC., VISTA HEALTHPLAN, INC. AND PSYCHCARE, LLC.**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................. 2

I.    FACTUAL BACKGROUND ..................................................................... 2

    A.    The 80/20 Statute ............................................................................... 2

    B.    The Plans' 80/20 Filings ................................................................... 3

II.   PROCEDURAL HISTORY ........................................................................ 4

    A.    Status of the Litigation ...................................................................... 4

    B.    Mr. Bereday's Public Records Request to AHCA ............................. 5

    C.    Buttner Hammock Audit ................................................................... 5

        1.    Preferred Medical Plan ........................................................... 6

        2.    Vista of South Florida (VSF) ................................................. 6

        3.    Vista Health Plan (Vista) d/b/a Buena Vista ........................... 7

        4.    Citrus Health Care .................................................................. 7

    D.    The Subpoenas ................................................................................... 8

        1.    January 19, 2010 Subpoenas ................................................... 9

        2.    January 29, 2010 Subpoenas ................................................... 10

ARGUMENT ..................................................................................................... 10

I.    THE SUBPOENAS SEEK RELEVANT INFORMATION AND DOCUMENTS ......... 10

    A.    Lead Plaintiffs' Claims ..................................................................... 11

    B.    Information and Documents Regarding The Industry's Interpretation and Compliance with the 80/20 Statute Are Relevant ................................................. 11

II.   THE SUBPOENAS ARE NOT UNDULY BURDENSOME ......................................... 13

    A.    Movants Have Failed to Carry Their Burden to Establish Compliance with the Subpoenas Would Be "Unreasonable and Oppressive" ................................. 13

        1.    Preferred Medical Plan & Vista Health Plans ........................... 14

        2.    Citrus Health Care .................................................................. 16

3894537_2.DOC

3.      PsychCare ....................................................................................... 17

B.      The Other Factors Considered By Courts Weigh In Favor of Discovery............. 18

III.    ANY OBJECTIONS WERE WAIVED BY FAILING TO TIMELY OBJECT.............. 19

CONCLUSION.................................................................................................................. 20

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## CASES

*Auto-Owners Ins. Co. v. Se. Floating Docks, Inc.*, 231 F.R.D. 426
(M.D. Fla. 2005) ..................................................................................10, 14, 18, 20

*Cent. Transp. Int'l, Inc. v. Global Advantage Distrib., Inc.*, No. 2:06-CV-401-
FtM-29SPC, 2007 WL 3124715 (M.D. Fla. Sept. 11, 2007)......................................15, 16

*Decicco v. United Rentals, Inc.*, 602 F. Supp. 2d 325 (D. Conn. 2009) .........................................13

*Donahay v. Palm Beach Tours & Transp.*, 242 F.R.D. 685 (S.D. Fla. 2007) ...............................13

*Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545 (11th Cir. 1985) ........................................10

*Fin. Bus. Equip. Solutions, Inc. v. Quality Data Sys., Inc.*, No. 08-60769,
2008 WL 4663277 (S.D. Fla. Oct. 21, 2008)......................................................................14

*Funke v. Life Fin. Corp.*, 237 F. Supp. 2d 458 (S.D.N.Y. 2002).............................................12, 13

*Hickman v. Taylor*, 329 U.S. 495 (1947)...................................................................................10

*In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004) ............................13

*In re Subpoenas Served on Wilmer, Cutler & Pickering and Goodwin Proctor
LLP*, 255 F. Supp. 2d 1 (D.D.C. 2003) ...............................................................................9

*L.M.P. v. Sch. Bd.*, No. 05-60845, 2009 WL 2578987 (S.D. Fla. Aug. 18, 2009) ........................14

*Lane v. Capital Acquisitions*, 242 F.R.D. 667 (S.D. Fla. 2005) ....................................................14

*Madeline L.L.C. v. Street*, No. 09-80705, 2009 WL 1563526
(S.D. Fla. June 3, 2009) .....................................................................................................19

*Micron Tech., Inc. v. Tessera, Inc.*, No. C06-80093, 2006 WL 1646132
(N.D. Cal. June 14, 2006) ...................................................................................................14

*Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230 (11th Cir. 2008) ......................................................11

*Nelson v. All Am. Life & Fin. Corp.*, 889 F.2d 141 (8th Cir. 1989) .............................................12

*Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395 (D.C. Cir. 1984) ...........................13

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978)...........................................................10

*Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207 (Fed. Cir. 1987)............................13

*Tuite v. Henry*, 98 F.3d 1411 (D.C. Cir. 1996) ..........................................................................19

*Universal City Dev. Partners, Ltd. v. Ride & Show Eng'g, Inc.*, 230 F.R.D. 688
(M.D. Fla. 2005) .................................................................................................................19

*Xtra, Inc. v. Comm'r of Revenue*, 402 N.E.2d 1324 (1979)..........................................................12

## STATUTES

Fla. Stat. § 409.912(4)(b) (2009) ......................................................................... *passim*

## RULES

15 U.S.C. § 78j(b) ..............................................................................................2, 11

17 C.F.R. § 240.10b-5 ...............................................................................................11

Fed. R. Civ. P. 26(b) ..........................................................................................10, 18

Fed. R. Civ. P. 45(c) ..........................................................................................13, 19

## MISCELLANEOUS

Oliver Wendell Holmes, The Theory of Legal Interpretation, 12 Harv. L. Rev.
    417, 419 (1898-99)............................................................................................12

Norman J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction §
    49:1 (7th ed. 2008)............................................................................................12

## INTRODUCTION

Defendant Thaddeus Bereday, the former General Counsel of defendant WellCare Health Plans, Inc. ("WellCare"), respectfully submits this Opposition to the Motions to Quash filed by certain non-parties.  This is a class action in which WellCare, Mr. Bereday and others are alleged to have violated the federal securities laws.  The core allegation of the Complaint is that WellCare, which provides managed care services to government-sponsored healthcare programs, defrauded Florida's Medicaid program by retaining money in violation of the state's newly-enacted "80/20 statute."

To prove their claim, plaintiffs must show that WellCare made false statements to the State of Florida and did so either intentionally or with severe recklessness.  In that regard, a core issue in the litigation will be whether WellCare's interpretation of the 80/20 statute was reasonable – if it was, WellCare and Mr. Bereday will defeat any claim that WellCare acted fraudulently in the way it interpreted the 80/20 statute in reporting to the State of Florida.

The subpoenas at issue go right to that question.  They seek documents concerning how other managed care plans, most of which were in the same position as WellCare and made submissions to the State of Florida under the 80/20 statute, interpreted the statute.  As explained in this opposition, materials Mr. Bereday has already received from the State of Florida reflect that these companies applied varied interpretations of the 80/20 statute that Mr. Bereday believes will demonstrate the reasonableness of WellCare's interpretation of the statute.

The Court should reject the variety of burden arguments raised by the third parties.  Most of these parties waived any objection they have by not serving timely written objections to the subpoenas and failing to meet and confer in any meaningful way prior to filing these motions.  In any event, the subpoenas were narrowly-tailored to the core issues presented in this lawsuit and do not present an unreasonable burden.[1]

---

[1] The five subpoenas at issue in this Opposition are attached as Exhibits 1 through 5 to the Declaration of Keith E. Eggleton ("Eggleton Decl.") submitted herewith.  All "Exh." references in this Opposition are citations to the Eggleton Declaration.

## STATEMENT OF FACTS

This is a securities class action lawsuit brought by WellCare shareholders against WellCare and three of its former officers. The Complaint asserts violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder; violation of Section 20(a) of the Exchange Act, *id.* § 78t(a); and violation of Section 20A of the Exchange Act, *id.* § 78t-1. Consolidated Class Action Complaint ("Compl.") ¶ 19. Lead Plaintiffs allege that defendants engaged in a scheme to inflate WellCare's financial results and mislead investors by "retain[ing] unspent Medicaid premiums that [WellCare] was legally required to return to the states." *Id.* ¶ 3. Mr. Bereday and the other defendants deny these allegations.

### I.   Factual Background

#### A.   The 80/20 Statute

This case involves the interpretation of a statute – Florida Statutes Section 409.912 – and certain provisions in related contracts between Florida's Agency for Health Care Administration ("AHCA" or the "Agency") and numerous managed care entities that operate within the State of Florida. *Id.* ¶¶ 56-57. Specifically, the Complaint references Section 409.912(4)(b), which provides in relevant part:

> [A]ll contracts issued pursuant to this paragraph must require 80 percent of the capitation paid to the managed care plan, including health maintenance organizations, to be expended for the provision of behavioral health care services. If the managed care plan expends less than 80 percent of the capitation paid for the provision of behavioral health care services, the difference shall be returned to the agency.

*See* Fla. Stat. § 409.912(4)(b) (2009) (the "80/20 statute"). This subsection was inserted into the Medicaid implementing act in the closing hours of the 2002 legislative session, without the benefit of legislative hearings or industry input. Immediately following its passage, members of the managed care industry – including the Florida Association of Health Plans ("FAHP") and several HMOs (including WellCare) – began discussing how AHCA would implement these provisions. Over the following years, AHCA and the industry engaged in a protracted debate regarding the statute and reached different interpretations about its meaning. The debate

concerned the definition of "behavioral health care services" and the types of expenses that were "expended for the provision of" those services and therefore count toward the 80% requirement.

A debate arose within AHCA as well as to the interpretation of the 80/20 statute. Certain officials and attorneys within AHCA believed the definition of "behavioral health care services" was clear from the face and text of the statute, while others within AHCA believed that certain words in the 80/20 statute were ambiguous and subject to varying interpretations. *See* Exhs. 6-7.[2]  For example, in April 2004, AHCA Assistant General Counsel Grant Dearborn prepared an internal legal opinion wherein he opined that the terms "expended for" and "provision of" in the 80/20 statute were "ambiguous." Exh. 7.  Notwithstanding this confusion, plans began submitting 80/20 filings in 2004.

### B.    The Plans' 80/20 Filings

Every year, AHCA compiles and distributes reporting templates to those HMOs that are subject to the 80/20 statute. *See* Exhs. 10, 12 & 14-15 at Exhs. A.  These templates include the amount of money (called a "capitation") that AHCA believes was allocated from AHCA to each HMO for the provision of behavioral health care services in that calendar year.  The capitation amount – the number provided to the plans by AHCA – is crucial because it becomes the "denominator" in the 80/20 calculation.  Although critical, this calculation is not simple and was subject to differing interpretations by AHCA and the industry.  For example, there was significant debate between AHCA and the industry as to whether the denominator should include payments attributable to pharmaceuticals, hospital claims, and other services that "relate to" behavioral health care even if not performed by a mental health provider (*e.g.*, a psychologist).

Calculating the "numerator" in the 80/20 calculation is equally difficult.  Whereas the denominator represents payments from AHCA to the HMOs, the numerator represents expenses incurred by the HMO "for the provision of behavioral health care services."  Therefore, each

---

[2] The HMOs, including WellCare, and FAHP agreed that the statutory definition of "behavioral health care services" was clear and could not be changed or limited by AHCA.

plan is required to calculate its own numerator. AHCA and the plans spent years discussing what could – and could not – be included in the 80/20 numerator. AHCA took the position that only a narrowly defined set of services could be included in the numerator, which would tend to result in a larger refund to the state. Many of the plans, however, interpreted the statute to allow additional services, consistent with industry practices and their contracts with AHCA.

In addition to what services and costs could be included, there was no guidance as to how the plans should determine their expenses from an organizational standpoint. The overwhelming majority of HMOs contract with "Behavioral Health Organizations" or "BHOs" – *i.e.*, companies that specialize in providing behavioral health services – to deliver their behavioral health services to patients. Many of those HMOs, like WellCare, may have used the payments to their BHOs as the basis by which they reported their 80/20 expenditures.[3] AHCA was well-aware of this possibility. As early as June 2002, AHCA staff asked, "[w]ho do we want the 80/20 from[?] The HMO's capitate [to] the BHO's [who] sub-capitate [to] the community mental health centers who perform the mentioned services." Exh. 8. These issues – whether it was reasonable for an HMO to include additional services and calculate its expenses on the basis of its payments to a BHO – will be important to this litigation. *See* Compl. ¶ 68 (alleging WellCare "falsely categoriz[ed] primary care expenses" and "padd[ed] mental health costs with a variety of other improper expenses"); *cf. id.* ¶¶ 60-62, 71-72.

## II.   Procedural History

### A.   Status of the Litigation

Lead Plaintiffs filed this action on October 26, 2007 – two days after federal and state officials executed a search warrant at WellCare's headquarters. On December 3, 2009, the Court

---

[3] Lead Plaintiffs appear to argue that when an HMO uses payments to a wholly-owned BHO (*e.g.*, WellCare's use of Harmony Behavioral Health) for purposes of reporting expenses, the HMO is engaging in "sham transactions designed to hide profits from the Company's state regulators." Compl. ¶¶ 60, 71 ("By forming a subsidiary and categorizing it as a provider, the Company could report all of the subsidiary's expenses – even administrative costs – as direct medical expenses.").

issued its Case Management Report and Scheduling Order requiring discovery to be complete by October 2010. Document discovery has begun. To date, the parties have issued 22 third-party subpoenas. At issue in this opposition are subpoenas issued to third-party HMOs that are subject to the 80/20 statute along with their respective BHOs. As discussed below, this discovery will bear on the industry's varied interpretations of the 80/20 statute and whether WellCare's interpretation was reasonable or – at a minimum – not "severely reckless."

**B.      Mr. Bereday's Public Records Request to AHCA**

Although discovery was stayed in this action pending resolution of defendants' motions to dismiss, Mr. Bereday's counsel spent two years pursuing information regarding the 80/20 statute. In late 2007, Mr. Bereday's counsel lodged the first of several public records requests with AHCA. Eggleton Decl. ¶ 13. Mr. Bereday's counsel has since lodged additional requests with other Florida agencies and related entities, including the Office of Insurance Regulation and the University of South Florida. After receiving documents from these sources, Mr. Bereday's counsel reviewed and analyzed them. As discussed below, these documents reflect that documents in the possession of the HMOs and BHOs are relevant to this case.

**C.      Buttner Hammock Audit**

Among the documents received from AHCA were materials pertaining to an audit of the 80/20 filings. This audit, conducted by Buttner Hammock & Company ("Buttner Hammock") for AHCA, appears to have commenced in fall 2007 – just weeks after the search warrant was executed at WellCare. Between December 2007 and early 2009, Buttner Hammock issued document requests, conducted site visits, and analyzed data submitted by at least nine different plans to determine how those plans sought to comply with the 80/20 statute.

Importantly, the audit only addressed the 80/20 submissions of these companies for calendar year 2006. Nevertheless, the materials Mr. Bereday's counsel has received from AHCA suggest that the plans applied different methodologies in reporting their expenses in their respective 80/20 submissions, *i.e.*, they applied varied interpretations of the 80/20 statute and

what could be included as expenses "expended for the provision of behavioral health services." Specifically, the Buttner Hammock audit materials reflect the following:

1.  *Preferred Medical Plan, Inc.*

Preferred submitted its 2006 report under the 80/20 statute to AHCA in March 2007. Preferred reported medical expenses of $995,996, resulting in a loss ratio of 85.82% and therefore no refund due to AHCA. Exh. 9.

For reasons that are unclear, AHCA allowed Preferred to submit a revised report for 2006 to AHCA in April 2008. Exh. 10 at 8 & Exh. B. The revised submission (prepared by Preferred after the raid on WellCare) reported much lower medical expenses, totaling only $463,288.11. *Id.* at Exh. B. In stark contrast to the original report – which resulted in no refund due to AHCA – the revised submission reported lower expenses and therefore resulted in a significant refund due to AHCA of $465,185.75. *Id.*

Mr. Bereday does not know from the AHCA materials what interpretation of the 80/20 statute Preferred applied in its original 2006 submission that resulted in no refund due to the Agency. Mr. Bereday also does not know what changes were made in the methodology applied by Preferred in the revised submission that resulted in a refund payment to AHCA, or how Preferred interpreted the 80/20 statute and reported its expenses in any other reporting year.

2.  *Vista Healthplan of South Florida, Inc. (VSF)*

The information Mr. Bereday has concerning VSF's 80/20 submissions is very similar to that of Preferred. VSF submitted its 2006 report under the 80/20 statute to AHCA in March 2007. VSF reported medical expenses of $1,049,192.28, resulting in a loss ratio of 91.53% and therefore no refund due to AHCA. Exh. 11.

As with Preferred, for reasons that are unclear, AHCA allowed VSF to submit a revised report for 2006 to AHCA in April 2008. Exh. 12 at 7 & Exh. B. The revised submission (prepared by VSF after the raid on WellCare) reported much lower medical expenses, totaling only $597,238. *Id.* at Exh. B. In stark contrast to the original report – which resulted in no refund due to AHCA – the revised expenses resulted in a refund due to AHCA of $325,795. *Id.*

Mr. Bereday does not know from the AHCA materials what interpretation of the 80/20 statute VSF applied in its original submission that resulted in no refund due to AHCA. Mr. Bereday also does not know what changes were made in the methodology applied by VSF in the revised submission that resulted in a refund payment to AHCA, or how VSF interpreted the 80/20 statute and reported its medical expenses in any other reporting year.

    *3.*    *Vista Healthplan, Inc. (Vista) d/b/a Buena Vista*

The information Mr. Bereday has concerning Vista's 80/20 submissions is very similar to that of Preferred and VSF. Vista submitted its 2006 report under the 80/20 statute to AHCA in March 2007. Vista reported medical expenses of $2,208,735.69, resulting in a loss ratio of 88.28% and therefore no refund due to AHCA. Exh. 13.

As with Preferred and VSF, for reasons that are unclear, AHCA allowed Vista to submit a revised report for 2006 to AHCA in April 2008. Exh. 14 at 7 & Exh. B. The revised submission (again, prepared after the raid on WellCare) reported much lower medical expenses, totaling only $1,660,920. *Id.* at Exh. B. In contrast to the original report – which resulted in no refund due to AHCA – the revised expenses resulted in a refund due to AHCA of $394,484. *Id.*

Mr. Bereday does not know from the AHCA materials what interpretation of the 80/20 statute Vista applied in its original submission that resulted in no refund due to AHCA. Mr. Bereday also does not know what changes were made in the methodology applied by Vista in the revised submission that resulted in a refund payment to AHCA, or how Vista interpreted the 80/20 statute and reported its medical expenses in any other reporting year.

    *4.*    *Citrus Health Care, Inc.*

Citrus submitted its 2006 report under the 80/20 statute to AHCA in early April 2007. Citrus reported medical expenses of $967,427.78, resulting in a loss ratio of 80.33% and, therefore, no payment due to AHCA. Exh. 15 at Exh. B. Buttner Hammock appears to have concluded that Citrus reported dramatically more medical expense than it was entitled to under AHCA's interpretation of the 80/20 statute.

The most significant difference was Citrus' inclusion of over $600,000 in pharmacy

expenses. *Id.* at 8. Buttner Hammock reports that Citrus' inclusion of those pharmacy expenses was inconsistent with AHCA's interpretation of the 80/20 statute. *Id.* During the audit, Citrus submitted an amended 80/20 filing for calendar year 2006 to AHCA along with a refund check of $373,814.91, explaining that it had "included pharmacy costs and certain other claims that may not have been allowable as 'behavioral health services' . . . . On the other hand, Citrus did not credit itself with outpatient and inpatient hospital claims in the original 2006 submission." Exh. 16. Despite amending its 80/20 filing in February 2009 (16 months after the raid on WellCare), Buttner Hammock concluded that Citrus' amended filing was inconsistent with AHCA's interpretation of the 80/20 statute and that Citrus owed an additional $357,981 (bringing the total refund to $731,796). Exh. 15 at 2.

Mr. Bereday does not know from the AHCA documents how Citrus interpreted the 80/20 statute and reported its medical expenses to AHCA in any other reporting year.

\*     \*     \*

As reflected by the above, the AHCA materials suggest the plans affected by the 80/20 statute reached different interpretations of the 80/20 statute than AHCA. As explained below, an understanding of these plans' interpretation of the statute is relevant to the defense of this case.

### D.  The Subpoenas

On January 19 and 29, 2010, Mr. Bereday's counsel issued thirteen subpoenas *duces tecum* to the HMOs subject the 80/20 statute, and the BHOs used by those plans, and the Prepaid Mental Health Plans (Florida Health Partners and Lakeview Center) (the "PMHPs"), which Mr. Bereday believes are subject to similar requirements. Each subpoena was tailored to the particular plan (based on the information obtained from AHCA) and each sought the following categories of documents: copies of the plans' 80/20 filings with AHCA (and any amended filings); documents sufficient to show the methodology used to calculate those filings; any alternative methodologies considered by the plan; any correspondence between the plans and AHCA regarding the 80/20 statute; the underlying "encounter data" that AHCA used to corroborate the plans' 80/20 filings; and BHO contracts.

*1.     January 19, 2010 Subpoenas*

Subpoenas were issued on January 19, 2010 to eight HMOs with a return date of February 16, 2010.  The last day to object to these subpoenas was February 4, 2010.  Those initial HMOs included the following entities.

*Preferred*:  Preferred was hand-served with the subpoena on January 21, 2010.  Preferred did not timely issue a written objection to the subpoena pursuant to Rule 45.  Eggleton Decl. ¶ 8.  On February 3, 2010, Bradley Seldin of the Ziegler law firm contacted Mr. Bereday's counsel on behalf of Preferred, Vista of South Florida, Vista Healthplan, and Amerigroup to meet and confer regarding the scope of the subpoenas.  *Id.* ¶ 5.  The parties continued their discussions on February 11, during which Mr. Bereday's counsel agreed to limit certain requests and provide a copy of the protective order entered in this case.  *Id.* ¶ 6.

On February 16, Preferred moved to quash the subpoena.[4]  In their amended motions to quash, filed the next day, Preferred and the Vista plans each state that "[p]ursuant to Local Rule 3.01(g), undersigned counsel conferred with the attorneys who issued the Subpoena for Defendant Bereday, but was unable to come to an agreement regarding the documents sought by the Subpoena."  *See* Preferred Motion ¶ 8.  While it is true that the parties began the meet and confer process, Mr. Bereday's counsel disagrees that the parties were "unable to come to an agreement," as discussions were ongoing.  Eggleton Decl. ¶ 7.

*VSF/Vista*:  VSF and Vista were each hand-served with the subpoenas on January 21, 2010.  Neither served timely written objections to the subpoenas.  *Id.* ¶ 8.  As discussed above, there were meet and confer discussions with the Ziegler firm, which Mr. Bereday's counsel believed were ongoing.  *Id.* ¶ 6. On February 16, the Vista plans moved to quash the subpoenas.

---

[4] Because the subpoenas to Preferred, VSF and Vista were issued out of the Southern District of Florida, these motions to quash are improper.  *See In re Subpoenas Served on Wilmer, Cutler & Pickering and Goodwin Proctor LLP*, 255 F. Supp. 2d 1, 1-3 (D.D.C. 2003).  However, to preserve judicial resources, Mr. Bereday does not oppose having this Court decide the motions.

*Citrus Health Care*:  Citrus was hand-served with the subpoena on January 21, 2010.
Citrus did not timely issue a written objection to the subpoena pursuant to Rule 45.  Eggleton
Decl. ¶ 10.  On January 22, Citrus' counsel, Robert Harding, contacted Mr. Bereday's counsel
regarding the subpoena.  Mr. Harding did not attempt to narrow its scope.  Although Mr.
Bereday's counsel had offered to consider limiting the scope of the subpoena, Citrus did not
contact Mr. Bereday's counsel again before filing its motion.  *Id.*

> 2.    *January 29, 2010 Subpoenas*

On January 29, 2010, additional subpoenas were issued to the PMHPs and the BHOs
used by the HMOs, including PsychCare, LLC.  PsychCare is not a managed care plan.  It is one
of the BHOs with whom the plans (including the two Vista health plans, as well as Preferred and
Humana) contracted to provide behavioral health services.  PsychCare was hand-served with the
subpoena on February 1, 2010.  On February 10, PsychCare filed objections with the Court and,
on February 15, moved to quash the subpoena.  At no point did PsychCare meet and confer with
Mr. Bereday's counsel prior to filing its motion.  *Id.* ¶ 12.

## ARGUMENT

**I.    The Subpoenas Seek Relevant Information and Documents**

The scope of third party discovery under Rule 45 "is governed by Rule 26, which allows
'discovery regarding any matter, not privileged, which is relevant to the subject matter of the
pending litigation.'"  *Auto-Owners Ins. Co. v. Se. Floating Docks, Inc.*, 231 F.R.D. 426, 430
(M.D. Fla. 2005) (M.J. Glazebrook) (quoting Fed. R. Civ. P. 26(b)(1)).  "The term 'relevant' is
'construed broadly to encompass any matter that bears on, or that reasonably could lead to other
matter that bears on, any issue that is or may be in the case.'"  *Id.* (quoting *Oppenheimer Fund,
Inc. v. Sanders*, 437 U.S. 340, 351 (1978), citing *Hickman v. Taylor*, 329 U.S. 495, 501 (1947));
*Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985) ("The Federal Rules
of Civil Procedure strongly favor full discovery whenever possible.").

### A.     Lead Plaintiffs' Claims

Lead Plaintiffs allege that WellCare, acting through the individual defendants, violated

Section 10(b) of the Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.  15 U.S.C.

§ 78j(b); 17 C.F.R. § 240.10b-5.  To prevail, Lead Plaintiffs must prove the following: "(1) a

material misrepresentation or omission; (2) made with scienter; (3) a connection with the

purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss;

and (6) a causal connection between the material misrepresentation or omission and the loss.  *See*

*Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir. 2008).[5]

As discussed below, the discovery sought by Mr. Bereday's subpoenas is relevant to the

first two elements – *i.e.*, whether WellCare made a material misrepresentation or omission, and

whether any such statement was made with scienter.  In the Eleventh Circuit, "scienter" means

"intent to deceive, manipulate, or defraud" or "severe recklessness."  *Mizzaro*, 544 F.3d at 1238

(internal quotation marks and citation omitted).  "Severe recklessness" is "'limited to those

highly unreasonable omissions or misrepresentations that involve not merely simple or even

inexcusable negligence, but an extreme departure from the standards of ordinary care, and that

present a danger of misleading buyers or sellers which is either known to the defendant or is so

obvious that the defendant must have been aware of it.'"  *Id.* (citation omitted).

### B.     Information and Documents Regarding The Industry's Interpretation and Compliance with the 80/20 Statute Are Relevant

A core issue in this litigation will be the interpretation of the 80/20 statute.  Lead

Plaintiffs will take the position that WellCare violated the securities laws based on WellCare's

80/20 filings and WellCare's related interpretation of the statute.  Critically, AHCA's documents

suggest that, like WellCare, other plans may have believed they could calculate their 80/20

"numerator" by using the amounts paid to their respective BHOs – the very methodology that

---

[5] Lead Plaintiffs have not asserted a Section 10(b) claim against Mr. Bereday.  However, to prevail on their Section 20(a) claims against him, Lead Plaintiffs must first establish an underlying violation of Section 10(b) by WellCare.  *Mizzaro*, 544 F.3d at 1237.

Lead Plaintiffs describe as a "scheme" by WellCare to defraud the state (Compl. ¶ 3) – and by including additional expenses, such as mental health pharmaceuticals. AHCA's documents do not, however, reflect the methodologies used by the plans between 2004 and 2007; rather, Buttner Hammock focused on the amended filings submitted by the plans in 2008 and 2009. Among other things, the subpoenas issued by Mr. Bereday seek to fill this gap.

The requested documents and information unquestionably relate to the meaning of the 80/20 statute. It is established that, in addition to considering the intent of the legislature, "it is important to know how people affected by an act understand it." *See* Norman J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 49:1 (7th ed. 2008) ("Sutherland"); Oliver Wendell Holmes, The Theory of Legal Interpretation, 12 Harv. L. Rev. 417, 419 (1898-99) ("We do not inquire what the legislature meant; we ask only what the statute means."). Indeed, "circumstances and situations developing after enactment of a statute may be of great or even conclusive significance to determine what meaning was conveyed." Sutherland § 49:1. "[C]ontemporaneous and practical interpretation of a statute by . . . the public constitutes an invaluable aid to determine the meaning of a doubtful statute. For example, the meaning of a term in a tax statute derives from the accounting profession, to the extent the meaning is influenced by the underlying reason and basis for the accounting principle." *Id.* § 49:3 (citing *Xtra, Inc. v. Comm'r of Revenue*, 402 N.E.2d 1324 (1979)). If WellCare's interpretation of the 80/20 statute was correct, then Lead Plaintiffs cannot demonstrate the first element of a Section 10(b) claim, *i.e.*, that WellCare made a material misrepresentation.

In addition to the meaning of the statute, this discovery concerning how other companies reported to AHCA under the 80/20 statute will demonstrate that WellCare's interpretation of the 80/20 statute was reasonable and, therefore, defeat any claim that defendants "intended to deceive" – or acted with "severe recklessness" in deceiving – the state of Florida. *Nelson v. All Am. Life & Fin. Corp.*, 889 F.2d 141, 150 (8th Cir. 1989) ("Where there is honest disagreement over an act or omission's legality because the directly controlling law is unclear or ambiguous, complete disregard will usually not be found."); *Funke v. Life Fin. Corp.*, 237 F. Supp. 2d 458,

468-69 (S.D.N.Y. 2002) (no scienter where "the accounting principle on which plaintiffs rely was not a long-standing, well-recognized rule"); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 567 (S.D.N.Y. 2004) (no scienter where "the applicable accounting principle might be simple, *i.e.*, whether all the risks and rewards of ownership transferred upon shipment of the goods, [but] the application of that principle to the facts is complex"); *Decicco v. United Rentals, Inc.*, 602 F. Supp. 2d 325, 342 (D. Conn. 2009) (no scienter where the text of the Agreement was susceptible of two reasonable interpretations).

## II.    The Subpoenas Are Not Unduly Burdensome

Citrus, Preferred, Vista, VSF, and PsychCare (collectively, "Movants") have moved the Court for orders quashing the respective subpoenas *duces tecum* on the grounds that they constitute an undue burden.  Rule 45(c)(3) allows courts to quash or modify a subpoena if it "subjects a person to undue burden."  Fed. R. Civ. P. 45(c)(3)(A)(iv).  However, Movants must meet "the heavy burden" of establishing that compliance with the subpoena would be "unreasonable and oppressive."  *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C. Cir. 1984) (denying motion to quash where "assertion that many of the documents sought by the subpoena will be privileged" did not "adequately demonstrate that applicable privileges would in fact protect these documents"); *Donahay v. Palm Beach Tours & Transp.*, 242 F.R.D. 685, 687 (S.D. Fla. 2007) ("[T]he onus is on the party resisting discovery to demonstrate specifically how the objected-to request is unreasonable . . . .").

### A.    Movants Have Failed to Carry Their Burden to Establish Compliance with the Subpoenas Would Be "Unreasonable and Oppressive"

Movants have not carried their "heavy burden" to establish that compliance would be "unreasonable or oppressive."  *Northrop*, 751 F.2d at 403.  Not one of these plans submitted any evidence, by affidavit or otherwise, that supports such a claim.  *See Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1211 (Fed. Cir. 1987) ("Having moved under Rule 45(b), Hydro-Air nonetheless made only the bald statement that the subpoena is 'unreasonable and oppressive,' submitting no affidavit and no evidence at the hearing . . . .  Arguments of counsel

-13-

are not evidence."); *L.M.P. v. Sch. Bd.*, No. 05-60845, 2009 WL 2578987, at *4 (S.D. Fla. Aug. 18, 2009) (third party "must 'show specifically how, despite the broad and liberal construction afforded the federal discovery rules, . . . each question is overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden.'") (alteration in original) (internal quotation marks omitted) (quoting *Lane v. Capital Acquisitions*, 242 F.R.D. 667, 670 (S.D. Fla. 2005)).[6]

On the contrary, there is nothing "unreasonable or oppressive" about these subpoenas. As a threshold matter, the time for compliance -- more than 30 days – was reasonable. *Auto-Owners*, 231 F.R.D. at 428 (finding adequate time where "subpoenas were served by mail on August 17, 2005, with a deposition and document production date of September 7, 2005"). More importantly, the scope of these subpoenas – when taken in context – is eminently reasonable.

### 1.   *Preferred Medical Plan & Vista Health Plans*

Preferred and the two Vista plans are represented by common counsel, the Ziegler firm, which filed virtually identical motions on behalf of the three entities. Preferred claims "the Subpoena fails to allow a reasonable time to comply to Requests # 2, 3, 4, 5, 6, 7, 8, and 9. It is estimated that it will take 60 days to search, identify, and gather any responsive documents to this request." Preferred Motion ¶ 2. The Vista plans claim it will take 90 days to do so. Vista Motion ¶ 2. Both assertions are dubious and, in any event, unsupported by any evidence. In fact, the requests target nine discrete categories of documents that are readily identifiable. Exhs. 1-3.

Request No. 1 seeks contracts between the plans and PsychCare. *Id.* As explained to the Ziegler firm, Mr. Bereday's counsel has obtained the April 1, 2006 contract through its public

---

[6] *See also Fin. Bus. Equip. Solutions, Inc. v. Quality Data Sys., Inc.*, No. 08-60769, 2008 WL 4663277, at *2 (S.D. Fla. Oct. 21, 2008) ("[P]at, generic, non-specific objections . . . are inconsistent with both the letter and the spirit of the Federal Rules of Civil Procedure."); *Micron Tech., Inc. v. Tessera, Inc.*, No. C06-80093, 2006 WL 1646132, at *2 (N.D. Cal. June 14, 2006) ("[Movant] makes familiar arguments about the unfair burden of producing any of the information sought [but] offers no evidence (i.e. facts, figures, time estimates), and the court is unpersuaded.") (footnote omitted).

records requests to AHCA and, therefore, any assertion of privilege (Preferred Motion ¶ 3) is baseless. In any event, any information produced in this litigation is subject to the protective order entered by the Court on January 25, 2010. Similarly, Request No. 4 seeks "[d]ocuments sufficient to show, by calendar year, all amounts paid by [the plan] to Psychcare." Exhs. 1-3. A single spreadsheet could satisfy this request.

Request No. 2 seeks the 80/20 filings submitted once a year by the plans to AHCA. *Id.* Because the 80/20 statute was passed in 2002, the 80/20 filings themselves will likely be fewer than ten documents. Similarly, Request No. 5 seeks the worksheets used to calculate the numerator for each 80/20 filing. *Id.* During the meet and confer, Mr. Bereday's counsel narrowed this request to "documents sufficient to show" rather than "all documents relating to." Because the plans prepared these calculations once a year since 2002 (at the earliest), there is unlikely to be a burdensome number of responsive documents. It is implausible that it would take 60-90 days to locate the annual 80/20 filings or the accompanying worksheets or that there is any great burden in producing fewer than 50 pages of documents.

Request No. 3 seeks correspondence with AHCA relating to the 80/20 statute. *Id.* It is unlikely that a complete response to this request consists of more than a handful of letters, faxes, and emails for each entity. Preferred and Vista both suggest that "[a]ll requests which seek documents submitted to AHCA should be obtained directly from AHCA under Florida's 'Sunshine Law.'" Preferred Motion ¶ 6; Vista Motion ¶ 6. As explained to the Ziegler firm and described above, Mr. Bereday has already received documents from AHCA. For whatever reason, Mr. Bereday's counsel has not received it all, and it is possible AHCA has failed to maintain or produce a complete record of all this correspondence despite the requirements of the Florida Sunshine Laws. In any event, the fact that information may be available from one source does not preclude Mr. Bereday from obtaining similar information from a different source. *See Cent. Transp. Int'l, Inc. v. Global Advantage Distrib., Inc.*, No. 2:06-CV-401-FtM-29SPC, 2007 WL 3124715, at *2 (M.D. Fla. Sept. 11, 2007) ("[M]erely because an item may be available from another source is not a proper objection."). Request No. 6 seeks documents relating to any

audits of the plans' 80/20 filings, including the documents and information already provided to Buttner Hammock and any related correspondence. Exhs. 1-3. Assuming there was a single audit, the documents responsive to this request would likely reside in a single file and with a small number of custodians at each plan.

Request No. 7 seeks encounter data submitted to AHCA relating to the plan's 80/20 filings. *Id.* Because these are discrete submissions, it is likely that this data resides on a single CD (for each year) or would be accomplished by a simple data pull using standard industry software. To the extent the plans demonstrate otherwise – or that complying with HIPPA would be unduly burdensome – Mr. Bereday's counsel would be willing to narrow (or withdraw) these requests.

Request No. 8 seeks all documents relating to the premiums received from AHCA for the provision of behavioral health services, *i.e.*, the "denominator" used in the 80/20 filing. *Id.* It is possible the only documents responsive to this request are the templates sent annually by AHCA to each plan. However, to the extent the plans calculated the amount themselves or determined that AHCA's calculations were incorrect, such documents would be responsive as well. In any event, there is no basis for asserting undue burden with respect to this request.

Request No. 9 seeks documents relating to any negotiations with BHOs (other than PsychCare) for the provision of behavioral health services. *Id.* If there were no other negotiations, there are no responsive documents. If there were such discussions, responding to this request would require the production of, at most, a handful of proposals, draft agreements and emails.

2.    *Citrus*

The subpoena issued to Citrus is substantially identical to those discussed above, with the exception of Request No. 6. This request is specific to Citrus, which – as suggested in the AHCA documents – appears to have included "pharmacy expenses" in calculating its numerator. Exh. 4. This request is limited to documents analyzing this narrow issue, if any such documents exist.

### 3.    *PsychCare*

The subpoena issued to PsychCare does not represent an undue burden. Request No. 1 seeks documents relating to WellCare. Exh. 5. PsychCare may have none. Request No. 2 seeks the contracts between PsychCare and the HMOs. *Id.* It is possible that there are only four such contracts. Requests Nos. 3, 4, 5, and 6 each request "documents sufficient to show" discrete categories of information by calendar year and, therefore, can be satisfied by the generation of a single spreadsheet for each request. *Id.* Request No. 7 requests documents related to the 80/20 statute, including any correspondence with AHCA regarding the statute. *Id.*

In light of the limited nature of these requests, PsychCare's representation to the Court that the subpoena "is limitless in time and practically limitless in documents" is simply not true. PsychCare Motion ¶ 5. Similarly, PsychCare's assertion of privilege is unsubstantiated. Although PsychCare claims "a reasonable expectation of privacy regarding its business transactions with all parties that it deals with" (*id.* ¶ 6), it does not address the fact that many of those "transactions" are available for public inspection and copying at AHCA. Furthermore, PsychCare has not cited any authority to suggest that any such "reasonable expectation of privacy" would override the Court's discovery requirements. Finally, PsychCare makes no effort to distinguish between information in which some claim of protection arguably remains and information that is publicly available.

*    *    *

For the foregoing reasons, each of the subpoenas at issue here are reasonable on their face. It is especially telling that these same plans did not object to – or seek judicial protection from – the audit conducted by Buttner Hammock on these very issues. Indeed, those audits sought many of the same documents and information through document requests, site visits, and employee interviews. Because the plans were able to make such information available to Buttner Hammock, there is nothing "oppressive" about complying with these subpoenas.

**B.      The Other Factors Considered By Courts Weigh In Favor of Discovery**

While the discovery sought is plainly relevant and reasonable, Mr. Bereday and his counsel recognize that "otherwise reasonable" discovery requests may be limited for a variety of reasons.  For example, courts may limit discovery (typically, by protective order) "'when (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had the opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, and the importance of the proposed discovery in resolving issues.'" *Auto-Owners*, 231 F.R.D at 430 (quoting Fed. R. Civ. P. 26(b)(2)).

Here, there is no basis for limiting the discovery requests.  First, although some of this information has been obtained from AHCA (*e.g.*, documents relating to 2006), it is by no means complete.  For example, AHCA would not have documents identifying the methodologies used by the plans in 2002, 2003, 2004, 2005, 2007, or 2008.  Moreover, after two years of engaging AHCA, and after repeated attempts to assist the Agency in locating missing or otherwise non-produced information, it is not "more convenient, less burdensome, or less expensive" to obtain this information from the Agency.  Second, Mr. Bereday cannot obtain this information from the parties.  Neither Lead Plaintiffs nor WellCare have documents reflecting the methodologies used by other plans.  Finally, the marginal burden placed on these plans does not outweigh its benefit to Mr. Bereday and the other defendants, who are defending themselves against claims in which Lead Plaintiffs are seeking hundreds of millions of dollars and asserting that these individuals defrauded WellCare's investors and the State of Florida.

Finally, PsychCare and Citrus ask the Court to limit the discovery sought by Mr. Bereday's subpoenas because they claim to "[have] no interest in the outcome" of this case.  PsychCare Motion ¶ 4; Citrus Motion at 4 ("[Citrus] has no interest whatsoever in the underlying action").  Although these entities might prefer otherwise, the HMOs subject to the 80/20 statute –

and the BHOs who provide the behavioral health services – are unquestionably interested in this litigation.  In fact, Citrus acknowledges that by producing documents in this litigation, "it could perhaps expose itself to future liability."  Citrus Motion at 4.

## III.   Any Objections Were Waived By Failing to Timely Object

In addition to the reasons set forth above, the motions to quash by Citrus, Preferred, VSF and Vista should be denied on the independent ground that these entities failed to timely object. Rule 45 is clear: "A person commanded to produce documents . . . may serve on the party or attorney designated in the subpoena a written objection . . . . The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served."  Fed. R. Civ. P. 45(c)(2)(B).  As explained by former Magistrate Judge Glazebrook:

> Although the Eleventh Circuit has not addressed the issue of waiver of privileges for documents subpoenaed pursuant to Rule 45, the rule[] itself requires both that an objection be made to the subpoena and the claim of privilege must be stated within 14 days of service of the subpoena. Fed. R. Civ. P. 45(c)(2)(B).  *See also Tuite v. Henry*, 98 F.3d 1411, 1416 (D.C. Cir. 1996).  ***Failure to serve written objection to a subpoena within the time specified by Fed. R. Civ. P. 45 typically waives any objections the party may have.***

*Universal City Dev. Partners, Ltd. v. Ride & Show Eng'g, Inc.*, 230 F.R.D. 688, 697 (M.D. Fla. 2005) (emphasis added); *see also Madeline L.L.C. v. Street*, No. 09-80705, 2009 WL 1563526, at *1 (S.D. Fla. June 3, 2009) ("'[F]ailure to object within the fourteen-day period usually results in waiver of the contested issue.'") (citation omitted).

Here, it is undisputed that the subpoenas to Citrus, Preferred, and the two Vista plans were properly served on January 19, 2010.  It is also undisputed that these plans failed to submit any written objections within 14 days.  Eggleton Decl. ¶¶ 8, 10.  Indeed, Preferred and the Vista plans acknowledge they failed to timely object, but ask the Court to allow untimely objections "to the Subpoena because it is overbroad on its face and exceeds the bounds of fair discovery." *See* Preferred Motion ¶ 5; Vista Motion ¶ 5.

Notably, these plans do not offer any excuse for their failure to timely object.  If the plans truly believed the subpoenas were "overbroad on [their] face," the proper response was to serve objections within 14 days of receiving the subpoenas.  Had they done so, the parties would have

had additional time to allow the mandatory meet and confer process to accomplish its purpose: avoiding needless motion practice.  Rather than follow the requirements of Rule 45, however, the plans contacted Mr. Bereday's counsel on the eve of their production deadlines before filing these unnecessary motions.  In any event, as explained above, the subpoenas are not overbroad on their face and, instead, are reasonably calculated to discover documents and information that bear on the issues of this case.  *Auto-Owners*, 231 F.R.D. at 430.

## CONCLUSION

For the foregoing reasons, Mr. Bereday respectfully requests that this Court deny the motions to quash.

Dated:  March 4, 2010

Respectfully submitted,

By: /s/ Keith E. Eggleton
Keith E. Eggleton (admitted *Pro Hac Vice*)
Dale R. Bish (admitted *Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
keggleton@wsgr.com

Jack Fernandez,
Florida Bar No. 843751
ZUCKERMAN SPAEDER, LLP
101 East Kennedy Blvd., Suite 1200
Tampa, FL 33602
Telephone: (813) 321-8215
Facsimile: (813) 223-7961
jfernandez@zuckerman.com

Counsel for Defendant
THADDEUS BEREDAY

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send an electronic notice to all counsel of record who are registered to receive electronic notices. I further certify that I mailed the foregoing document and the notice of electronic filing by first class mail to the following non-CM/ECF participants: NONE.

/s/ Keith E. Eggleton

Keith E. Eggleton
Attorney